**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE REPUBLIC OF ARGENTINA )<br><br>)<br><br>)<br><br>Petitioner, )<br><br>)<br>-against- )<br><br>)<br><br>)<br><br>)<br>BG GROUP PLC. )<br><br>Respondent**.** )<br><br>)<br><br>)<br><br>)<br><br>) | **Case No. 08-0485 (RBW)**<br><br><br>**PETITION TO VACATE OR MODIFY<br>ARBITRATION AWARD** |

Petitioner, the Republic of Argentina by its attorneys, Gleason & Koatz, LLP respectfully

states:

## THE PARTIES

1.      Petitioner is the Republic of Argentina ("Argentina") acting through the

Procuración del Tesoro de la Nación (Office of the Attorney General) whose principal office is

located at Posadas 1641, Buenos Aires, C.P. 1112, Republic of Argentina.

2.      Respondent BG Group Plc. ("BG") is a British corporation located at 100 Thames

Valley Park  Drive, Reading Berkshire, RG6 1PT, in the United Kingdom.

3.      Petitioner seeks to vacate or modify that certain award (the "Award") dated

December 24, 2007 rendered pursuant to arbitration (the "Arbitration") that resulted in a

substantial monetary award in favor of BG and against Argentina (a copy of the Award is

annexed hereto as **Exhibit A**).

## JURISDICTION

4.      This court has jurisdiction over each of the parties and the subject matter of this Petition pursuant to 9 U.S.C. §§ 201 et seq. because Argentina and BG agreed that Washington, D.C. would be the seat of the Arbitration and of the final award, and they conducted the Arbitration hearing within New York City and Washington, D.C. in July 2006 pursuant to the United Nations Commission on International Trade Law Arbitration Rules (UNCITRAL Arbitration Rules) (9 U.S.C. §201).

5.      This court has jurisdiction to vacate or modify the Award pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 10(a) and 11, which states in pertinent part:

> **Section 10(a)**: In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration:
>
> (1) Where the award was procured by corruption, fraud, or undue means.
>
> (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
>
> (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
>
> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
>
> (5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.
>
> **Section 11**: In either of the following cases the United States court in and for the district wherein the award was made may make an

order modifying or correcting the award upon the application of any party to the arbitration

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

## THE ARBITRATION – PROCEDURAL HISTORY

6.      On April 25, 2003 BG served upon Argentina a Notice of Arbitration (**Exhibit B**).

7.      BG nominated as arbitrator Albert Jan van den Berg ("Berg"). Argentina nominated Alejandro M. Garro ("Garro"). Berg and Garro selected Guillermo Aguilar Alvarez as the third arbitrator and President of the Arbitral Tribunal so constituted. The Arbitral Tribunal was formally constituted on June 22, 2004.

8.      BG filed and served its Statement of Claim dated February 7, 2005.

9.      Argentina filed and served its Answer dated November 7, 2005.

10.     The Arbitral Tribunal conducted a preliminary conference in New York on October 29, 2004. It issued a scheduling order dated November 8, 2004 that scheduled a hearing for January 30 through February 6, 2006. In fact, the hearing occurred in Washington, D.C. on July 5, 6, 7, 10, 11, 12, 13 and 14, 2006.

11.     On December 24, 2007, the Arbitral Tribunal issued the Award in favour of BG and against Argentina in the amount of $185,285,485.85, which amounts to 78% of the amount BG had claimed), together with costs and attorneys' fees of $1,302,623 and £2,414,141.10, plus

interest from January 6, 2002 until the date the Award is paid (or a total of $186,588,108.85 plus £2,414,141.10).

12.     Argentina was notified of the Final Award on December 24, 2007.

## FACTUAL BACKGROUND

13.     The claims raised in the Arbitration between the parties to the proceedings were allegedly based on the Bilateral Investment Treaty by and between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic of Argentina for the Promotion and Protection of Investments of 11 December 1990 (the "Argentina-U.K. BIT", or the "BIT").

14.     The complex facts in this case are compounded by the events that took place in Argentina before and subsequent to the execution of the BIT.

## I.  PRIVATIZATION

15.     In 1989, Argentina enacted necessary economic measures, as part of a wide reformation process, to reduce inflation and the public deficit. Law 23.696 of 17 August 1989 provided, inter alia, for the privatization of certain state owned companies in many sectors including the gas transportation and distribution industry - Gas del Estado, Sociedad del Estado (Gas del Estado), electricity, telecommunications, and water and sanitation.

16.     The restructuring of the gas industry for the purpose of its privatization was set forth in Decree 48/91, Decree 633/91, Law 24.076 (the Gas Law) and Decree 1738/92 (the Gas Decree).

17.     In 1991, Argentina enacted Law 23.928 of 27 March 1991 (the Convertibility Law), which established a 1 to 1 fixed parity between the Argentine peso and the U.S. dollar.

18.     The assets of Gas del Estado were divided into two transportation companies and eight distribution companies. One of the gas distribution companies was Distribuidora de Gas Metropolitana S.A. This entity's corporate name subsequently changed to MetroGAS.

19.     Pursuant to Resolution 874/92 of 12 July 1992, an international public tender was called for in order to sell a controlling interest in the transportation and distribution companies.

20.     Gas Argentino, S.A. (GASA) was the successful bidder for the 70% ownership interest of MetroGAS. GASA, a consortium of investors consisting of BG, Compañía Naviera Pérez Companc S.A. Comercial, Financiera, Inmobiliaria, Minera, Forestal y Agropecuaria (Pérez Companc), Astra Compañía Argentina de Petróleo S.A. (Astra) and Invertrad S.A. (the Initial Shareholders) was formed for the sole purpose of holding this ownership interest.

21.     BG's initial 41% interest in GASA increased on August 11, 1998 when it acquired an additional 13.67% interest via a transfer from Pérez Companc through British Gas International BV, its wholly owned subsidiary (BG International).

