# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                )
REPUBLIC OF ARGENTINA,        )
                                )
              Plaintiff,       )
                                )
          v.                )       Civil Action No. 08-485 (RBW)
                                )
BG GROUP PLC,              )
                                )
             Defendant.     )
_____)

## MEMORANDUM OPINION

The Republic of Argentina ("Argentina"), the petitioner in this case, seeks to vacate or modify an arbitral award (the "Award") rendered against it and in favor of respondent BG Group PLC ("BG Group") under the Federal Arbitration Act, 9 U.S.C. §§ 1-14 (2006) (the "FAA"). Petition to Vacate or Modify Arbitration Award (the "Petition" or "Pet'r's Pet.") ¶ 3. In response, BG Group filed a cross-motion to confirm the Award under the FAA and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, <u>available</u> <u>at</u> 1970 WL 104417 (the "New York Convention" or the "Convention"), which was ratified by Congress and codified at 9 U.S.C. §§ 201-08 (2006). Cross-Motion for Recognition and Enforcement of Arbitral Award (the "Resp't's Cross-Mot.") at 1. After carefully considering Argentina's petition to vacate or modify the Award, BG Group's cross-motion to confirm the Award, and all relevant documents and exhibits attached to

those submissions,[1] the Court concludes for the reasons below that it must deny Argentina's petition to vacate or modify the Award.

## I.     Background

During the late 1980s and early 1990s, Argentina undertook a "wide [economic] reformation process," which included entering into numerous bilateral investment treaties with various foreign nations in the hopes of attracting foreign investors.  Resp't's Cross-Mot. at 1; Pet'r's Pet. ¶ 13.  One of the treaties entered into during this period was the Agreement for the Promotion and Protection of Investments, Arg.-U.K., Dec. 11, 1990, 1765 U.N.T.S. 33 (the "Investment Treaty"), between Argentina and the United Kingdom.  Resp't's Cross-Mot. at 1; Pet'r's Pet. ¶ 13.  Similar to other bilateral investment treaties, the Investment Treaty was designed to ensure foreign investors that they would be treated fairly and equitably, to provide them with "full protection and security," and to restrict the host country "from expropriating the assets of such investors without just compensation."  Resp't's Cross-Mot. at 1.  To address any disputes arising from these investments, Argentina and the United Kingdom agreed to a two-tiered system of dispute resolution in which the dispute could be submitted to a "competent tribunal" of the country "in whose territory the investment was made," after which the matter

---

[1] In addition to Argentina's petition and BG Group's cross-motion, the Court considered the following documents in reaching its decision: (1) Argentina's Memorandum of Points and Authorities in Reply to Respondent's Opposition to the Motion to Vacate or Modify Arbitration Award and in Opposition to Respondent's Cross-Motions for Confirmation of the Award and For a Pre-Judgment Bond (the "Pet'r's Reply"); (2) BG Group's Memorandum of Points and Authorities in Reply to Petitioner's Opposition to Respondent's Cross-Motion for Recognition and Enforcement and for a Pre-Judgment Bond (the "Resp't's Reply"); (3) BG Group's Supplemental Memorandum of Law in Support of Respondent's Motion for Pre-Judgment Bond (the "Resp't's Supp. Mem."); (4) Argentina's Supplemental Memorandum of Points with Regard to Posting a Bond (the "Pet'r's Supp. Mem."); (5) Argentina's Second Supplemental Memorandum of Points with Regard to Posting of Bond (the "Pet'r's 2d Supp. Mem."); (6) BG Group's Supplemental Memorandum of Law on the Applicability of the New York Convention (the "Resp't's 2d Supp. Mem."); and (7) BG Group's Supplemental Memorandum in Support of Respondent's Motion for a Pre-Judgment Bond (the "Resp't's 3d Supp. Mem.").

could be referred to arbitration under certain conditions, or the dispute could be submitted directly to international arbitration. Investment Treaty, art. 8(2).[2]

Also as part of its economic reforms, Argentina enacted several measures in an effort "to reduce inflation and the public deficit," including "privatization of certain state[-]owned companies in many sectors[,] including the gas transportation and distribution industry." Pet'r's Pet. ¶ 15. As part of these efforts, Argentina divided its gas transportation and distribution industry, Gas del Estado, Sociedad del Estado, into two transportation companies and eight distribution companies. Id. ¶ 18. BG Group, a United Kingdom company, invested in one of the eight distribution companies, MetroGAS, through a consortium of investors known as Gas Argentino, S.A. Id. ¶ 20. Eventually, BG Group acquired a 54.67% interest in Gas Argentino, S.A., which in turn owned 70% of MetroGAS. Id. ¶ 21.

In 2001, after a period of exceptional economic growth, Argentina began to experience an economic crisis. Pet'r's Pet. at 6-7. In its efforts to respond to this predicament, Argentina enacted an emergency law in 2002, implementing regulatory measures that negatively impacted

---

[2] Article 8(2) of the Investment Treaty provides for recourse to arbitration under the following circumstances:

    (a)  if one of the Parties so requests . . .:

        (i) where, after a period of eighteen months has elapsed from the moment when the dispute was submitted to [a] competent tribunal of the [country] in whose territory the investment was made . . . ;

        (ii) where the final decision of the aforementioned tribunal has been made but the Parties are still in dispute;

    (b)  where the [Parties] have so agreed.

Furthermore, the Investment Treaty provides that "where the dispute is referred to international arbitration," the parties "may agree to refer the dispute either to: (a) the International Centre for the Settlement of Investment Disputes [(the "ICSID")] . . . or (b) an international arbitrator or ad hoc arbitration tribunal . . . under the Arbitration Rules of the United Nations Commission on International Trade Law [(the "UNCITRAL Rules")]. Award at 6 (citing Article 8(3)(a)-(b) of the Treaty). Here, "[b]ecause the [p]arties failed to agree on submission of the dispute to the . . . []ICSID[], BG [Group] submitted to arbitration under . . . []the UNCITRAL Rules[]." Id. at 7.

