## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE REPUBLIC OF ARGENTINA )<br><br>Petitioner, )<br>-against- )<br><br><br>BG GROUP PLC. )<br>Respondent. ) | Civil Action No. 08-0485 (RBW) |

THE REPUBLIC OF ARGENTINA )
)
)
)
Petitioner, )
-against- )
)
) **Civil Action No. 08-0485 (RBW)**
)
)
BG GROUP PLC. )
Respondent. )
)
)
)
)

## SUPPLEMENTAL MEMORANDUM

Pursuant to this Court's order dated June 7, 2010 (the "Order"), Petitioner The Republic of Argentina ("Argentina") files this Supplemental Memorandum explaining the reasons the Court should refrain from confirming the arbitral award dated December 24, 2007.[1]

## I. INTRODUCTION

By Petition to Vacate or Modify Arbitration Award ("Petition to Vacate the Award") dated March 20, 2008, Argentina sought to vacate the arbitral award granted in favor of respondent ("BG") and against Argentina.

BG opposed the Petition to Vacate and filed a Cross Motion for Recognition and Enforcement ("Cross Motion for Recognition of the Award") on June 7, 2010.

---

1. Argentina submits this Supplemental Memorandum without waiving and without prejudice to any of its rights to appeal the Order.

Argentina opposed the Cross Motion for Recognition of the Award on June 20, 2008, in light of the pending Petition to Vacate the Award, and requested this Court to have full opportunity to respond to the Cross Motion for Recognition of the Award once the Court had issued a decision on the Petition to Vacate the Award.

On March 31, 2010, this Court denied Argentina's Petition to Vacate the Award. At the same time, the Court permitted Argentina to file this Supplemental Memorandum to explain the reasons why the Court should refrain from recognizing the Arbitral Award.[2]

## II. Grounds for Non-recognition of the Award

Article V of the Convention on the Recognition and Enforcement of Foreign Arbitral Award ("New York Convention") provides that recognition and enforcement of the award may be refused, among others, on the following grounds:

> (1)(c): when the award deals with a difference...not falling within the terms of the submission to arbitration...

> (2)(b): when the recognition or enforcement of the award would be contrary to the public policy of that country.

Pursuant to Article V(1)(c) of the New York Convention, an award cannot be enforced if the tribunal rendered a decision that applies to matters

---

[2] Argentina maintains all the grounds for vacatur, modification or annulment of the Arbitral Award and the arguments developed during the proceeding for vacating the Arbitral Award; in particular, as to the issue raised in connection with arbitrator van den Berg it should be noted that the "propriety of the makeup of an arbitration panel sufficiently implicates public policy to fall within Article v(2)(b) of the Convention")  see *Brandeis Intsel Ltd.* v. *Calabrian Chemicals Corp.*, 656 F.Supp. 160 169 (1987) (see also *Transmarine Seaways Corp. of Morovia, as Owner of the M.S. Ocean Voyager* v. *March Rich & Co. A.G.*, 480 F.Supp. 352 357 (1979)).

beyond the scope of the agreement, which, indeed, "authorizes vacating an award 'where the arbitrators exceeded their powers.'" (*Parsons & Whittemore Overseas Co., Inc.* v. *Societe Generale de L'Iindustrie du Papier (RAKTA)*, 508 F.2d 969 976 (1974)).

Courts must not override the terms of the agreement to arbitrate. Courts should ensure enforceability of international awards by respecting the parties' agreement to arbitrate (See *Encyclopedia Universalis S.A.* v. *Encyclopedia Britannica, Inc.*, 403 F.3d 85, 91 (2005); see also *Volt Information Sciences, Inc.* v. *Board of Trustees*, 489 U.S. 468, 479 (1989); *Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). In a recent decision, the U.S. Supreme Court has held that national policy favoring arbitration "cannot [override] the principle that a court may submit to arbitration 'only those disputes…that the parties have agreed to submit.' ('[T]he FAA's proarbitration policy does not operate without regard to the wishes of the contract parties')" (*Granite Rock Co.* v. *Int'l. Brotherhood of Teamsters et al*, 561 U.S. ___ 12 (2010) (citations omitted); see *Stolt-Nielsen S.A. et al* v. *AnimalFeeds Int'l. Corp.*, 559 U.S. ___ 11 (2010) ("It falls to courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties)). Additionally, it concluded that

> Nor have we held that courts may use policy considerations as a substitute for party agreement. We have applied the

presumption favoring arbitration, in FAA and in labor cases, only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and (absent a provision clearly and validly committing such issues to an arbitrator) is legally enforceable and best construed to encompass the dispute" (*Id.*).