## II.   THE LICENSE

22.     On December 21, 1992, the then Argentine President issued Decree 2459/92, which granted the predecessor of MetroGAS a 35-year exclusive license (the "MetroGas License") to distribute natural gas in the City of Buenos Aires and the southern and eastern greater metropolitan Buenos Aires area.

23.     Pursuant to its terms the MetroGAS License is governed by the laws of Argentina.

24.     The MetroGAS License provided that tariffs would be calculated in U.S. dollars and expressed in pesos, within the framework of the Convertibility Law.

25.     Under the adjustment provisions of the MetroGAS License, tariffs would be adjusted every six months in accordance with the U.S. PPI (the "U.S. PPI Adjustment");

26.     MetroGAS was entitled to a review every five years to maintain tariffs at a level sufficient to provide a reasonable rate of return after covering costs, taking into account the licensees efficiencies and investments (the "Five Year Review"); and

27.     Beyond the Five Year Review, MetroGAS could also request an "extraordinary review" based summarily on "objective and justified" grounds (the "Extraordinary Review").

### III.   THE ECONOMIC CRISIS AND STATE OF NECESSITY

28.     During the decade of 1990, Argentina was seen as a model of successful policymaking. By pegging its exchange rate to the U.S. dollar under a currency board type arrangement in 1991, Argentina ended hyperinflation, reducing inflation rates to single-digit levels. The World Bank in 1998 rated Argentina second only to Singapore among emerging markets in the quality of its bank supervision (Perry and Serven 2002). Greater economic stability attracted foreign investment, which contributed to acceleration in economic growth.[1]

29.     The collapse of the Brazilian currency – among several external shocks that severely affected the Argentine economy - led to sharp declines in export revenues, and economic growth was negative for three years in a row.

30.     In 2001, a run on Argentine banks occurred causing Argentine central bank reserves to fall by $500 million in one day, and as a result, the Argentine government imposed a $1,000 per month limitation on personal bank withdrawals.

31.     Subsequently, the IMF withheld from Argentina a $1.24 billion loan instalment.

---

[1] Learning from Argentina's Crisis, Federal Reserve Bank of San Francisco, ECONOMIC LETTER 2002

32.     Riots and upheavals dominated Argentina and five Presidents took office within a period of 12 days.

33.     On December 24, 2001, Argentina announced it could no longer guarantee payment on foreign debt.

34.     As a result of the entire situation, on January 6, 2002, Argentina enacted the Emergency Law, declaring a state of emergency throughout the country.

35.     In 2002, Argentina faced inflation of over 70% and an economic contraction that rivalled the Great Depression that struck the United States.[2]

36.     In facing the worst recession of its history, the Argentine government adopted a series of policies and measures (the "Measures") to bring stability back to the country. Among other measures, the Emergency Law:

a.                          terminated the currency board established by the Convertibility Law which had pegged the peso to the dollar (parity between the peso and the U.S. dollar had been destroyed already by market forces);

b.                          set aside dollar denominated adjustment clauses converting dollar-denominated agreements under Argentine law into peso-denominated agreements;

c.                          eliminated the U.S. PPI adjustment mechanism by prohibiting indexation clauses tied to international price indices, and

d.                          converted dollar denominated tariffs into pesos at the rate of one peso to one U.S. dollar.

## IV.  THE ARBITRATION

---

[2] Learning from Argentina's Crisis, Federal Reserve Bank of San Francisco, ECONOMIC LETTER 2002

37.     BG's claims in the Arbitration focused on the argument that the Measures damaged MetroGAS and caused economic loss:

> In short, as a result of [the] Measures, MetroGAS's business is no longer viable. MetroGAS's tariff revenue is no longer sufficient to cover its costs and provide a reasonable rate of return, as promised in the Regulatory Framework. Some three years after the January 2002 Law was enacted, the absence of a renegotiated Licence or material tariff increase means that MetroGAS remains in a critical financial condition and at the mercy of its creditors.

38.     BG further alleged that Argentina had breached the following provisions of the Argentina-U.K. BIT:

a.          Article 5 by expropriating BG's (i) shareholder interest in GASA and MetroGAS and, alternatively, (ii) rights under or related to the MetroGAS License; and

b.          Article 2.2 (i) by failing to provide BG fair and equitable treatment and protection and security, (ii) by taking unreasonable and discriminatory measures, (iii) by failing to observe obligations entered into with regard to BG's Investments, and (iv) for acts of its judiciary.

39.     BG requested that the Tribunal rule:

a.          that it had jurisdiction over the parties' dispute and reject Argentina's objections to such jurisdiction as well as its motion to dismiss BG' claims;

b.          that Argentina had breached Article 5(1) of the Argentina-U.K. BIT by expropriating BG's investment without just compensation;

c.          that Argentina breached Article 2(2) of the Argentina-U.K. BIT by mistreating BG's investment in violation of the standards of treatment provided therein;

d.           that Argentina compensate BG in an amount of $238.1 million plus interest at the average interest rate applicable to U.S. six-month certificates of deposit, compounded semiannually;

e.           in favour of BG for such additional relief as the Tribunal considers appropriate; and

f.           that Argentina pay the costs of the arbitration proceedings, including the Tribunal's fees and expenses, and the cost of BG's legal representation, plus interest.

40.    Argentina requested that the Tribunal:

a.           Dismiss BG's claims for lack of jurisdiction and award expenses to Argentina, including costs and expenses of the Tribunal and all other expenses paid by Argentina related to the this arbitration and

b.           Dismiss BG's complaint, with costs to be paid by BG.