BG Group's investment in MetroGAS.  Id.; Resp't's Cross-Mot. at 2.  Pursuant to the Investment

Treaty, BG Group initiated international arbitration proceedings on April 25, 2003.[3]  Resp't's

Cross-Mot. at 2; Pet'r's Pet. ¶ 6.  An arbitral panel commenced proceedings in New York and

Washington, D.C. beginning in July of 2006.  Pet'r's Pet. ¶ 4.

Argentina raised a number of objections at the outset of the arbitration.  First, Argentina

objected to the arbitral panel's jurisdiction to entertain BG Group's claims, arguing, inter alia,

that the Investment Treaty authorizes recourse to arbitration "only where disputes have been

submitted for 18 months to the competent tribunal of the State which hosts the decision," i.e., a

competent tribunal in Argentina.  Award ¶ 140.  Second, Argentina challenged the arbitral

panel's jurisdiction on the grounds that BG Group's claims were derivative in nature, and such

claims "are proscribed by international law and by [Argentine] corporate law."  Id. ¶ 191.  Third,

Argentina challenged the appointment of Albert Jan van den Berg to the arbitral panel, id. ¶ 8,

alleging that Jan van den Berg had issued arbitrary and capricious rulings in previous arbitrations

involving Argentina, Pet'r's Pet. ¶ 75-76.  Each of these objections was rejected.  Award ¶ 157

(finding that BG Group's claims were arbitrable); id. ¶ 205 (concluding that the arbitral panel

"has jurisdiction to hear BG[ Group's] claims as they relate to its indirect shareholding in

MetroGAS"); id. ¶ 11 (noting that the International Chamber of Commerce International Court

of Arbitration (the "ICC Court") "had decided to reject [Argentina's] challenge [to] Professor

Albert Jan van den Berg" to the arbitral panel).[4]  Both parties then proceeded with the arbitration,

and, on December 24, 2007, the arbitral panel unanimously ruled in favor of BG Group and

_____

[3] Over 25 foreign investors initiated arbitration against Argentina claiming violations of bilateral investment treaties caused by the emergency law's enactment.  Resp't's Opp'n at 2.

[4] Under Article 12(1)(b) of the UNCITRAL Rules, which governed the arbitration at issue in this case, a challenge to the seating of an arbitrator on an arbitral panel must be brought before an "appointing authority" that has been previously designated by the parties.  In this case, the ICC Court had been designated as the "appointing authority" by the parties.  Award ¶ 9.

issued an award in the amount of $185,285,485.85 plus costs, attorneys' fees, and interest. Pet'r's Pet. at 3. In its decision, the arbitral panel rejected numerous arguments raised by Argentina, one of which was its reliance on the "state of necessity" doctrine to exonerate it from liability.[5] Award ¶ 391. The arbitral panel then concluded that Argentina breached the Investment Treaty and awarded damages to BG Group based on the fair market value of its investment in MetroGAS. Id. ¶ 422.

Clearly unsatisfied with the outcome of the arbitration decision, Argentina filed its petition to vacate or modify the Award on March 21, 2008. In support of its prayer for relief, Argentina asserts the following arguments: (1) "[t]he [a]rbitrators exceeded their authority by disregarding [the] terms of [the] parties' agreement," Pet'r's Pet. ¶ 41; (2) "[t]he [a]rbitral [t]ribunal misunderstood applicable law . . . and failed to correctly apply [such law]," id. ¶ 61; (3) "[t]he International Court of Arbitration exceeded its authority by failing to disqualify [Jan van den] Berg from serving as [an] arbitrator," id. ¶ 69; (4) the award was procured by "corruption, fraud, or undue means," id. ¶¶ 79-80; and (5) the arbitral tribunal imposed a disproportionate and unfair award, id. ¶ 107. BG Group, in turn, argues that Argentina's claims are "without merit and must be dismissed." Resp't's Cross-Mot. at 16.[6] BG Group also moves to have the Award confirmed pursuant to 9 U.S.C. § 9 and Article IV of the New York Convention. Id. at 36.

---

[5] Argentina argued that it could invoke the "state of necessity" doctrine because it was purportedly "compelled to depart from [its] obligations with [the United Kingdom] in order to preserve an essential state interest in a situation of grave or imminent danger." Award ¶ 391.

[6] BG Group also seeks an order from the Court requiring Argentina to post a pre-judgment bond before having its petition considered by the Court. On March 31, 2010, the Court issued an order requiring Argentina to post a pre-judgment bond. Upon further reflection, however, the Court concludes that the posting of a bond is unnecessary, in light of the Court's conclusion here that Argentina's petition to vacate or modify the Award is entirely without merit. Accordingly, the March 31, 2010 Order is vacated, and BG Group's cross-motion for a pre-judgment bond is denied as moot.

## II.    Standard of Review

The Court's authority to vacate an arbitral award is governed by 9 U.S.C. § 10(a), which provides the following:

> In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration-
>
> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

Additionally, the Court may modify or correct an arbitral award if (1) the movant can demonstrate that there "was an evident material miscalculation of figures[,] or an evident material mistake in the description of any person, thing, or property referred to in the award," (2) the arbitrator has rendered a decision "upon a matter not submitted to [him], unless it is a matter not affecting the merits of the decision upon the matter submitted," or (3) "the award is imperfect in matter of form not affecting the merits of the controversy." 9 U.S.C. § 11. The Supreme Court has held that the grounds enumerated in Sections 10(a) and 11 of the FAA are the exclusive means for vacating, modifying, or correcting an arbitral award.[7]  Hall St. Assoc., LLC v. Mattel, Inc., 552 U.S. 576, 581 (2008).

---

[7] In addition to Sections 10(a) and 11 of the FAA, Argentina relies on the non-statutory ground that an arbitral award may be vacated where the award was issued in "manifest disregard of the law." Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 481 F.3d 813, 816 (D.C. Cir. 2007). A question remains, however, as to whether this basis for

(continued . . .)