Pursuant to Article V(2)(b) of the New York Convention, enforcement of an award may also be refused if such enforcement would be contrary to the public policy of the country where enforcement is sought. In this regard it should be noted that the United States Court of Appeals for the Second Circuit has interpreted Article V(2)(b) of the New York Convention to apply to "situations where the contract as interpreted by the arbitrators would violate  some explicit public policy that is well defined and dominant, and tis to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest" (*Karen Maritime Ltd.* v. *Omar Int'l. Inc.*, 322 F.Supp.2d 224 (2004)).

## III.   Application of the Grounds for Non-recognition of the Award

### A.  The Arbitral Tribunal Exceeded Its Authority

The U.S. Supreme Court has held that "[a]rbitration is strictly 'a matter of consent,' *Volt Information Sciences, Inc.* v. *Board of Trusteed of Leland Stanford Junio Univ.*, 489 U.S. 468, 479 (1989), and thus 'is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration" (*Granite Rock Co.* v. *International Brotherhood of Teamsters et al*, 561 U.S. ___ 9 (2010) (citations omitted)). Indeed, the

Supreme Court highlighted that "the FAA requires courts to enforce valid and enforceable arbitration agreements *according to their terms*" (*id.* at n. 8, emphasis added).

In another recent decision in which issues were raised as to the validity of the consent to arbitrate, the U.S. Supreme Court highlighted that "arbitrators must look to the language of the parties' agreement to ascertain the parties' intention" (*Stolt-Nielsen S.A. et al v. AnimalFeeds Int'l. Corp.*, 559 U.S. ___ 11 (2010)), and that "[w]hile the interpretation of an arbitration agreement is generally a matter of state law, the FAA imposes certain rules of fundamental importance, including the basic precept that <u>arbitration 'is a matter of consent, not coercion</u>" (*id.* at 17 (citations omitted) (emphasis added)).

Moreover, in very clear terms, the U.S. Supreme Court confirmed that

> [w]hether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must 'give effect to the contractual rights and expectations of the parties' (citation omitted). In this endeavor, 'as with any other contract, the parties' intentions contol.' *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). This is because an arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution. See *AT&T Technologies, Inc.* v. *Communications Workers*, 475 U.S. 643, 648-649 (1986) ('[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration'); *Mitsubishi Motors*, *supra*, at 628 (Stolt-Nielsen S.A. et al v. AnimalFeeds Int'l. Corp., 559 U.S. ___ 11 (2010)).

In the present case, the arbitrators exceeded their authority by

completely disregarding the terms of the parties' agreement to submit to arbitration, contained in the Argentina-UK BIT, which expressly establish the rules under which international arbitration can be initiated. In this respect, the U.S. Supreme Court has stated that "parties are 'generally free to structure their arbitration agreements as they see fit.' For example,…parties may agree to limit the issues they choose to arbitrate, and may agree on <u>rules under which any arbitration will proceed</u>" (*id.* at 19) (citations omitted) (emphasis added).

Article 8 of the BIT states in pertinent parts:

a. *Disputes with regard to an investment which arose within the terms of this Agreement* between an investor of one Contracting Party and the other Contracting Party, which have not been amicably settled shall be submitted, at the request of one of the Parties to the dispute, *to the decision of the competent tribunal of the Contracting Party in whose territory the investment was made*;

b. The aforementioned disputes shall be submitted to international arbitration in the following cases:

   i. <u>*if*</u> one of the parties so requests, in any of the following circumstances:

      I. where<u>*, after a period of eighteen months has elapsed from the moment when the dispute was submitted to the competent tribunal of the Contracting Party in whose territory the investment was made, the said tribunal has not given its final decision*</u>;