**GROUNDS REQUIRING VACATION OF THE AWARD**

**I.      The Tribunal Exceeded Its Authority and Lacked Jurisdiction**

41.    The Arbitrators exceeded their authority by disregarding terms of parties' agreement. State, Office of Employee Relations v. Communications Workers of America, AFL-CIO, 154 N.J. 98, 711 A.2d 300, 159 L.R.R.M. (BNA) 2401 (1998)

42.    Article 8 of the BIT states in pertinent parts:

a.   Disputes with regard to an investment which arose within the terms of this Agreement between an investor of one Contracting Party and the other Contracting Party, which have not been amicably settled shall be submitted, at the request of one of the Parties to the dispute, to the decision of the competent tribunal of the Contracting Party in whose territory the investment was made;

   b.  The aforementioned disputes shall be submitted to international arbitration in the following cases:

      i.  if one of the parties so requests, in any of the following circumstances:

         I.  where, after a period of eighteen months has elapsed from the moment when the dispute was submitted to the competent tribunal of the Contracting Party in whose territory the investment was made, the said tribunal has not given its final decision;

        II.  where the final decision of the aforementioned tribunal has been made but the Parties are still in dispute;

      ii.  where the Contracting Party and the investor of the other Contracting Party have so agreed...

43.    In essence, BG would have been able to recourse to international arbitration if the following two requirements are met:

    a.  a period of eighteen months has elapsed from the time when the dispute was submitted to the competent tribunal of the Contracting Party in whose territory the investment was made, Argentina in this case, and

    b.  the aforementioned tribunal has not made a final decision, or even if it has, the Parties were still in dispute.

44.    BG did not file its grievances with the Argentine courts, as it was required to do by agreement, but rather it invoked the application of the Most-Favoured Nation Clause (MFNC), and brought its claim directly to the International Centre for the Settlement of Investment Disputes (the "ICSID").

45.    BG claimed that, according to customary international law, it was excused from exhausting the local remedies before going to international arbitration since its claims could have never been resolved within the period of time required by the BIT.

46. The Tribunal referred to customary international law but limited its review for the purpose of understanding the evolution of International Investment Law ("IIL"). [3]

47. The Tribunal correctly recognized that the investment bilateral treaties have transformed IIL to determining the filing parameters against the Government in whose territory an investment has been made. Thus, it concluded that BG's reliance on the exceptions to the customary international law rule of exhaustion of local remedies in this matter was difficult to accept.

48. The Tribunal agreed with Argentina that as a matter of treaty law, investors acting under the Argentina-UK BIT must litigate in the host State's courts for 18 months before they can bring their claims to arbitration. [4]

49. Notwithstanding this clear conclusion, the Tribunal arbitrarily decided to excuse BG from abiding by the terms of the very Treaty BG sought to enforce. Furthermore, the Tribunal has construed the disputed agreement in a completely irrational way. See <u>Anthony v. Kaplan, 324 Ark.</u> 52, 918 S.W.2d 174 (1996).

50. The Tribunal capriciously concluded that "the regular operation of the courts in Argentina came under significant pressure after promulgation of the Emergency Law." [5]

51. The Tribunal referred to Decrees No. 214/02, 320/02 and 1090/02 and to Ministry of Economy Resolution No. 308/02.

52. Based on these regulations, the Tribunal charged the Argentine Government with exercising "significant pressure on the local judiciary after promulgation of the Emergency Law."

---

[3] Award, ¶¶ 143 and 144.
[4] Award, ¶ 146
[5] Award, ¶ 148

53.     The Tribunal failed to make findings of fact and conclusions of law but rather based its decision on:

> "….The Tribunal is also persuaded that under the dire circumstances surrounding the emergency measures, the Executive Branch sought to prevent the collapse of the financial system by (i) directly interfering with the normal operation of its courts, and (ii) by excluding litigious licensees from the renegotiation process." [6]

54.     The tribunal cited no facts or precedents to support its charge against the executive branch of a sovereign nation for its alleged interference with the Argentine judicial system.

55.     Furthermore, the Tribunal failed to support its erroneous conclusion with any reasoning sufficient to justify its decision. In fact, as can be seen from the Tribunal's review of the parties positions on this point, the issue that the Tribunal referred to was not discussed by the parties.

56.     On the contrary, it disregarded the fact that Decree No. 214/02 – Section 12, modified by Decree No. 320/02, only ruled the temporary stay of enforcement of precautionary measures and stay of execution in those legal processes filed against the Argentine Government by virtue of the emergency legislation. This stay, which was originally enacted for a period of 180 days, was extended only once (through Decree No. 320/02) for another 180 days.

57.     These regulations were not an obstacle for BG to bring its grievance against the local courts in Argentina.

58.     Assuming arguendo that the aforementioned regulations would have impaired BG's claim in the Argentine courts, BG was obligated nonetheless under the BIT to prosecute its

---

[6] Award, ¶ 155

claim before the local courts. Only after a period of eighteen months where decision had not been reached, BG could have submitted its claim to international arbitration.

59.     Furthermore, BG lacked standing to arbitrate MetroGAS' claim. BG claimed damages on the value of its shares allegedly caused by (or derived from) measures adopted by Argentina which had a negative impact on the activities of MetroGAS and, hence, on the value of its shareholding in GASA and in MetroGAS. Despite of recognizing that the measures adopted by Argentine Government only affected Metrogas's rights, the Tribunal granted BG a compensation because of such measures.

60.     The Tribunal exceeded their powers in (i) permitting BG to arbitrate its claims contrary to the terms of the BIT and (ii) bringing a derivative claim on behalf of MetroGAS.

**II.     The Arbitral Tribunal Erred by Arbitrarily Rejecting Argentina's Evidence of the Applicability of the State of Necessity Doctrine.**

61.     Despite abundant evidence that Argentina suffered an economic crisis of epic, even historical, proportions the Arbitral Tribunal summarily rejected Argentina's claim that its state of emergency justified application of emergency measures pursuant to the state of necessity doctrine. The Arbitral Tribunal misunderstood applicable law, the state of necessity doctrine, and failed to correctly apply the doctrine.