In relying on these standards to determine whether vacatur or modification of the Award is warranted, the Court must remain mindful of the principle that "judicial review of arbitral awards is extremely limited," and that this Court "do[es] not sit to hear claims of factual or legal error by an arbitrator" in the same manner that an appeals court would review the decision of a lower court. Teamsters Local Union No. 61 v. United Parcel Serv., Inc., 272 F.3d 600, 604 (D.C. Cir. 2001) (quoting Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175, 1178 (D.C. Cir. 1991)). In fact, careful scrutiny of an arbitrator's decision would frustrate the FAA's "emphatic federal policy in favor of arbitral dispute resolution," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985) (internal citation omitted)—a policy that "applies with special force in the field of international commerce," id.—by "undermining the goals of arbitration, namely, settling disputes efficiently and avoiding lengthy and expensive litigation," LaPrade v. Kidder, Peabody & Co., 94 F. Supp. 2d 2, 4-5 (D.D.C. 2000) (Sullivan, J.), aff'd 246 F.3d 702 (D.C. Cir. 2001). Instead, "a court must confirm an arbitration award where some colorable support for the award can be gleaned from the record." Id. Thus, "[t]he showing required to avoid summary confirmation of an arbitration award is high, and a party

---

(. . . continued)

vacating an arbitral award survived the Supreme Court's recent decision in Hall Street Associates LLC v Mattel, Inc., 552 U.S. 576 (2008). There, the Supreme Court concluded that Sections 10(a) and 11 of the FAA "provide the . . . exclusive grounds for expedited vacatur and modification," 552 U.S. at 584 (emphasis added), but acknowledged that its "vague phrasing" of the "manifest disregard of the law" standard in prior precedents has caused confusion amongst the various circuit courts of appeals, with some circuits viewing that standard as being encompassed within the grounds explicitly listed under the FAA (specifically Sections 10(a)(3) and (4)), id. at 585, while others, including the District of Columbia Circuit, have viewed the standard as independent of the grounds explicitly enumerated under Section 10(a), see Lessin, 481 F.3d at 816 ("In addition to the grounds under the [FAA] . . . on which an arbitration award may be vacated, an award may be vacated only if it is 'in manifest disregard of the law.'"). The Supreme Court remained silent, however, as to which approach is correct, and neither the Supreme Court nor the District of Columbia Circuit have yet to weigh in on whether Hall Street Associates affects any of their respective precedents. See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., ___ U.S. ___, ___, ___ S. Ct. ___, ___, 2010 WL 1655826, at *7 n.3 (Apr. 27, 2010) (declining to decide whether the "manifest disregard of the law" standard survived Hall Street Associates); Regnery Pub., Inc. v. Miniter, No. 09-7039, 2010 WL 1169843, at *1 (D.C. Cir. Mar. 17, 2010) (assuming, without deciding, that the "manifest disregard of the law" standard survived Hall Street Associates). Regardless, the Court need not conclusively determine whether precedent regarding the "manifest disregard of the law" standard has continued viability in light of Hall Street Associates, for Argentina's claims nonetheless fail under that standard for the reasons discussed below.

moving to vacate the award has the burden of proof." Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12 (2d Cir. 1997) (citations omitted).

### III.    Legal Analysis

Before addressing the merits of the Petition, the Court must first assess whether it has subject-matter jurisdiction under the FAA to entertain this dispute. In the Petition, Argentina cites 9 U.S.C. § 203 as the basis for the Court's jurisdiction over this matter, see Pet'r's Pet. at 2 ("This court has jurisdiction over . . . this Petition pursuant to 9 U.S.C. §§ 201 et seq."), which confers jurisdiction on this Court to entertain "action[s] or proceeding[s] falling under the [New York] Convention," 9 U.S.C. § 203 (2006). Although Argentina seemingly took the position in its jurisdictional statement that the Award falls within the ambit of the New York Convention, it has actually taken the opposite position in this litigation with regards to whether the Court has the authority to grant BG Group's cross-motion for a pre-judgment bond pursuant to Article VI of the New York Convention. See, e.g., Pet'r's 2d Supp. Mem. at 2. The Court suspects that Argentina merely intended to argue against the applicability of the Convention for the sole purpose of defeating BG Group's efforts at securing a pre-judgment bond, but in so doing, Argentina has also potentially undermined its own invocation of this Court's subject-matter jurisdiction. This is because without recourse to Section 203, the Court is likely without any other basis to find that it has subject-matter jurisdiction, as the FAA does "not itself bestow[] jurisdiction on the federal district courts" under 28 U.S.C. § 1331, Karsner v. Lothian, 532 F.3d 876, 882 (D.C. Cir. 2008) (quoting Kasap v. Folger Nolan Fleming & Douglas, Inc., 166 F.3d 1243, 1245-46 (D.C. Cir. 1999)), jurisdiction is not available under 28 U.S.C. § 1332 because diversity jurisdiction is not available where "a lawsuit [is] brought by one alien against another alien, without a citizen of a state on either side of the litigation," see, e.g., Saadeh v. Farouki, 107

F.3d 52, 58 (D.C. Cir. 1997); see also Pet'r's Pet. ¶¶1-2 (noting that the petitioner is the Argentinean government, while the respondent is a British corporation), and there is no other independent ground for federal court jurisdiction that the Court is aware of that would allow it to entertain this matter. Given that Argentina has called into question the applicability of the New York Convention, and that the resolution of this issue may have a material effect on the Court's jurisdiction, the Court has no choice but to first resolve the issue of whether the exercise of jurisdiction over this matter is proper under Section 203 before addressing the merits of Argentina's petition and BG Group's cross-motion. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977) (concluding that all courts "are obliged to inquire sua sponte whenever a doubt arises as to the existence of federal jurisdiction"); Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007) (citing Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 93-102 (1998)) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of a claim in suit . . . .").

 A. The Jurisdiction of the Court to Entertain the Petition and Cross-Motion

 As noted above, whether the Court has subject-matter jurisdiction over this dispute hinges on whether the Award is one that is covered under the New York Convention. Article I(1) of the New York Convention provides the following:

> This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

New York Convention, art. I(1). Put differently, the first sentence applies to arbitral awards that are issued outside the territorial boundaries of the nation where enforcement is being sought,

while the second sentence refers to awards that are issued within the borders of the nation where enforcement is sought, yet are sufficiently foreign in character as to not be considered "domestic awards" in that country.[8]  The parties agree that the Award was issued in the District of Columbia and it therefore falls outside the bounds of the "extraterritorial" provision of Article I(1).  See Bergensen v. Joseph Muller Corp., 710 F.2d 928, 932 (2d Cir. 1983) (concluding that an arbitral award issued in New York "does not meet the territorial criterion").  The parties do not agree, however, whether the United States recognizes the "non-domestic" provision at all, and even if it does, whether this Award falls within the meaning of a "non-domestic" award under Article I(1) of the New York Convention.