      II. where <u>*the final decision of the aforementioned tribunal has been made but the Parties are still in dispute*</u>

(Emphasis added)

Argentina's offer to arbitrate a dispute arising directly from an investment protected by the BIT was made under the condition that such

dispute be submitted, before recourse be had to international arbitration, to the competent tribunals of Argentina. The use of the term "shall" in the Argentina-UK BIT leaves no doubt as to Argentina's consent; *i.e.* BG would have been able to have recourse to international arbitration if the following two requirements had been met: a) a period of eighteen months has elapsed from the time when the dispute was submitted to the competent tribunal of the Contracting Party in whose territory the investment was made, Argentina in this case; and b) the aforementioned tribunal has not made a final decision, or even if it has, the Parties were still in dispute.

BG did not file any complaint as regards its treaty claim or any other claim with the Argentine courts, as it was required to do by the agreement to arbitrate.

The Tribunal agreed with Argentina that as a matter of treaty law, investors acting under the Argentina-UK BIT must litigate in the host State's courts for 18 months before they can bring their claims to arbitration.[3] But, regardless of the clear terms of the Treaty, the Tribunal decided to excuse BG from abiding by the terms of the very Treaty BG sought to enforce.

The Tribunal capriciously, and without relying on any evidence, not even an  inference, concluded that "the regular operation of the courts in Argentina came under significant pressure after promulgation of the Emergency Law,"[4] and that "the Executive Branch...directly interfer[ed] with

---

[3]        Award, ¶ 146.
[4]        Award, ¶ 148.

the normal operation of its courts, and (ii)…exclud[ed] litigious licensees from the renegotiation process."[5]

There is no single reference, throughout the whole Award, to even an attempt by BG to file a complaint with Argentine courts. Nor is there anything in the record that would support the conclusion that BG could not approach Argentine state courts because their "regular operation…came under pressure…" Nor could there be one, since BG never resorted to Argentine courts, not even for a day.

The Arbitral Tribunal's reference to Decrees No. 214/02, 320/02 and 1090/02, and to Ministry of Economy Resolution No. 308/02,[6] cannot justify BG's complete failure to resort to Argentine courts since: a) Decrees No. 214/02 and 320/02 only ruled the *temporary stay* of "enforcement of precautionary measures" and of "execution in those legal processes filed against the Argentine Government by virtue of the emergency legislation;" and not the commencement of legal actions, and b) Decree 1090/02 and Ministry of Economy Resolution No. 308/02[7] only applied to concessionaires and licensees, not to its shareholders.

Such regulations were in no way an obstacle for BG to bring the dispute  before local courts since BG's claim for Argentina's alleged violations of the BIT would not have been either an "enforcement proceeding of precautionary measure" or an "execution proceeding in a process against

---

[5]      Award, ¶ 155.
[6]      Award, ¶ 153.
[7]      Award, ¶ 154.

Argentina." Neither BG was a concessionaire or a licensee. Therefore, BG was not affected or impeded by such regulations; thus, it was never prevented from filing its treaty claim with Argentina courts. And again, it never even tried to do it.

Therefore, even though the terms of the consent to arbitrate (Article 8 of Argentina-UK BIT) were clear — which the Tribunal acknowledged,"[8] the Arbitral Tribunal blatantly disregarded those terms when concluding, without any evidence, that recourse to domestic courts is not required since that would have allowed States to "unilaterally elude arbitration."[9]

In this sense, it is appropriate to highlight that recent proceedings show that final decisions in Argentine courts are obtained within 18 months or less. However, even assuming arguendo that the aforementioned regulations would have impaired BG's claim before Argentine courts, BG was obligated nonetheless under the BIT to prosecute its claim before the local courts. After an eighteen-month period in which a decision had not been reached, BG could have submitted its claim to international arbitration.