62.     Indeed, the Arbitral Tribunal recognized that Argentina had encountered extraordinary and sudden economic travails. "The Tribunal is also persuaded that under the dire circumstances surrounding the emergency measures, the Executive Branch sought to prevent the collapse of the financial system…"

63.     Despite such recognition of "dire circumstances surrounding [the enactment of the temporary] emergency measures", the Arbitral Tribunal summarily and without reasoning rejected the application of the state of necessity doctrine.

64.     In a mere, short seven paragraphs of the Award (totaling 467 paragraphs and 138 pages) the Arbitral Tribunal arbitrarily dismissed Argentina's state of necessity defense.

65.     The Arbitral Tribunal rested its entire unreasonable rejection of the state of necessity defense on the false assumption that "…the Argentine-U.K. BIT <u>implies</u> such an exclusion" (emphasis added).

66.     The Argentine-U.K. BIT neither overtly nor impliedly implies the exclusion of the state of necessity defense.

67.     The Arbitral Tribunal offered no reasoning whatsoever to support the conclusion that "…the Argentine-U.K. BIT <u>implies</u> such an exclusion" (emphasis added).

68.     The Arbitral Tribunal failed in the Final Award to point to any provision in the Argentine-U.K. BIT containing such alleged implication. The Arbitral Tribunal failed in this regard for good reason; there is, in fact, no such implied provision in the Argentine-U.K. BIT.

### III.     The ICC International Court of Arbitration Erred in Permitting Albert Jan van den Berg to Serve as Arbitrator

69.     The International Court of Arbitration exceeded its authority by failing to disqualify Berg from serving as arbitrator as Argentina had requested the Arbitral Tribunal do. The impartiality and objectivity required of Berg were fatally compromised by his prejudice and bias against Argentina.

70.     By way of background, as a result of Argentina's 2001 economic crisis, no fewer than thirty international arbitration proceedings were commenced against Argentina.

71.     Berg had been appointed as arbitrator by claimants in four such arbitrations – LG&E, BG, Enron and recently in case brought by Italian nationals. Even though he ruled against Argentina in the first three cases, as regards state of necessity, a crucial issue for Argentina's defense, the reasoning of the first Tribunal that decided on the merits of the case, in

the LG&E case, contradicted that of the other two Tribunals, in the Enron and BG cases, without any dissenting or, at least, separate opinion rendered by Berg that could have explained his change of mind in such a short period of time. **In the Decision on liability in the LG&E case, which involved an investment in the natural gas sector, Berg recognized that Argentina's crisis justified the application of Article XI of the Argentina-US BIT – a provision that authorizes the adoption of measures necessary to protect public order and essential security interests – and also of the state of necessity under customary international law. This was an unprecedented decision, since it was probably the first time in which an international tribunal admitted the application of the state of necessity as such to the facts of the case. Only 7 months later, in the Enron decsision, Berg found, regarding the same crisis, with respect to another investment as well in the gas sector - and applying the same treaty - that Argentina could not rely on Article XI of the Argentina-US BIT and on the state of necessity to justify the same measures he had analyzed in the LG&E decision.**

72.     Finally, in this arbitration, Berg decided the very same issues he had earlier ruled on based on nearly identical facts (the only principal difference being that the BIT was with the U.K, not the U.S.).

73.     Based on the same facts, the same issues, the same measures and the same time period, Berg rejected the state of necessity doctrine – the Argentina-UK BIT not having an Article XI-type clause - and found Argentina liable for substantial damages.

74.     The chart below sets forth the inconsistency in the three decisions rendered by Berg involving identical facts, issues, measures and time period.

| | | LG&E | ENRON | BG |
|---|---|---|---|---|
| DATE BERG APPOINTED | | June 20, 2002 | July 11, 2006 | June 17, 2003 |
| | | | | |
| DATE OF ARBITRAL | LIABILITY | October 6, 2006 | May 22, 2007 | December 24, |

| | | | | 2007 |
|---|---|---|---|---|
| | DAMAGES | July 25, 2007 | May 22, 2007 | December 24, 2007 |
| | | | | |
| ISSUES INVOLVED | | | | |
| | | | BERG REFUSED RECOGNIZITION OF DOCTRINE OF STATE OF NECESSITY AND FOUND ARTICLE 11 INAPPLICABLE AND FOUND ARGENTINA LIABLE FOR THE WHOLE PERIOD INCLUDING DECEMBER 2001-APRIL 2003 | BERG REFUSED RECOGNIZITION OF DOCTRINE OF STATE OF NECESSITY AND FOUND ARGENTINA LIABLE FOR PERIOD DECEMBER 2001-APRIL 2003 |
| | | BERG RECOGNIZED DOCTRINE OF STATE OF NECESSITY AND APPLICABILITY OF ARTICLE 11 & FOUND ARGENTINA NOT LIABLE FOR PERIOD DECEMBER 2001-APRIL 2003 | | |

DECISION

75.     Due to his arbitrary and abrupt change of mind between the time of the LG&E and Enron decisions, which Berg never even tried to explain through a separate opinion, Argentina challenged Berg in this proceeding. The International Court of Arbitration of the International Chamber of Commerce (the "ICC Court") rejected the challenge, without providing any reasons..

76.     Berg's capricious stance in treating Argentina's necessity defense evidences partiality against Argentina. Further, the ICC Court exceeded its power in rejecting Argentina's challenge in the circumstances of the case. For these two reasons, the Award should be vacated.

77.     Further, Argentina argued here, as it did in the LG&E case, the defense of state of necessity. The term 'state of necessity' under international law describes a situation in the presence of which a state is excused from performing an international obligation. Such situation is generally believed to be an actual threat to a state's essential interest.