In support of its argument that the United States does not recognize the "non-domestic" provision of the New York Convention, Argentina relies on the United States's invocation of a reservation contained in Article I(3) of the Convention, Pet'r's 2d Supp. Mem. at 2, which was aptly described by one of the Convention's drafters as the "reciprocity clause," see, e.g., United Nations Conference on International Commercial Arbitration, May 20-June 10, 1958, Adoption and Signature of the Final Act and Convention, at 9, U.N. Doc. E/CONF.26/SR.23 – E/CONF.26/L.60 (June 9, 1958).  The clause maintains, in part, that "[t]he United States of America will apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State."[9]  New

---

[8] For ease of reference, the Court will refer to the first provision of Article I(1) as the "extraterritorial" provision, and the second provision as the "non-domestic" provision.

[9] Article I(3) of the New York Convention states the following:

When signing, ratifying[,] or acceding to this Convention, or notifying extension under article X hereof, any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State.  It may also declare that it will apply the Convention only to differences arising out of legal

(continued . . .)

York Convention, Note by the Department of State, 21 U.S.T. 2517, 330 U.N.T.S. 38, <u>available</u> <u>at</u> 1970 WL 104417, at *1.  Argentina argues that a plain reading of this declaration compels "a district court to recognize and enforce only . . . arbitral award[s] rendered in a foreign state." Pet'r's 2d Supp. Mem. at 4.

Argentina's reading of the reservation fails to comport with the well-known canon of statutory construction that a court must "give effect, if possible, to every word . . . used," <u>Reiter</u> <u>v. Sonotone Corp.</u>, 442 U.S. 330, 339 (1979), because its interpretation renders superfluous the phrase "on the basis of reciprocity" as it is used in the declaration.  Indeed, Argentina's proffered interpretation of the "reciprocity clause" has nothing to do with the concept of reciprocity whatsoever.  By taking into account the reciprocity language, it is evident that Article I(1) of the New York Convention is not concerned with the applicability of the "non-domestic" provision, but rather, as noted by BG Group, the clause addresses "the inapplicability of the New York Convention to [arbitral] awards rendered in States that are not a party to the . . . Convention." Resp't's 2d Supp. Mem. at 2-3.  It is BG Group's interpretation of Article I(1), not Argentina's, that accounts for each and every word comprising the "reciprocity clause."

Another defect present in Argentina's interpretation of the "reciprocity clause" is that it directly conflicts with Congress's understanding of the New York Convention's extensive reach to arbitral awards issued in the United States, as reflected in the language of 9 U.S.C. § 202 (2006), which provides that:

> [a]n agreement or award arising out of [a commercial] relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages

(. . . continued)
relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration.

> performance or enforcement abroad, or has some other reasonable relation with
> one or more foreign states.

While it is clear that arbitral awards "between citizens of the United States" that maintain "some . . . reasonable relation[ship] with one or more foreign states" are covered by the New York Convention pursuant to Section 202, Congress did not explicitly state whether Section 202 applies to arbitral awards rendered abroad, awards issued domestically, or both.  But in reading Section 202 in pari materia with the New York Convention, it is evident that Congress did not intend for this provision to relate to arbitral awards issued outside of the territorial jurisdiction of the United States, as an award rendered under that circumstance falls within the explicit language of the "extraterritorial" provision of Article I(1) of the Convention.  See New York Convention, art. I(1); Albert Jan van den Berg, When Is an Arbitral Award Nondomestic Under the New York Convention of 1958, 6 Pace L. Rev. 25, 39 (1985) ("[T]he New York Convention always applies to the recognition and enforcement of an arbitral award made in another state.").  Thus, Congress must have intended for Section 202, and the provisions of the New York Convention, to apply to arbitral awards issued within the territorial boundaries of the United States, i.e., awards covered under the "non-domestic" provision of the Convention.  Accordingly, Section 202 debunks any argument that Congress, in ratifying the New York Convention, understood the "reciprocity clause" to limit the reach of that treaty to only those arbitral awards issued extraterritorially.

As for whether the Award constitutes a "non-domestic" award under the New York Convention, the starting point in resolving that question is the Convention itself.  As the plain text of Article I(1) states, each individual signatory to the Convention determines what constitutes a "non-domestic" award.  See New York Convention, art. I(1) (applying the Convention to "arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought").  And, as noted above, Congress intended to "spell[]

out its definition of" a "non-domestic" award in Section 202 of the FAA, and that in doing so, it did not exclude from its definition arbitral awards involving two foreign parties. Bergensen, 710 F.2d at 933. In fact, Section 202 extends the coverage of the New York Convention to arbitral awards "between citizens of the United States" that maintain some "reasonable relation[ship] with one or more foreign states." 9 U.S.C. § 202. Given that Congress plainly intended for the New York Convention to cover certain arbitral awards issued in matters involving two domestic parties, it would be nonsensical for this Court to conclude that the Award—which was issued in a dispute involving two foreign parties, a foreign treaty, and a foreign investment —falls outside the reach of a treaty that was ratified for the purpose of recognizing and enforcing foreign arbitral awards. Therefore, the Award plainly falls within the "non-domestic" provision of Article I(1) of the New York Convention and, consequently, this Court has subject-matter jurisdiction to entertain this matter under 9 U.S.C. § 203.[10]

---

[10] BG Group contends that the Court should not entertain the Petition because Argentina failed to comply with 9 U.S.C. § 12, which requires a party moving to vacate, modify, or correct an arbitral award to serve "[n]otice of [the] motion . . . upon the adverse party or his attorney within three months after the award is filed or delivered." Specifically, BG Group alleges that the Award was delivered to the parties on December 24, 2007, and that Argentina did not serve notice of the Petition until April 8, 2008, approximately two weeks after the limitations period expired on March 24, 2008. Resp'r's Cross-Mot. at 14. On the other hand, Argentina asserts that it had sent an e-mail, with the Petition attached, to both BG Group and its counsel on March 20, 2008. Pet'r's Reply at 5; see also Pet'r's Pet., Ex. 3 (Affidavit of Fernando Koatz) ¶ 6-7 (declaring under oath that the Petition was served on BG Group and its counsel on March 20, 2008).