The Wintershall decision, introduced by Argentina in this proceeding on February 3, 2009, sheds light on this point. It is instructive for the present case since it states that the claimant was not entitled to refer the dispute raised by it directly to ICSID arbitration since it had not complied with the provisions contained in the BIT as regards exhaustion of local remedies (a

---

[8]      Award ¶ 146.
[9]      Award ¶ 147.

circumstance that is identical to the one that the BG Tribunal had to consider). That tribunal stated that:

> [i]t is a general principle of the law of treaties that a third beneficiary of a right under it must comply with the conditions for the exercise of the right provided for in the treaty or established in conformity with the treaty. On the analogy of Article 36(2) of the Vienna Convention on the Law of Treaties of 196998 (the "Vienna Convention"), the 'secondary right-holder' under a bilateral treaty (the investor) who is conferred certain rights, being in no different position from "the third State" (mentioned in Article 36) – must comply with the conditions stipulated for the exercise of the rights provided for in the treaty concerned, which in the instant case is the "basic" treaty.
>
> The manner in which Article 10 of the BIT is worded (and it is words that determine the intention of the Parties when interpreting a treaty) it is apparent – that reference to ICSID arbitration is expressly conditioned upon inter alia a claimant-investor first submitting his/its dispute to a Court of competent jurisdiction in Argentina, during an 18–month period (and a three month further waiting period) and then proceeding to ICSID arbitration.
>
> In the present case, therefore the BIT between Argentine/and Germany is a treaty undoubtedly providing for a right of access to international arbitration (ICSID) for foreign investors, who are German nationals – but this right of access to ICSID arbitration is not provided for unreservedly, but upon condition of first approaching competent Courts in Argentina. That such a condition as that stipulated under Article 10(2) (e.g. a local-remedies-clause with an opt-out provision) can be lawfully provided for is clear from the provisions of Article 26 of the ICSID Convention – The first part of Article 26 states that "consent of the parties to arbitration under this Convention shall, unless otherwise stated be deemed consent to such arbitration to the exclusion of any other remedy." The exclusive remedy rule mentioned in the first sentence of Article 26 is subject to modification by the terms of a particular BIT between two Contracting States. Thus, a local-remedies rule may be lawfully provided for in the BIT – under the first part of Article 26; once so provided, as in Article 10(2), it becomes a condition of Argentina's "consent" – which is, in effect, Argentina's "offer" to arbitrate disputes under the BIT, but only

upon acceptance and compliance by an investor of the
provisions inter alia of Article 10(2); an investor (like the
Claimant) can accept the "offer" only as so conditioned.

[…] Since the Claimant (a German national) can only make a
claim under the Argentina-Germany BIT, and under no other
document, when the Claimant Wintershall so makes a claim –
(as it has done in the present case) – it has no option but to
comply with the closely – interlinked conditions mentioned in
Article 10, before exercising its right to ICSID arbitration –
simply because that is the expressed will of the Contracting
States.

Article 10(2) contains a time-bound prior-recourse-to-local-
courts-clause, which mandates (not merely permits) litigation
by the investor (for a definitive period) in the domestic forum –
which both Contracting Parties have considered to be an
appropriate judicial body. It does not mention what relief
should be sought in the domestic courts, nor does it require
that it should be the same or similar relief to that sought in
international arbitration. Whatever may have been the object
in contemplation of the Contracting States when the
Argentina-Germany BIT was agreed to and adopted, (and there
is no evidence of this in the present case apart from the text of
the treaty – i.e. the BIT) it does definitely indicate a
compulsion to comply.[10]

Thus, the submission of the dispute to an International
Arbitral Tribunal is conditioned upon prior fulfilment of the
provision contained in Article 10(2) unless the parties to the
dispute agree otherwise (also an event envisaged in Article
10(3)(b)).[11]

Therefore, Wintershall reflects that the BG Tribunal lacked
appropriate jurisdiction and that it egregiously exceeded its power when
granting itself jurisdiction. For the sake of brevity, Argentina refers for a
more detailed description of Wintershall to its submissions of February 3,
2009, and February 20, 2009.