78.     By this failure to recognize, or acknowledge, Berg's prior treatment of the defense of necessity and his views on Argentina's performance under the applicable BIT, the Arbitration

Tribunal clearly failed to arbitrate the dispute in an impartial and objective manner and, in so doing, the Tribunal exceeded its authority under § 10(a)(4) of the Federal Arbitration Act. [7].

## IV.     Corruption, Fraud or Undue Means

79.     Section 10(a)(1) of the FAA provides that the Final Award may be vacated "[w]here the award was procured by corruption, fraud, or undue means."

80.     Evidence of such corruption, fraud, or undue means is present in this matter.

81.     Counsel for BG is also counsel in several other arbitration actions commenced against Argentina, including Total S.A. v. República Argentina (ICSID Case No. ARB/04/1). In January 2008 a hearing on the merits for this case was carried out in Washington D.C. At that hearing Argentina learned that the witness statements prepared for use in such arbitration had been written by counsel for Total based on interviews with the witnesses.

82.     Total and BG were represented by the same law firm. Witness statements presented in this case have many passages that are identical or substantially identical to a witness statement presented in the Total case. This would show that such witness statements do not necessarily reflect what the witness saw, thought or believed at the time to which the statement refers. Rather, they reflect what Counsel would have witness declare, with unrelated fact witnesses saying roughly the same in two different cases, in order to influence the Tribunals in this case and in the Total case by undue means.

83.     It should be borne in mind that the "similar" witness statements prepared in the two cases were inter alia directed to evince the witnesses' expectations, as officials of BG and Total, in relation to Argentina's promises as to how it would treat their investments, in light of the gas regulatory framework. The concept of the investor's legitimate expectations has evolved as one of the main features of international investment litigation, having a fundamental bearing

---

[7] American Law Reports ALR Federal, 136 A.L.R. Fed. 183 (Originally published in 1997).

on the issue of whether the standard of fair and equitable treatment was breached (precisely the standard which the BG, Enron and LG&E Tribunals found Argentina had breached and on the basis of which those Tribunals granted damages to the claimants). By constructing the statements of (at least) two witnesses in this case and one in the Total case, counsel "created" the legitimate expectations of those witnesses for the purpose of the underlying and the Total proceedings, in order to unduly support their allegation as to the breach of the fair and equitable treatment standard, allegation which proved successful.

84.     In the present arbitration claimant put forth  witnesses, William Harvey Adamson ("Adamson") and Richard Souchard ("Souchard"), and in the Total v. Argentina litigation the claimant, represented by the same counsel as BG, put forth witness Francois Faurés ("Faurés").

85.     For example, compare ¶ 53 of the Faures statement with ¶ 47 of Adamson's:

> 53.     The WACC was the weighted average of TGN's: (a) cost of debt; and (b) cost of equity.   In using the WACC methodology to discount cash flows, ENARGAS recognised that TGN (in common with the other Licensees) had leveraged itself with debt to finance its investments, as explained above.

47. The WACC is the weighted average of the Licensees´ (a) cost of debt capital; and (b) cost of equity capital. In using the WACC methodology to discount cash flows, ENARGAS recognised that MetroGas and the other Licensees had leveraged themselves with debt, as explained above.

86.     Compare ¶ 54 of the Faures statement with ¶ 48 of Adamson's:

> 54.     In calculating the WACC in the RQT I, ENARGAS determined that a reasonable debt to equity ratio for TGN was 37:63.  Given that the cost of debt was lower than the cost of equity, a higher level of debt produced a lower WACC, which in turn resulted in lower tariffs for consumers.  By using a debt to equity ratio of 37:63 in its WACC calculation applicable to tariffs for the second five-year period, ENARGAS was thus able to pass the benefit of TGN's gearing onto consumers.  In addition, ENARGAS used a cost of debt (or interest rate) of 12.6 per cent that reflected the cost of international debt

> 48.    In the RQT I, in calculating the WACC, ENARGAS determined that a reasonable debt to equity ratio for MetroGAS and the other distribution companies was 30:70. Given that the cost of debt is lower than the cost of equity, a higher level of debt produces a lower WACC, which in turn results in lower tariffs for consumers. By using a debt to equity ratio of 30:70 in its WACC calculation applicable to tariffs for the second five-year period, ENARGAS was able to pass the benefit of MetroGAS's gearing on to consumers. In addition, ENARGAS used a cost of debt (or interest rate) of 13.02% that reflected the cost of international debt and not local debt. In this way it was able to further lower the WACC and the tariffs.

87.    Compare ¶ 56 of the Faures statement with ¶ 50 of Adamson's:

> 56.    The second Five-Year Review, or RQT II, scheduled for 2002, never took place. It was suspended by certain measures taken by the government, which I outline briefly below. However, by the time it was suspended, ENARGAS had already performed the WACC calculation (which was based on the same methodology as the calculation used in the RQT I) that it intended to apply to fix the tariffs for the third five-year period of 2003 to 2007. The report on the calculation of the WACC was issued by ENARGAS after I became involved with TGN, on 13 November 2001.[30]

> 50.    The Second Five-Year Review, or RQT II, scheduled for 2002, never took place. It was suspended by certain measures taken by the Government, which I outline briefly below. However, by the time it was suspended, ENARGAS had already performed the WACC calculation (which was based on the same methodology as the calculation used in the RQT II) that it intended to apply to fix the tariffs for the third five-year period of 2003-2007.

88.    Similarly, ¶ 57 of the Faures statement and ¶ 51 of Adamson's are strikingly similar:

> 57.    In calculating the WACC to be applied in the RQT II, ENARGAS determined that a reasonable debt to equity ratio for TGN was 46:54, thus increasing this ratio –(for the benefit of consumers) in accordance with TGN's increased gearing (50:50 at that time). In its RQT II calculations, ENARGAS also used an even lower cost of debt – again for the benefit of consumers- than in the RQT I, of 11.3 per cent. On the basis of its calculations, ENARGAS determined that the WACC for TGN was 11.5 per cent, or 10.4 per cent in "real" inflation adjusted terms.