While Section 12 of the FAA is unquestionably applicable to the Petition now before the Court, see 9 U.S.C. § 208 (providing that 9 U.S.C. §§ 1-12 are applicable to matters covered under the New York Convention "to the extent that [they] are not in conflict with [9 U.S.C. §§ 201-208] or the Convention as ratified by the United States"), the problem with construing Section 12 in the context of international arbitration awards is that this provision "is an anachronism [that does not] account for the internationalization of arbitration law subsequent to its enactment." Matter of Arbitration Between InterCarbon Bermuda, Ltd. and Caltex Trading and Transp. Corp., 146 F.R.D. 64, 67 n.3 (S.D.N.Y. 1993). This is because Section 12 prescribes the appropriate manner of service for parties located in a district within the United States, but does not "give any direction for service on a foreign party." Id. at 67. Further complicating the analysis is that the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (the "Hague Convention"), Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163, presumably governs the method for serving process on an adverse party abroad, at least in the absence of any mandate to the contrary. But under the Hague Convention, a petitioner's compliance with Section 12 of the FAA would be virtually impossible because the Convention requires that a "central authority" located within the receiving country be solely responsible for serving the documents within that country, id. art. 5, and these "central authorities can and do take significantly longer than 90 days to arrange for service of process," Broad v.
(continued . . .)

13

B.  The Merits of the Petition and Cross-Motion

Turning to the merits of the Petition, Argentina relies on several provisions under 9 U.S.C. §§ 10(a) and 11 in support of its request for vacatur or modification of the Award. Specifically, Argentina argues that the Award should be vacated for the following reasons: (1) the arbitral panel exceeded its authority under the Investment Treaty, 9 U.S.C. § 10(a)(4); (2) the arbitral panel acted "in manifest disregard of the law," LaPrade, 246 F.3d at 706 (citation omitted); (3) there was "evident partiality or corruption" on the part of one of the arbitrators on the panel, 9 U.S.C. § 10(a)(2); (4) the Award was procured through "corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1); and (5) the Award is disproportionate, unfair, and irrational, and therefore should be modified pursuant to 9 U.S.C. § 11.  The Court will address each issue in turn.

1.  Whether the Arbitral Panel and ICC Court Exceeded Their Authority

Argentina proffers several arguments in support of its position that the Court should vacate the Award pursuant to Section 10(a)(4) of the FAA.  First, Argentina contends that the ICC Court exceeded its authority by failing to disqualify Jan van den Berg from serving on the

_____

(. . . continued)

Mannesmann Anlagenbau AG, 196 F.3d 1075, 1077 (9th Cir. 1999).  And because various courts have observed that "[t]here is no statutory or common law exception to" the three-month time limitation set forth under Section 12, strict enforcement of the limitations period set forth under Section 12 would effectively bar any petition to vacate an arbitral award where foreign parties stand on both sides of the aisle.  Dalal v. Goldman Sachs & Co., 541 F. Supp. 2d 72, 76 (D.D.C. 2008 ) (Sullivan, J.), aff'd 575 F.3d 725 (D.C. Cir. 2009); see also Webster v. A.T. Kearney, Inc., 507 F.3d 568, 574 (7th Cir. 2007) (denying the petition to vacate because it was filed one day late); Sanders-Midwest, Inc. v. Midwest Pipe Fabricators, Inc., 857 F.2d 1235, 1238 (8th Cir. 1988) (finding no exceptions to the time for service of notice as prescribed under Section 12).

Fortunately for the Court, the quandary of applying Section 12 in the international arbitration context is a perplexing problem whose resolution will be left for another day, as this issue does not involve a question of jurisdiction, Dalal, 541 F. Supp. 2d at 76 (construing the three-month time limitation under Section 12 as a statute of limitations, rather than a jurisdictional bar), that the Court must resolve first before addressing the merits, Sinochem, 549 U.S. at 430-31 (citing Steel Co., 523 U.S. at 93-102).  Furthermore, the Court need not resolve this issue because even assuming that Argentina timely served notice of the Petition, the Court nonetheless concludes that the Petition is without merit.  The Court will, therefore, pass on the question of whether Argentina is time-barred under Section 12 from asserting the claims at issue here.

panel. Pet'r's Pet. ¶ 69. Second, Argentina asserts that the Court must vacate the Award under Section 10(a)(4) because the arbitral panel improperly "permit[ed] BG [Group] to arbitrate its claims" before seeking recourse in the Argentine courts. Id. ¶ 60. Third, Argentina contends that the arbitral panel acted outside the bounds of its authority by allowing BG Group to "bring[] a derivative claim on behalf of MetroGAS." Id. And fourth, Argentina argues that the arbitral panel wrongfully rejected "the discounted cash flow method" in calculating the amount of the Award. Id. ¶ 105.

In order for Argentina to prevail in its efforts to vacate the Award under Section 10(a)(4), it must demonstrate that the "arbitrator stray[ed] from interpretation and application of the agreement and effectively dispense[d] his own brand of industrial justice." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., ___ U.S. ___, ___, ___ S. Ct. ___, ___, 2010 WL 1655826, at *7 (Apr. 27, 2010) (citations and internal quotation marks omitted). But, "if an arbitrator was arguably construing or applying the contract, a court must defer to the arbitrator's judgment." Madison Hotel v. Hotel & Rest. Employees, Local 25, 144 F.3d 855, 859 (D.C. Cir. 1998) (citation and internal quotation marks omitted). In conducting its review, the Court "may review the substance of an arbitration award, [but] only the narrowest circumstances will justify setting the award aside." Id. at 858-59 Applying these standards here, it is evident that Argentina has failed demonstrate that vacatur is appropriate under Section 10(a)(4).