Thus, considering the "well established principle that arbitration is a

---

[10]     *Wintershall Aktiengesellschaft* v. *Argentine Republic*, ICSID Case No. ARB/04/14,
("Wintershall") ¶¶ 114-118.
[11]     Winterhsall ¶ 122

matter of contract; therefore, an arbitration award must draw its essence from the parties' collective bargaining agreement" (Howard Univ. v. Metro. Campus Police Officer's Union, 519 F. Supp. 2d 27, 32 (D.D.C. 2007), and that the arbitration clause, *i.e.* consent to arbitrate, is fundamental to the determination of an arbitral tribunal's powers to decide a dispute, and a foundational principle of the FAA (*Stolt-Nielsen S.A. et al* v. *AnimalFeeds Int'l. Corp.*, 559 U.S. ___ 20 (2010), there can be no doubt that the Arbitral Tribunal exceeded its jurisdiction. The Arbitral Tribunal exceeded its powers in permitting BG to arbitrate its claims in blatant disregard of the Parties' agreement to arbitrate.

### B. BG's Derivative Claims Are  Contrary U.S. Law and Violate U.S. Public Policy

In paragraph 190 of the Award, the Arbitral Tribunal correctly characterized BG's claims as derivative, in the following words:

> Thus articulated, BG's claims are derivative. BG does not claim that Argentina's measures were specifically directed against its shareholding in GASA and MetroGAS. BG claims instead that damage to the value of its shares was caused by (or derives from) measures adopted by Argentina which had a negative impact on the activities of MetroGAS and, hence, on the value of its shareholding in GASA and in MetroGAS.[12]

Furthermore, in its Statement of Claim, BG itself described the investment at issue in the arbitration as "BG's participations in the Argentine companies MetroGAS and GASA," "interests in claims to money

---

[12]      Award ¶ 190.

and performance under *contracts entered into by MetroGAS,*" and "benefits from the *Licence granted by the Government to MetroGAS* to carry out gas distribution services in Argentina."[13]

The Arbitral Tribunal, after rejecting Argentina's objection that "derivative claims are proscribed by international law and by domestic corporate law,"[14] concluded that it had jurisdiction to hear "BG's claims as they relate to its indirect shareholding in MetroGAS and GASA."[15]

It concluded, however, that "BG does not have standing to seize this Tribunal with 'claims to money' and 'claims to performance', or to assert any other right, derived from the MetroGAS License,"[16] noting in passim that "BG's expert did not provide a valuation of damage to BG's rights in the MetroGAS License independent of the loss of value of its shareholding interest in GASA and MetroGAS."[17]

Hence, it is clear — and the Arbitral Tribunal so expressly acknowledged — that BG's claims are derivative, in the sense that they refer to measures applying to and alleged damages suffered not by BG (or at least not directly) but by a company — MetroGAS — in which BG held (and still holds) shares. It should be noted that not only Argentina but also the United States of America, as recognized by the Arbitral Tribunal,[18] have affirmed

---

[13]     Award ¶ 178.
[14]     Award ¶ 191.
[15]     Award ¶ 205.
[16]     Award ¶ 217.
[17]     Award ¶ 215.
[18]     Award ¶ 197.

that derivative claims are proscribed by international law. In the words of the

United States Department of State:

> Under customary international law, no claim by or on behalf of
> a shareholder may be asserted for loss or damage suffered
> directly by a corporation in which that shareholder holds
> shares. Only direct loss or damage suffered by shareholders is
> cognizable. A classic example of direct loss or damage suffered
> by shareholders is when the host State wrongfully expropriates
> the shareholders' ownership interests, whether directly
> through an expropriation of the shares, or indirectly
> expropriating the corporation as a whole. Another example of
> direct loss or damage sustained by a shareholder is that
> incurred by the shareholder as a result of it having been denied
> its right to vote its shares in a company incorporated in the
> territory of the host State.[19]

The same principle obtains under U.S. law. Indeed, it is well

established that "[a] corporation is a distinct legal entity from those persons

who compose it." *Sparks* v. *Progessive American Insurance Co.*., 517 So.2d

1036 1039 (1987); *Middleton* v. *Parish of Jefferson*, 707 So. 2d 454 456 (1998)

("The general rule that corporations are distinct legal entities is well

supported by jurisprudence and statute.").