> 51. In calculating the WACC to be applied in the RQT II, ENARGAS determined that a reasonable debt to equity ratio for MetroGAS and the other distribution companies was 29:71. In its RQT II calculations, ENARGAS used an even lower cost of debt (or interest rate) than in the RQT I, of 11.3%. On the basis of its calculations, ENARGAS determined that the WACC for MetroGAS (and the other distribution companies) was 12.1% (real, i.e. inflation adjusted).

89.  Likewise, ¶ 60 of the Faures statement and ¶ 66 of Adamson reveal strong similarities:

> *The January 2000 Agreement*
>
> 60. In December 1999, a new President, Fernando de la Rúa, took office in Argentina. In advance of the US PPI adjustment of gas transportation and distribution tariffs scheduled for January 2000, the newly elected government became concerned about an unusually sharp increase in US inflation over the previous six months compared to local inflation. The government feared that the, albeit small, impact this increase would have on consumer gas tariffs might evoke an adverse consumer reaction in the context of a deepening recession in Argentina.

> 65. In December 1999, a new President, Fernando de la Rúa, took office in Argentina.
>
> **The January 2000 agreement**
>
> 66. In advance of the US PPI adjustment of gas transportation and distribution tariffs scheduled for January 2000, the newly elected Government became concerned about an unusually sharp increase in the US inflation over the previous six months, particularly compared to local inflation. The Government feared that the (albeit small) impact this increase would have on gas prices might evoke an adverse consumer reaction in the context of a deepening recession in Argentina. This was particularly so given that Mr de la Rúa's party had promised a reduction in public service tariffs in its election campaign.

90.  Further comparisons of the two statements demonstrate duplication:

> 66. After seven and a half years of uncontested application of the US PPI adjustment, in August 2000, the Argentine ombudsman brought a claim before the Argentine courts to strike down that mechanism in the gas transportation and distribution sector, alleging that it was unconstitutional. The ombudsman also sought an injunction suspending the July Agreement and Decree 669/2000.

75.     Once again, Argentina failed to live up to its agreement.  The stabilisation fund was never created.  More importantly, after seven and a half years of uncontested application of the US PPI adjustment, in August 2000, the Argentine ombudsman started proceedings before the Argentine courts alleging that the US PPI-linked adjustment of the tariffs in the gas industry was unconstitutional.  These proceedings were extended to include a request by the ombudsman for an injunction suspending the provisions of Decree 669/2000.  The Judge responsible for the case issued an injunction on 18 August 2000 suspending the application of Decree 669/2000, pending resolution of the underlying claim of unconstitutionality.

69.     The Court of Appeals of Buenos Aires eventually rejected all appeals against the injunction on 5 October 2001.[37]  TGN, together with the other Licensees, ENARGAS and the government, filed an appeal with the Supreme Court of Argentina.  However, these proceedings were swiftly overtaken by even more draconian measures taken by the government in January 2002, which I outline below.

together with ENARGAS and the Licensees, against the injunction.  On 5 October 2001, the Court of Appeal of Buenos Aires dismissed all appeals against the injunction.  MetroGAS, together with the other Licensees, ENARGAS and the Government, filed an appeal with the Supreme Court of Argentina.  However, these proceedings were swiftly overtaken by even more draconian measures taken by the Government in January 2002, which I outline below.

91.     Paragraphs 71/72 and 78/79 of the respective Faures and Adamson statement are similar, if not identical:

III.    **ARGENTINA'S MEASURES FROM JANUARY 2002**

71.     At the end of 2001, the economic difficulties in Argentina deepened leading to another change in government.  President Duhalde took over on 1 January 2002.

A.      THE EMERGENCY LAW AND IMPLEMENTING REGULATIONS

72.     On 6 January 2002, the new administration implemented a new economic plan whose main pillar was (and remains) the Public Emergency and Reform of the Exchange Rate Mechanism Law (the *Emergency Law*).[38]

**B.** THE JANUARY 2002 LAW AND SUBSEQUENT REGULATIONS

78.    At the end of 2001, the economic difficulties in Argentina deepened, leading to another change in Government.  President Duhalde took over on 1 January 2002.

*The January 2002 Law*

79.    On 6 January 2002, the new administration implemented a new economic plan, in the form of the Public Emergency and Reform of the Exchange Rate Mechanism Law (the *January 2002 Law*).

92.    Further comparisons:

74.    This rate was artificial given that the Emergency Law and its subsequent regulations also abolished the peso-dollar peg that had been in force in Argentina since 1991, with the result that the market exchange rate soared to approximately four pesos to one dollar, eventually stabilising at a rate of approximately three to one at the end of 2002.

one dollar, and frozen at that value.  This rate was artificial given that the January 2002 Law and its subsequent regulations also abolished the peso-dollar peg that had been in force in Argentina since 1991, with the result that the market exchange rate soared to four pesos to one dollar, eventually stabilising at a rate of three to one.  As a result, MetroGAS's revenue plummeted to one third of its previous dollar value.

93.    Paragraphs 87 and 84 of the Faures and Adamson statements show still more similarities:

87.    The renegotiation process began around March 2002.  Each company affected by this process was required to submit certain information to the Renegotiation Commission.  The information consisted of: (a) a description of the impact caused by the "emergency", (b) a summary of the recent economic and financial situation of the company, (c) information on the progress of the company's contract, (d) information on the company's pending liabilities, (e) the company's proposals for overcoming the state of "emergency" and (f) an initial presentation to the Renegotiation Commission and an executive summary.

84.     The renegotiation process began around March 2002. Each company affected by the renegotiation process was required to submit initial information to the Renegotiation Commission. The initial information consisted of (1) a description of the impact caused by the "emergency", (2) a summary of the recent economic and financial situation of the company, (3) information on the progress of the company's contract, (4) information on the company's pending liabilities, (5) the company's proposals for overcoming the state of "emergency" and (6) an initial presentation to the Renegotiation Commission and an executive summary.