On the question of whether the ICC Court exceeded its authority by failing to unseat Jan van den Berg from the arbitral panel, the claim is without merit. Nowhere in its Petition does Argentina dispute the ICC Court's authority under the Investment Treaty or the UNICTRAL arbitration rules to entertain its objection to Jan van den Berg's appointment to the arbitral panel. And, to the extent that Argentina argues that the ICC Court exceeded its authority by allowing a

partial and biased arbiter to sit on the panel, that argument must be rejected because Argentina has failed to provide any evidence establishing partiality on the part of Jan van den Berg. <u>See infra</u> p. 20-21. Argentina has simply provided no basis from which the Court could vacate the Award based on the ICC Court's exercise of authority.

Likewise, Argentina has not met its burden of showing that the arbitral panel exceeded its authority by entertaining BG Group's claims without requiring that recourse first be sought in the Argentine court system. The panel concluded that BG Group need not seek recourse in the Argentine court system before arbitrating this dispute because "[a]s a matter of treaty interpretation, . . . Article 8(2)(a)(i) cannot be construed as an absolute impediment to arbitration" where "any such interpretation would lead to the kind of absurd and unreasonable result proscribed by Article 32 of the Vienna Convention [on the Law of Treaties]."[11] Award ¶ 147. And, the arbitral panel concluded that a strict textual interpretation of Article 8(2)(a)(i) would result in an "absurd and unreasonable result" because Argentina had promulgated "emergency legislation . . . whose purpose was to bar recourse to the courts by those whose rights were felt to be violated." <u>Id.</u> ¶ 148; <u>see also</u> <u>id.</u> ¶ 149 (concluding that Argentina had also implemented a decree which "provided for a stay of all suits brought by those whose rights were allegedly affected by the [government's] emergency measures"). As the cited language illustrates, the panel correctly turned to the text of Article 8(2)(a)(i) of the Investment Treaty and relevant international law sources in attempting to discern its jurisdiction to hear BG Group's

---

[11] Article 32 of the Vienna Convention on the Law of Treaties, to which Argentina is a signatory, provides that "[r]ecourse may be had to supplementary means of interpretation" when standard means of treaty interpretation would "leave[] the meaning [of the provision] ambiguous or obscure[,] or . . . lead[] to a result which is manifestly absurd or unreasonable." The arbitral panel was authorized, if not compelled, to resort to sources of international law in construing Article 8(2)(a)(i) of the Investment Treaty. <u>See</u> Investment Treaty, art. 8(4) (requiring "[t]he arbitral tribunal [to] decide the dispute in accordance with the provisions of [the Investment Treaty] and the applicable principles of international law").

claims, and it relied upon a colorable, if not reasonable, interpretation of these provisions in concluding that the matter was arbitrable. Under Section 10(a)(4) and controlling case law, the Court is without authority to disturb the panel's conclusions.

Argentina's remaining efforts to vacate the Award under Section 10(a)(4) must also be rejected. In determining whether international law authorized BG Group to bring "a derivative claim on behalf of MetroGAS," Pet'r's Pet. ¶ 60, the panel reviewed several arbitration decisions and ultimately concluded that those cases supported the proposition that derivative claims are allowable under international law. In fact, the two cases cited by Argentina to support its argument that the panel could not hear derivative claims were actually found by the arbitral panel to stand for the opposite proposition. See Award ¶ 192 ("In support for its position [that derivative claims are not allowable] under international law, [Argentina] initially relied on Barcelona Traction, Light and Power Co. [(Belg. v. Spain), 1970 I.C.J. 3 (Feb. 5)], and it later invoked . . . [GAMI Investments, Inc. v. United Mexican States, UNCITRAL/NAFTA, Final Award (Nov. 15, 2004)]"), id. ¶ 197 (concluding that international law "does not require a claimant shareholder to be a majority or controlling owner for his investment to qualify for protection"); id. ¶ 193 ("The Tribunal finds the GAMI decision apposite and compelling as it relates generally to derivative claims, and specifically to the significance of Barcelona Traction."). Similarly, when the panel concluded that Section 2.2 of the Investment Treaty was silent on the standard for calculating damages, the arbitral panel properly turned to sources of international law to "identify the rule of law that governs in that situation." Stolt-Nielsen S.A., ___ U.S. at ___, ___ S. Ct. at ___, 2010 WL 1655826, at *7; see also Award ¶ 423-24 (relying "on the principle established in 1928 by the Permanent Court of International Justice in the Case Concerning the Factory at Charzów [(F.R.G. v. Pol.), 1928 P.C.I.J. (ser. A) No. 17, at ¶ 330

(Sept. 13)]" that "reparation is due for failure to apply a convention even where the convention itself is silent on the issue"); id. ¶ 428 (construing customary international law to require that the wrongful act be the proximate cause of the damages, and that the damages must not be speculative in nature). And, the panel determined that under customary international law, BG Group was entitled to the difference in value of BG's investment before the enactment of Argentina's emergency laws and the value of the investment after the legislation was adopted. Id. ¶ 440 (referring to BG Group's relinquishment of "an 18.8% indirect interest in MetroGAS in exchange for a US$38.2 million write-off," resulting "in a post-Emergency Law value of BG's 45.11% interest in MetroGAS of US$91,825,244.15"); id. ¶ 441 (relying on BG Group's expert witness in determining that the company's share in MetroGAS prior to the enactment of the emergency laws was US$277.0 million); id. ¶ 443 (concluding that BG Group is entitled to approximately US$185 million in damages). Whether the arbitral panel's reached the correct result in resolving these issues is not a matter fit for resolution by the Court; rather, it is merely enough that the arbitral panel reached conclusions that could arguably be justified by a colorable construction of the Investment Treaty's provisions and any applicable concepts derived from international law. And here, the Court is satisfied that the panel's conclusions meet that threshold. The arbitral panel having provided sustainable constructions of the Investment Treaty, the Court must rebuff Argentina's efforts to vacate the Award under Section 10(a)(4).