Likewise, it is well established that a shareholder does not have an

individual cause of action against third parties for wrongs or injuries to the

corporation in which he or she holds stock, even if he or she suffers harm

from the damage to the corporation, such as a reduction in the value of his or

her stock.[20] This is because, as sustained for example by the English Court of

---

[19]    Submission of the United States of America in the case of *Gami Investments Inc.* v.
*The United Mexican States*, UNCITRAL/NAFTA, June 30, 2003, ¶ 9.
[20]    Richard A. Mann, Barry S. Roberts, Smith and Roberson's Business Law 666 (2003)

Appeal:

> When the shareholder acquires a share he accepts the fact that
> the value of his investment follows the fortunes of the company
> and that he can only exercise his influence over the fortunes of
> the company by the exercise of his voting rights in general
> meeting.[21]

In fact, a stockholder may not sue on a cause of action derived from the corporation. The shareholder may not act as a self-chosen representative and a volunteer champion of the corporation. *Cohen, Executrix, Et Al. v. Beneficial Industrial Loan Corp. Et Al.*, 337 U.S. 541 (1949).

A cardinal precept of Delaware corporate law is that directors, rather than shareholders, manage the business and affairs of the corporation. 8 *Del.C.* § 141(a). Section 141(a) states in pertinent part:

> The *business and affairs* of a corporation organized under this
> chapter *shall be managed by or under the direction* of a board
> of directors except as may be otherwise provided in this chapter
> or in its certificate of incorporation.

This is not to be confused with a derivative action brought by one or more shareholders to enforce a right of a corporation, the corporation having failed to enforce a right that it may properly assert. That rule requires a shareholder bringing such a suit to set forth the efforts, if any, made by the plaintiff to obtain the action he desires from the directors, and the reasons for his failure to obtain the action or for not making the effort. *Daily Income Fund, Inc., et al.* v. *Fox,* 464 U.S. 523 (1984).

---

(explaining that the only way a shareholder has the possibility of filing a derivative suit is when the board of directors refuses to so act on the corporation's behalf). Obviously, this has not been the case here.

[21]     *Prudential Assurance Co* v. *Newman Industries*, [1982] Ch 204, 224.

Allowing BG to put forward derivative claims — without any evidence whatsoever that MetroGAS, the holder of the Licence, has failed to enforce its rights — goes against these  accepted principles of law.

This alone constitutes grounds to annul the award since, being a court of primary jurisdiction — i.e. a court of the country of the arbitral situs— it has the power to deny enforcement of an award that contradicts its own domestic law (*Karaha Bodas Co., L.L.C.* v. *Perusahaan Pertambangan Miny Ak Dan Gas Bumi Negara*, 364 F.3d 274 288 (2004).

Further, permitting BG's derivative claims in the circumstances of this case is contrary to the public policy of the United States of America, in the terms of Article V 2(a) of the New York Convention, and therefore this Court should refuse recognition and enforcement of the award. As described above, BG's derivative claims violate "explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest" (*Karen Maritime Ltd.* v. *Omar Int'l. Inc.*, 322 F.Supp.2d 224 (2004)).

Moreover, BG's derivative claims also affect basic property rights of the companies in which BG has shares, that is GASA and particularly Metrogas, which in turn also affects explicit public policy principles.

Consider the consequences of  permitting BG to advance derivative claims: (i) if damages are payable to the shareholder directly, then the rights of the company's creditors may be prejudiced or even eviscerated if the

company cannot pay its debts as they  become due; (ii) the shareholder can bypass the company's own governing bodies by pursuing a strategy that the company itself does not endorse, thus generating a real risk of double or multiple recovery; and (iii) in the case of a large multinational company, a single measure of the host State causing prejudice to that company could potentially generate an endless number of claims from individual or corporate shareholders with different levels of direct or indirect interest in the investment in relation to, we must emphasise, the same  wrong.