94.     Here are two similar paragraphs from the Faures statement and the Souchard statement:

(ii) tariffs would be calculated and adjusted in US dollars and converted to Argentine pesos for billing purposes only;[6]

(iii) tariffs would be adjusted every six months in accordance with variations in the US Producer Price Index (*US PPI*);[7]

(iv) tariffs would be reviewed every five years on a price cap basis following certain pre-established criteria, taking into account the investments

(v) tariffs could be subject to a non-recurrent review on "objective and justified" grounds (among others), always ensuring a continued reasonable rate of return for TGN (the *Extraordinary Review*);[9]

(vi) tariffs would not be frozen or subject to regulation or price control without full compensation from the government; and[10]

(vii) the basic rules of the TGN Licence (which included the tariff regime) would not be changed without TGN's consent.[11]

(b) tariffs would be calculated in US dollars and converted to Argentine pesos for billing purposes only, to ensure a dollar revenue stream;

(c) tariffs would be adjusted every six months in accordance with variations in the US Producer Price Index (*US PPI*), to ensure a constant real dollar revenue stream;

(d) tariffs would be reviewed every five years on a price cap basis following certain pre-established criteria (the *Five-Year Review*), taking into account the investments and efficiencies of the Licensee, to ensure a continued reasonable rate of return for the Licensee;

(e) tariffs could be subject to a non-recurrent review on "objective and justified" grounds, (among others), to ensure a continued reasonable rate of return for the Licensee; and

(f) tariffs would not be frozen or subject to regulation or price control without full compensation.

95.     Another comparison between Faures and Souchard reveals similar wording and reasoning;

> 30.     Argentina also advances the extraordinary argument that tariffs were only to be calculated in dollars for as long as the Convertibility Law remained in force.[21] This is fundamentally counter-intuitive.
>
> 31.     Argentina set out to create a Gas Regulatory Framework that would be capable of attracting foreign investment by ensuring adequate rewards over the period of the TGN Licence (some 35 or 45 years). A conditional link to the Convertibility Law would have entirely defeated this objective – indeed in such a case, there would have been no need to provide for dollar tariffs in the first place.

> 14.     Argentina goes on to allege that the dollar-calculated tariffs were only to be calculated in dollars for as long as the Convertibility Law remained in force (Statement of Defence, ¶¶598; 604; 609; 618). This is counter-intuitive. Argentina set out to create a regulatory framework capable of attracting foreign investment by ensuring that the investment was adequately rewarded over the period of the Licence (some 35 or 45 years). A conditional link to the Convertibility Law would have entirely defeated this objective – indeed in such a case, there would have been no need to have dollar tariffs in the first place.

32.   Given Argentina's record of economic instability, the Convertibility Law could never have constituted sufficient protection for foreign investors, since its long-term continuance was not assured. Foreign investors, including Total, would simply not have been prepared to assume the risk of devaluation in Argentina. Thus, while the Convertibility Law was enacted as part of a larger set of macro-economic reforms that Argentina undertook to balance its economy, the Government offered dollar tariffs as the cornerstone of the Gas Regulatory Framework enacted specifically to attract investors into the gas privatisation. In this context, it was clear to Total and to our legal advisors at the time that the calculation of TGN's tariffs in dollars provided a layer of protection *over and above* the Convertibility Law for the period of the Licence.[22]

33.   As is clear from the Licence, (i) the calculation of the tariffs in dollars and (ii) the rate used to convert those dollar tariffs into pesos for billing purposes are two distinct processes. Essentially, the conversion into pesos is a technical process done to facilitate invoicing customers in pesos for a dollar-based tariff. It is logical that the Convertibility Law (enacted in 1991) was mentioned in the TGN Licence simply because it was the exchange rate system prevailing at the time (December 1992). Moreover, the Licence stipulates that dollar tariffs are to be converted at the rate set out in the Convertibility Law "and its subsequent modifications".[23]   This meant that if the exchange rate changed from 1:1 as it did in January 2002, the dollar tariffs should simply have been converted into pesos at the new exchange rate.

privatisation, since its long-term continuance was not assured. Foreign investors, including BG, were simply not prepared to assume the (clear and present) risk of devaluation in Argentina. Thus, while the Convertibility Law was enacted as part of a larger set of macro-economic reforms that Argentina undertook to balance its economy, the Government offered dollar-calculated tariffs as the cornerstone of the regulatory framework enacted specifically to attract investors to the privatisation of the gas industry. In this context, it was always clear to BG, and to our legal advisors, that the calculation of MetroGAS's tariffs in dollars provided a layer of protection over and above the Convertibility Law for the period of the Licence.

16.   As is clear from the Licence, the calculation of the tariffs (in dollars) and the rate used to convert those dollar tariffs into pesos for billing purposes were two different things entirely. Convertibility (enacted in 1991) was simply the exchange rate system prevailing at the time the Licence was granted (December 1992). Moreover, as is also clear from the Licence, dollar-calculated tariffs were to be converted into pesos for billing purposes in accordance with the parity set out in the Convertibility Law and its modifications. This meant that if the exchange rate changed from one:one, as it did in January 2002, the dollar-calculated tariffs would be converted into pesos at the new market exchange rate.

96.   Returning to a comparison between Faures and Adamson:

43.    I should note that when local inflation was higher than the US PPI, as it generally was from 1992 (when the rules regulating TGN's tariff structure were set out) until 1998, as illustrated in the graph below, the Licensees never argued that the resulting adjustment of tariffs was "unreasonable". They simply accepted that this was the bargain struck at the time of privatisation, and dutifully decreased their tariffs in accordance with decreases in the US PPI. It seems to me that Argentina should not be allowed to profit from the commitment to the US PPI adjustment of tariffs when it suits it (*ie* when the US PPI was lower than Argentine inflation) and disregard it completely when it does not suit it (*ie* when the US PPI became higher than Argentine inflation).