2. Whether the Arbitral Panel Acted In Manifest Disregard of the Law

To prevail under the "manifest disregard of the law" standard, Argentina must demonstrate "more than error or misunderstanding with respect to the law." LaPrade, 246 F.3d at 706. Rather, it must show that "(1) the arbitrators knew of a governing legal principle[,] yet refused to apply it or ignored it altogether[,] and (2) the law ignored by the arbitrators was well[-

]defined, explicit, and clearly applicable to the case." Id. Here, Argentina argues that the arbitral panel's exercise of jurisdiction over BG Group's claims, as well as the panel's rejection of the "state of necessity" doctrine relied upon by Argentina in the arbitration, were made in "manifest disregard of the law." Pet'r's Reply at 10, 12. These arguments are simply without merit.

In resolving the jurisdictional question, the arbitral panel did not "ignore[] the plain language of the [Investment] Treaty," as Argentina suggests. Pet'r's Reply at 10 (emphasis added). Rather, as noted above, the arbitral panel construed Article 8(2)(a)(i) of the Investment Treaty together with Article 32 of the Vienna Convention and determined that the former was not applicable under the particular circumstances of this case. Given that the arbitral panel provided a colorable justification for its interpretation of the Investment Treaty, it can hardly be said that the panel disregarded the applicable law.

Similarly, Argentina's argument that the arbitral panel "misunderstood . . . and failed to correctly apply the ['state of necessity'] doctrine" is nothing more than a mere assertion of error, and not that the panel manifestly disregarded the law. Pet'r's Pet. ¶ 61. Indeed, Argentina even admits that the panel addressed the "state of necessity" doctrine in issuing the Award. See id. ¶ 64 (contending that "[i]n a mere[] short seven paragraphs of the Award . . . the [panel] arbitrarily dismissed [the ']state of necessity['] defense"). But putting aside the fact that the arbitral panel considered, rather than ignored, Argentina's invocation of the "state of necessity" doctrine, it is far from certain that the doctrine is "clearly applicable" in this case. As the arbitral panel explained in issuing the Award, a country cannot invoke the "state of necessity" doctrine without being subject to "very restrictive conditions" to ensure that the country does not abuse the doctrine and "violate . . . international law with impunity." Award ¶ 410; see also International

Court of Justice, Case Concerning The Gabcikovo-Nagymaros Project (Hungary/Slovakia), 1997 I.C.J. 7 (Sept. 25) (concluding that the "state of necessity" doctrine, as codified in Article 25 of the International Law Commission's Articles on State Responsibility, is limited to circumstances in which there is "grave and imminent peril"). And, the panel found that Argentina could not invoke this doctrine because, inter alia, it had lured BG Group and other investors to accept measures that Argentina described as temporary, but later "set[] up a mechanism . . . that was never intended to restore the conditions of Argentina's initial representations." Award ¶ 411. Thus, the "state of necessity" doctrine is by no means "clearly applicable" to this case; if anything, the arbitral panel explained why this doctrine has no application to the facts of this case whatsoever. The Court, therefore, rejects Argentina's challenges to the arbitral panel's decision based on the "manifest disregard of the law" standard.

3. Whether There was Evident Partiality or Corruption With the Arbitrators

To have the award vacated under Section 10(a)(2), Argentina must present evidence of partiality or corruption that is "direct, definite, and capable of demonstration[,] rather than remote, uncertain, or speculative." Al-Harbi v. Citibank, N.A., 85 F.3d 680, 683 (D.C. Cir. 1996) (citation omitted). Indeed, Argentina has the "heavy" burden to "establish specific facts that indicate improper motives on the part of an arbitrator." Id. (emphasis added and citation omitted). As grounds for its position, Argentina contends that arbitrator Albert Jan van den Berg presided over four arbitral matters arising out of the Investment Treaty, and that in the first matter (involving a company named LG&E), he held that Argentina could rely on the "state of necessity" doctrine, while in the three other arbitrations (including the one now being disputed before the Court), Jan van den Berg concluded, without elaboration, that the doctrine could not be invoked. Pet'r's Pet. ¶ 71. Argentina argues that Jan van den Berg's inconsistent decisions,

as well as his failure to explain the reasoning behind his decisions, is evidence of bias and that the Award must be vacated for those reasons. Id. ¶ 76. The argument lacks merit.

Jan van den Berg's failure to provide an explanation for his decision is hardly evidence of nefarious intent on his part, especially given the well-settled principle that arbitrators have no obligation to disclose the basis upon which their awards are made. Wilko v. Swan, 346 U.S. 427, 436 (1953). Furthermore, there could be a number of innocuous reasons to explain why Jan van den Berg reached a different conclusion in the first case. For example, there may be a material factual distinction between this case and the LG&E case. See, e.g., Resp't's Reply at 2 n.3 (asserting that the LG&E tribunal accepted Argentina's defense of necessity based on a provision which is contained in the bilateral investment treaty between the United States and Argentina, but does not exist in the Investment Treaty at issue here). Or, it may be that LG&E failed to articulate a persuasive argument in opposition to Argentina's invocation of the state of necessity doctrine, while BG Group and the other litigants have since raised convincing challenges. The upshot is that there is no basis for the Court to conclude that Jan van den Berg was a biased arbiter without engaging in rank speculation. Accordingly, Argentina has failed to provide the Court with "direct" and "definite" evidence of arbiter bias which is necessary to prevail under Section 10(a)(2) of the FAA. Al-Harbi, 85 F.3d at 683.

4. Whether the Award was Procured by Corrupt, Fraudulent, or Undue Means

Argentina asserts that the Award was procured by "corrupt, fraud, or undue means" because witness statements presented in this case contain "passages that are identical or substantially identical to a witness statement presented in [another unrelated] case." Pet'r's Pet. ¶ 82. Specifically, Argentina observes that the "witness statements presented in this case have many passages that are identical or substantially identical to a witness statement presented in [an

earlier] case," and that because counsel for BG Group represented the plaintiff involved in the earlier case, the statements must "reflect what [c]ounsel would have [the] witness[es] declare," rather than "what the witness[es] saw, thought[,] or believed at the time" the statements were made. Id. ¶ 82.