C.  **The decision on damages makes Argentina compensate BG for the consequences of the deterioration of the macroeconomic conditions before Argentina adopted the measures at issue. This constitutes an excess of the Tribunal's powers and a violation of U.S. public policy**

The award on damages is against the public policy of the United States not because of the method it used to calculate damages or the discount rate it used. It is against US public policy because — due to the date it chose to estimate the value before the measures — it is making Argentina liable for the consequences of the deterioration of macroeconomic conditions that took place *before* the measures at stake were adopted. Making a country liable to pay compensation for the consequences of an economic crisis not only contradicts "the forum country's most basic notions of morality and justice" (see, e.g. *Parsons & Whittemore Overseas Co., Inc.* v. *Societe Generale de L'Iindustrie du Papier (RAKTA)*, 508 F.2d 969 974 (1974)). It is also inconsistent with the Arbitral Tribunal's own rationale, which only includes

measures taken by Argentina to address the crisis — and not the crisis itself — as the sources of Argentina's liability.

The Arbitral Tribunal fixed the damages as the difference between the value of BG's stake in MetroGAS in 1998 and its value in 2001. By considering a 1998 transaction, the Arbitral Tribunal  committed a fatal mistake: to regard the value of  MetroGAS' shares  as of 1998 (July 12, 1998), when the Argentine economy was at its peak, as the fair market value at the time of the collapse of the Argentine economy at the end of 2001 is utterly without basis in logic or law. The fatal flaw was to assume that the value MetroGAS had at the middle of 1998 — precisely the peak of Argentina's economy of the last decades — was the same value it had at the end of 2001, which was the worst point of Argentina's crisis.

It was precisely on June 31, 1998, when a record high was hit in the Argentine economy — as measured in US dollars — during the entire life of convertibility.[22]   Argentina — which featured growth in a vertiginous manner until June 1998 — fell into a recession the following quarter which would become the worst crisis ever in Argentine history.

The following chart shows the moment indicated by the Arbitral Tribunal to establish the fair market value of Metrogas, in terms of Argentine GDP:

---

[22]     This would remain a peak —as measured in current Argentine pesos— until 2005. Source: INDEC (*Argentine Bureau of Censuses and Statistics*), Oficina Nacional de Cuentas Nacionales (*National Office of Federal Accounts*).



Source: INDEC. Dirección Nacional de Cuentas Nacionales (*National Direction of Federal Accounts*).

Hence, the Tribunal's misconception not only granted BG damages for the effects of the measures adopted by Argentina during its 2001 crisis, but also resulted in a condemnation of Argentine for the economic crisis that it suffered between 1998 and 2001. This can be easily verified by reference to Metrogas stock value as it was listed. The following is a chart that shows the impact on the stock value pertaining to the main stock exchange index in Argentina (MERVAL index).



As one can see, Metrogas stock value decreased between the two periods very significantly. The decrease in value of Metrogas stock price on the New York Stock Exchange market (NYSE) since the day prior to Metrogas stock purchase by Perez Companc[23] until the day before the adoption of the measures at stake[24] was of 41%.[25] Therefore, the Arbitral Tribunal's misconception on the part of the Tribunal implied an over assessment of damages which amounts to about a half of the value established in the award.

By doing so, the Tribunal also failed to apply widely accepted standards in international law for the assessment of damages. The standard

---

[23]   July 11, 1998 was the date used by the Arbitral Tribunal as a reference point for comparison of values. Had the date been a week after that date there would have been a decrease in value of 46%.

[24]   November 30, 2001.

[25]   Metrogas Stock is listed on NYSE and information regarding daily transactions is available to the public.

for damages assessment in international law is that the value in capital of a given asset for the purpose of the compensation to be awarded resulting from an internationally wrongful act is to be estimated on the basis of the fair market value of the asset *immediately before the time at which the wrongful act occurs*, or at the time at which knowledge thereof is gained[26]

> This standard is explicitly contained in the World Bank Guidelines:
>
> > Compensation will be deemed "adequate" if it is based on the fair market value of the taken asset as such value is determined *immediately before the time at which the taking occurred* or the decision to take the asset became publicly known.[27]
> > ….

In sum, the fundamental concept for the valuation of the asset value in capital terms at the moment immediately before the measures, was  ignored by the BG Arbitral Tribunal. The adoption of a value other than the real value the investment had on the market at the moment immediately preceding the measures, is contrary to accepted legal standards on damages assessment.