31.    I should note that when the Argentine Wholesale Price Index (IPM – *Indice de Precios al Mayorista*) was higher than the US PPI (as it generally was from 1993 until 1998), the Licensees never argued that the adjustment of tariffs which resulted was "unreasonable". They simply accepted that this was the bargain struck at the time of privatisation. It seems to me that Argentina should not be allowed to profit from its decision to include the guarantee of the US PPI adjustment of tariffs when it suits it (i.e. when the US PPI was lower than the equivalent Argentine index) and disregard it completely when it does not suit it (i.e. when the US PPI became higher than the equivalent Argentine index).

32.    Argentina's argument that the tariffs resulting from the US PPI adjustment due in January 2000 "no longer reflected the evolution of MetroGAS's costs" is similarly incorrect. Adjustment in accordance with the US PPI was not supposed to reflect the evolution of MetroGAS's costs, but to reflect the fact that tariffs were calculated in dollars. The purpose of this adjustment was to ensure that the tariffs maintained their "real dollar" value between five-year tariff reviews. In any event, the small tariff increase that the adjustment would have involved in no way implied a distortion in MetroGAS's cost structure as argued by Argentina, particularly since the majority of MetroGAS's costs, including its financial costs, were denominated in dollars.

97.    There are further comparisons that are cumulative. They are not included in order not to burden the court. The inference is plain that such witness statements were harmonized and prepared conjointly in such a way that each witness ignored or failed to address the particular facts in the present arbitration. The statements in effect became the statements of non-parties and thereby lacked probative value.

## V.      **Disproportionate and Unfair Award**

98.      The Arbitral Tribunal ruled in favour of BG, ordering Argentina to pay it $185,285,485.85, together with costs and attorneys' fees of $1,302,623 and £2,414,141.10, plus interest from January 6, 2002 until the date the Award is paid. The total Argentina must pay amounts to $186,588,108.85 plus £2,414,141.10.

99.      The Arbitral Tribunal held that Argentina did not violate Article 5 of the BIT (expropriation) but did breach Article 2.2 of the BIT.

100.      The Arbitral Tribunal recognized that Article 2 of the BIT provided no standard for the calculation of compensation flowing from its breach.

101.      Not deterred by the lack of a agreed standard for the calculation of damages, the Arbitral Tribunal relied on a 1928 decision that merely established a broad standard ("breach of an engagement involves an obligation to make reparation in an adequate form").

102.      It also turned to the draft ILC Articles, which are not so different from those expressed in the 1928 decision ("…responsible state is under an obligation to make full reparation for the injury caused by the…wrongful act").

103.      The Arbitral Tribunal also required that the damages complained of be proximately caused by the wrongful act.

104.      The Arbitral Tribunal then adopted a method to calculate damages that neither BG nor Argentina sought.

105.      The Arbitral Tribunal rejected the standard it should have applied, namely the discounted cash flow method, and instead focused on an unreasonable comparison. It took the value of an isolated 1998 transaction involving a transfer of GASA shares, which took place before the measures at issue where adopted, and compared it against the value of another

transaction that took place after the measures were adopted. The Tribunal found that the first transaction reflected the value of the company in which BG had invested, before the measures were adopted, and that the second transaction reflected the value of that company after the measures were adopted. The difference between the two values, the Tribunal found, reflected BG's damages (in the proportion of its shareholding participation). The serious flaw of the Tribunal's "method", however, is that, from the time of the first transaction –that occurred at the peak of Argentina's economy in the 1990s- and the second transaction, Argentina endured three years and half of economic recession that resulted in a substantial reduction in the value of all Argentine companies –as reflected in the free-fall of the Buenos Aires stock exchange- and that period of the economic recession occurred prior to the measures, Argentina was held liable for damages resulting not from its measures but from the general macroeconomic crisis.

106.   Indeed, the use of a value of an allegedly "comparable" transaction from 1998 in order to evaluate a pre-measures value was a manifest excess use of powers by the Tribunal. As the Tribunal itself recognized, in the period from 1998 to 2002, the fall in GDP amounted to 25% and the fall in GDP per capita amounted to 70%, independently of the measures at issue in the arbitration. However, the value of BG's participation in Metrogas, according to the Tribunal, remained constant.

107.   In using this method to calculate damages the Tribunal exceeded its powers in as far as BG requested compensation for the alleged damages from the measures adopted by Argentina. However BG never alleged that it could be compensated for the general effects of the macroeconomic crisis in Argentina. In deciding to use this method for calculation of damages the Tribunal in this case held Argentina responsible for all the effects of the macroeconomic crisis that had afflicted it and did not isolate the alleged effects of the Measures. This is particularly

serious taking into account that the discounted cash flow method, which had been advocated by both parties, allowed for the distinction between the effects of the measures and the effects of the macroeconomic crisis on the investment.

108.   This resulted in the multi-million dollar award against Argentina.

WHEREFORE, Argentina requests that this Court enter an order vacating or modifying the Award and for such other and additional relief as the Court may deem appropriate or necessary.

Dated:  Washington, D.C.
         March 20, 2008

Gleason & Koatz, LLP
230 Park Avenue
New York, New York 10169
(212) 986-1544
Of Counsel to Petitioner

                              Haar & Associates

                              By: /s/ Paul Haar
                                   Paul Haar (PH ____)


                              1150 Connecticut Ave., N.W. 9th Floor
                              Washington, D.C.  20036
                              (202) 862-4328
                              Attorney for Petitioner

                              Plaintiff:
                              The Republic of Argentina
                              Procuracion Del Tesoro de la Nacion
                              Posadas 1641
                              (1112ADC) Buenos Aires
                              Argentina