But Argentina assumes too much. At best, the similarities between the witness statements establish that counsel drafted the declarations in both cases. Assuming that counsel did in fact have a heavy hand in drafting the declarations at issue in these cases, their actions do not rise to the level of wrongdoing unless Argentina can prove that the witness signed the statement without subscribing to the facts stated therein. See Resolution Trust Corp. v. Bright, 6 F.3d 336, 342 (5th Cir. 1993) (finding no ethics violation where attorneys drafted an affidavit but "made sure that [the witness] signed [it] only if she agreed with its contents"). Argentina has provided no evidence to that effect, and thus there is nothing in the record before the Court that allows for vacatur of the Award pursuant to Section 10(a)(1).

5. Whether a "Disproportionate," "Unfair," and "Irrational" Award Can Be Modified Under 9 U.S.C. § 11

Finally, Argentina argues that the Court should modify the Award because the arbitral panel's rejection of the "discounted cash flow basis" standard resulted in a disproportionate, unfair, and irrational Award. Pet'r's Reply at 17. Unfortunately for Argentina, Section 11 of the FAA does not authorize the Court to modify the Award on these grounds. Rather, the Court can modify the Award under Section 11 only if it finds that the Award contains a "material miscalculation of figures," 9 U.S.C. § 11(a), i.e., a "mathematical error appear[ing] on [its] face," Grain v. Trinity Health, Mercy Health Servs., Inc., 551 F.3d 374, 378 (6th Cir. 2008) (quoting Apex Plumbing Supply, Inc. v. U.S. Supply Co., 142 F.3d 188, 194 (4th Cir. 1998)), the arbitrators had decided a matter that was "not submitted to them," 9 U.S.C. § 11(b), or that the

Award "is imperfect in matter of form not affecting the merits of the controversy," id. § 11(c). Argentina does not rely on any of these as grounds for modifying the Award under Section 11 and therefore relief under this provision is not available to it. The request for such relief must therefore be denied.

## IV.    Conclusion

"A federal court cannot vacate [or modify] an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law." Howard Univ. v. Metro. Campus Police Officer's Union, 519 F. Supp. 2d 27, 37 (D.D.C. 2007) (Walton, J.) (quoting Wallace v. Buttar, 378 F.3d 182, 190 (2d Cir. 2004)). Yet Argentina's attack on the validity of the Award is premised on nothing more than numerous assertions of error on the part of the arbitral panel. To be sure, under a more searching, appellate-style review, the arguments presented by Argentina in its Petition could very well carry the day. But, because the Court in this circumstance does not sit like "an appellate court does in reviewing the decisions of lower courts," Kanuth, 949 F.2d at 1178, the Court has no choice but to deny the relief sought by Argentina in its Petition.

The remaining question in this matter, therefore, is whether the Court should grant BG Group's cross-motion to confirm the Award. Argentina argues that it "should be given [a] full opportunity to respond to [BG Group's cross-motion] once the Court has [rendered] a decision" regarding its Petition, "considering the serious violations of public policy" allegedly committed by the arbitral panel,[12] Pet'r's Reply at 22, while BG Group responds that Argentina has had more than a month to oppose the cross-motion, but that in any event, "Argentina's challenge to the Award on public policy grounds is entirely without foundation," Resp't's Reply at 4 n.4. The

---

[12] Article V(2)(b) of the New York Convention provides a court with the authority to refuse recognition of an arbitral award if confirmation of the award "would be contrary to the public policy of that country."

Court shares a level of empathy with BG Group's position (i.e., that Argentina could have (and should have) set forth in its memorandum in opposition to BG Group's cross-motion the basis for vacatur on public policy grounds), and that given the nature of the Award, the Court is highly skeptical that the Award violates this country's "most basic notions of morality and justice." TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 939 (D.C. Cir. 2007) (quoting Karahas Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 364 F.3d 274, 305-06 (5th Cir. 2004)).

Nonetheless, in light of Argentina's express reservation for further briefing on the issue of whether vacatur is appropriate under Article V(2)(b) of the New York Convention, the Court concludes that Argentina should be given the opportunity to submit a supplemental memorandum. Thus, any supplemental memorandum that Argentina desires to submit on this issue shall be filed on or before June 30, 2010, BG Group shall file its memorandum in opposition to Argentina's supplemental memorandum on or before July 21, 2010, and Argentina shall file its brief in reply to BG Group's opposition memorandum on July 30, 2010. And, to ensure the prompt resolution of this matter, the parties shall then appear before the Court at 9:30 a.m. on August 13, 2010, for a hearing on the merits of BG Group's motion to confirm the Award. The Court expects strict adherence to this schedule, given the inconvenience and additional delay that BG Group will have to endure as a result of additional briefing. Accordingly, the Court will not grant Argentina any extensions of time to file its submissions absent the most compelling circumstances, and the failure of Argentina to timely file a supplemental memorandum will result in the Court treating BG Group's cross-motion as conceded.

**SO ORDERED** on this 7th day of June, 2010.[13]

REGGIE B. WALTON
United States District Judge

---

[13] The Court issued an order on March 31, 2010, granting BG Group's motion for a pre-judgment bond and, <u>inter alia</u>, staying further action in this case until otherwise ordered by the Court. In light of the foregoing analysis, the Court will issue an order accompanying this memorandum opinion (1) vacating the March 31, 2010 order; (2) lifting the stay and administratively reopening the case; (3) denying Argentina's Petition to Vacate or Modify an Award; (4) denying as moot BG Group's Motion for a Pre-Judgment Bond; (5) directing Argentina to file a supplemental memorandum explaining its reasons why the Court should refrain from confirming the Award pursuant to Article V(1)(c) of the New York Convention, if any it intends to file, on or before June 30, 2010; (6) directing BG Group to file its memorandum in opposition to Argentina's supplemental memorandum, if any it intends to file, on or before July 21, 2010; (7) directing Argentina to file its brief in reply to BG Group's opposition memorandum, if any it intends to file, on or before July 30, 2010; and (8) directing the parties to appear before the Court at 9:30 a.m. on August 13, 2010, for a hearing on the merits of BG Group's motion to confirm the Award.