The Tribunal's misconception, non-application of well-accepted international standards, and a discretionary and groundless selection of the dates to compare values, are more than a mathematical error or a material

---

[26]      Report of the International Law Commission on the the work of its fifty-third session. U.N. GAOR, 56° ses., sup. No. 10, Chapter. IV, ¶ 77, Articles on Responsibility of States for Internationally Wrongful Acts with Commentaries, commentary to Art. 36, ¶ 22 n.583, U.N. Doc A/56/10 (2001) (AL RA 183); *Guidelines on the Treatment of Foreign Direct Investment*, § IV.3, *in* 2 World Bank, Legal Framework  for the Treatment of Foreign Investment 33, 41 (1992).

[27]      Guidelines on the Treatment of Foreign Direct Investment, § IV.3, en 2 World Bank, Legal Framework for the Treatment of Foreign Investment 33, 41-42 (1992) (emphasis added).

miscalculation of figures. Not only is this a case of exceeding the tribunal's powers, but also one of violation of U.S. public policy.

In the United States of America, the general rule as to damages is that they are the actual damages suffered as of the time of the wrongful act or the taking (of property).  Actual pecuniary loss sustained as a direct result of the wrong is the measure to be applied in fixing damages. *Ainger v. Michigan General Corp.*476 F.Supp. 1209 S.D.N.Y., 1979, *American Fire & Cas. Co. v. Finn,*341 U.S. 6, 71 S.Ct. 534, U.S. 1951.

In cases of expropriation within the United States, the rule is plain. The amount due for private property expropriated for public purposes is its market value when taken. *The Texas Pipe Line Company v.  Alfred M. Barbe and Lucius L. Moss*, 85 So.2d 260, 229 La. 191 (1955).

Therefore, this Tribunal must refuse to enforce the award on the grounds that it exceeds the Tribunal's powers and a violates  U.S. public policy. In the <u>Laminoirs</u> case, the court refused to enforce a portion of the award that required

> the imposition of an additional 5% interest by the arbitrators in accordance with the French statute [since it] is penal rather than compensatory, and bears no reasonable relation to any damage resulting from delay in recovery of the sums awarded. Therefore, that portion of the award which purports to assets the rates of interest at 141/2% and 151/2% will not be enforced or recognized by this Court. 9 U.S.C.A. s 201, Art. V, par. 2(b), Convention on the Recognition and Enforcement of Foreign Arbitral Awards (*Trefileries-Cableries de Lens, S.A.* v. *Southwire Co.* and *Southwire Co.* v. *Laminoirs-Trefileries-Cableries de Lens, S.A.*, 484 F.Supp. 1063 1069 (1980).

In the present case, the Arbitral Tribunal held Argentina responsible, and even <u>punished</u> Argentina, for the effects of the economic crisis it suffered between 1998 and 2001. This is all the more serious because "[t]he collapse of the Argentine economy was one of the most spectacular in modern history." Paul Blustein, And The Money Kept Rolling In (And Out):  Wall Street, The IMF, And The Bankrupting Of Argentina 1 (Public Affairs 2005).   "The dramatic economic collapse in Argentina, culminating in 2002, resulted in the deepest political and economic crisis in generations.   Few countries have experienced such economically catastrophic events."  28   This is in blatant violation of U.S. public policy. Thus, recognition of the Arbitral Award must be refused.

## IV. CONCLUSION

For the foregoing reasons, Argentina respectfully requests that the Court rejects BG's Cross-Motion for Recognition and Enforcement of Arbitral Award.

Respectfully submitted,

---

28  Carlos G. Fernández Valdovinos, *Growth, Poverty, and Social Equity in Argentina*, World Bank Newsletter, November 2005. No. 82, *available at* http://siteresources.worldbank.org/INTENBREVE/Newsletters /20847679/82-NOV05-AR_Growth.pdf.  The Argentine crisis has been described as the "worst case scenario" in eight centuries of financial crises.  *See* Carmen M. Reinhart & Kenneth S. Rogoff, *This Time is Different: A Panoramic View of Eight Centuries of Financial Crises*, Abstract, April 16, 2000.

Dated:  June 30, 2010

Gleason & Koatz, LLP

By: /s/ John P. Gleason
        John P. Gleason

122 East 42nd Street, Suite 519
New York, New York
(212) 986-1544
Attorney for Petitioner