**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE REPUBLIC OF ARGENTINA )<br><br>)<br><br>)     Petitioner,<br>  -against-<br><br>BG GROUP PLC.<br>       Respondent. | **Civil Action No. 08-0485 (RBW)** |

THE REPUBLIC OF ARGENTINA )
                                                        )
                                                        )     **Civil Action No. 08-0485 (RBW)**
                                                        )
                                    Petitioner,     )
          -against-                               )
                                                        )
                                                        )
                                                        )
BG GROUP PLC.                           )
                        Respondent**.**     )
                                                        )
                                                        )
                                                        )
                                                        )

**REPLY SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES**
**OF PETITIONER**

Pursuant to this Court's Memorandum Opinion of June 7, 2010 (the "June 7 Order"), Argentina files this Reply Memorandum further explaining its reasons why the Court should refrain from confirming the arbitral award dated December 24, 2007 ("Award") pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").

## INTRODUCTION

By Petition dated March 20, 2008, Argentina sought to vacate the arbitral award granted in favor of respondent BG Group PLC ("BG"). The June 7 Order denied Argentina's petition. However, the Court granted Argentina permission to file a supplemental memorandum explaining its reasons why the Court should refrain from

1

confirming the Award pursuant to the New York Convention. In the Tribunal's Order and the Tribunal's Memorandum Opinion, both dated June 7, 2010, the Tribunal expressly gave Argentina the opportunity to submit a supplemental memorandum in respect of Articles V(1)(c) and V(2)(b) of the New York Convention.

BG Group mistakenly seeks to limit Argentina's defenses on recognition and enforcement under the New York Convention. In addition, BG breezily concludes that Argentina's public-policy argument fails because Argentina has not articulated any public policy violation.

## ARGUMENT

### I.    Grounds for non-recognition of the Award

Preliminarily, it must be pointed out that Argentina's defenses for refusing recognition and enforcement of the Award are made pursuant to the terms of the New York Convention — Article V — while Argentina's grounds for annulment were presented and argued pursuant the terms of the Federal Arbitration Act (FAA) — Section 10(a). Hence, the issues presented in Argentina's Supplemental Memorandum are certainly not the same as those decided in the June 7 Order, as alleged by BG.

Argentina's submissions opposing to the recognition and enforcement of the Award under the New York Convention do not refer to the issues already decided by this Court under the FAA. Even though some of the facts on which the present submissions are based are similar to the ones decided in the June 7 Order, the legal determination that the Court has to make is a different and independent one. This is why the Court's decision to afford Argentina an opportunity to brief certain grounds for opposing the recognition and enforcement under the New York Convention was not unnecessary, as BG would

have it.

Argentina now responds to a few other more specific points raised in BG's Memorandum of Points and Authorities of BG Group Plc in Opposition to Petitioner's Supplemental Memorandum ("Memorandum in Opposition").

Article V of the New York Convention provides as follows:

### *Article V*

1.    Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes
to the competent authority where the recognition and enforcement is sought, proof that:

*(a)* The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is
not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

*(b)* The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings
or was otherwise unable to present his case; or

*(c)* The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

*(d)* The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such
agreement, was not in accordance with the law of the country where the arbitration took place; or

3

*(e)* The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which,
or under the law of which, that award was made.

2.      Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and
enforcement is sought finds that:

*(a)* The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

*(b)* The recognition or enforcement of the award would be contrary to the public policy of that country.

BG recognized in its Memorandum in Opposition that there are seven defenses under the New York Convention (Memorandum in Opposition, at 4 (citing the *Telenor* case)). Accordingly, Argentina's arguments referring to  a) the complete disregard of the terms of the Parties' consent to arbitrate (in connection with the recourse to local courts) by the Award; b) the fact that the recognition and enforcement of the Award would be contrary to the public policy of the U.S. due to the derivative nature of BG's claim; and c) the fact of making Argentina pay damages not only for the consequences of measures it took but also for the reduction of the value of BG's investment prior to any measure taken by Argentina, were made pursuant to Article V(1)(c) and V(2)(b) of the New York Convention. These two grounds for refusing recognition and enforcement of the Award have been presented by Argentina in accordance with the Court's instructions.

Pursuant to Article V(1)(c) of the New York Convention ("excess of the arbitral tribunal's authority clause"), an award cannot be enforced if the tribunal rendered a decision that applies to matters beyond the scope of the agreement.

This ground for non-enforcement requires "a determination of what constitutes

the scope of the arbitration clause [and]...having determined the scope, it requires a determination of the matters that the parties have submitted to the resolution by the arbitral tribunal in question. The latter is also referred to as the tribunal's mandate [in the instant case the Argentina-U.K. BIT]" (A. Jan van den Berg, The New York Convention of 1958: An Overview, at 15).

Pursuant to Article V(2)(b) of the New York Convention ("public policy clause"), enforcement of an award may also be refused if such enforcement would be contrary to the public policy of the country where enforcement is sought.

BG alleges, without citing any authority in support, that "[i]t is patently obvious that an excess of authority argument under Article V(1)(c) of the New York Convention is not an argument under Article V(2)(b) of the New York Convention". If BG's argument means the obvious proposition that Article V(1)(c) and Article V(2)(b) are two different provision of the New York Convention, Argentina accepts it. But what Argentina certainly does not accept is that the same facts cannot give rise to a ground for refusing recognition under both provisions or that, for example, an excess of power by an arbitral tribunal cannot, in turn, make the recognition and enforcement of an award contrary to the public policy of the country where recognition and enforcement is sought.

BG further argues that the "public policy exception to recognition and enforcement in Article V(2)(b) of the New York Convention is 'to be construed narrowly'" (Memorial in Opposition, at 4); otherwise, BG adds, it would be contrary to the "emphatic federal policy in favor of arbitral dispute resolution" (Memorial in Opposition, at 6).

BG's statements in this respect disregard what the U.S. Supreme Court has clearly

and very recently affirmed:

> we have never held that this policy [in reference to the federal policy favoring arbitration] overrides the principle that a court may submit to arbitration 'only disputes…that the parties have agreed to submit ([T]he FAA's proarbitration policy does not operate without regard to the wishes of the contract parties. [...] We have applied the presumption favoring arbitration, in FAA and in labor cases, only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and…is legally enforceable and best construed to encompass the dispute. (*Granite Rock Co.* v. *Int'l. Brotherhood of Teamsters et al*, 561 U.S. ___ 12 (2010) (citations omitted)).

In its Memorandum in Opposition, BG does not respond to the substantial arguments made by Argentina, and limits itself to arguing that they are not proper grounds for refusing recognition under Article V(2)(b)  In fact, as to the substance of the arguments, BG  fails even to deny the existence of the rules affirmed by Argentina or state, not even briefly,  those rules that should be applied as to the substantive grounds.

## II.    **Application of the Ground for non-recognition of the Award**

### A.    **The Arbitral Tribunal exceeded its authority**

Argentina's offer to arbitrate a dispute arising directly from an investment protected by the BIT was made under the condition that such dispute be submitted, before resorting to international arbitration, to the competent tribunals of Argentina. The use of the term "shall" in the Argentina-UK BIT leaves no doubt as to Argentina's consent; *i.e.* BG would have been able to have recourse to international arbitration *if* the following two requirements had been met: a) a period of eighteen months has elapsed from the time when the dispute was submitted to the competent tribunal of the Contracting Party in

6

whose territory the investment was made, Argentina in this case; and b) the aforementioned tribunal has not made a final decision, or even if it has, the Parties were still in dispute.

BG did not file a single complaint as regards its treaty claim or any other claim with the Argentine courts, as it was required to do by the agreement to arbitrate.

Even though the Tribunal agreed with Argentina that as a matter of treaty law, investors acting under the Argentina-UK BIT must litigate in the host State's courts for 18 months before they can bring their claims to arbitration,[1] it completely disregarded the clear terms of the Treaty, and decided to override those terms and to excuse BG from abiding by the terms of the very Treaty BG sought to enforce.

Thus, the Tribunal manifestly exceeded the authority granted to it by the Parties when disregarding the clear terms of the Parties' consent to arbitrate. "It falls to courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intention of the parties" (*Stolt-Nielsen S.A. et al* v. *AnimalFeeds Int'l. Corp.*, 559 U.S., 20). As affirmed by the U.S. Supreme Court, "arbitration is a matter of consent, not coercion" (*Id.*, 17) and, as that is precisely "the foundational FAA principle" (*Id.*, 20) — bearing in mind that the FAA has incorporated the New York Convention (Chapter 2 of the FAA).

It should be noted that Argentina is not arguing on this issue an error of interpretation on the part of the Tribunal as BG would have it. Argentina does not claim that the Tribunal should have interpreted the BIT in another way, but that it wholly disregarded the terms of the submission to arbitration - which required as noted the prior

---

[1]       Award, ¶ 146.

submission of the dispute to local courts - by asserting that BG's recourse to local courts would have been ineffective, when the record shows that BG did not submit its dispute to an Argentine court not even for a single day.

**B.     BG's derivative claims are contrary to U.S. law and violate U.S. public policy**

The Arbitral Tribunal expressly acknowledged that BG's claims are derivative, in the sense that they refer to measures applying to and alleged damages suffered not by BG (or at least not directly) but by a company — MetroGAS  in which BG indirectly held (and still holds) shares. The Tribunal also admitted that the Argentina-U.K. BIT (the instrument containing Argentina's consent to arbitrate) does not provide a mechanism for BG to bring claims derived from the License…BG does not have standing to seize this Tribunal with 'claims to money' and 'claims to performance', or to assert other rights, which it is not entitled to exercise directly."[2] However, it granted jurisdiction as to BG's derivative claim, which related to "its indirect shareholding in MetroGAS and GASA".[3]

Independently of the position under international law, derivative claims are against U.S. law. This point is not denied by BG, which also does not deny that BG's claim is a derivative claim (which in any event was expressly recognized by the Tribunal itself).

BG's position in this regard simply appears to be that derivative claims are against U.S. law but not against U.S. laws of such a fundamental nature as to implicate U.S. public policy. However, and even leaving aside BG's erroneous and unprecedented interpretation of *Karaha Bodas*, the fact remains that derivative claims are against some

---

2       *Id.* ¶ 214.
3       *Id.* ¶ 205.

of the most fundamental principles of U.S. law and therefore repugnant to U.S. public

policy. In particular, derivative claims severely affect the right to property of the

company in which the shareholder who is exercising the claim holds shares. Indeed, since

a shareholder has no direct right to the assets of the company, allowing it to receive

compensation for damages suffered by the company imports an expropriation by the

shareholder of property that belongs to the company (thereby indirectly affecting the right

to property of other stakeholders, such as for example the company's creditors). Further,

each of Argentina and the United States of America has affirmed that derivative claims

are proscribed by international law. In the words of the United States, as expressed in its

submission in the *Thunderbird NAFTA* case (which is the same as the one filed in the

*GAMI* case):

> Articles 1116 and 1117 provide separate jurisdictional bases and serve distinct functions. Article 1116 provides for claims for loss or damage incurred by an investor of a Party. Article 1117 addresses claims for loss or damage to an enterprise in the territory of the respondent State that is owned or controlled by an investor.
>
> The derivative right of action provided by Article 1117 is unavailable under customary international law for two reasons. First, it is well established that corporations have a legal existence separate from that of their shareholders. That a wrong done to the corporation also indirectly injures the shareholders does not in and of itself give the latter standing to bring a claim for compensation.
>
> Second, it is well established under customary international law that an international claim may not be asserted against a State on behalf of the State's own nationals.
>
> The NAFTA was drafted with this background in mind. The drafters of the NAFTA were aware of the difference between direct injury to an investor and injury to an investment. The drafters also recognized that investors often choose to carry out their investment activities in a State through a locally-incorporated entity. However, because of the customary international law principle of non-responsibility, customary international law remedies

were not available to remedy injuries to such locally-incorporated entities.

To address this situation, the drafters of Chapter Eleven created a derivative right of action under Article 1117 that derogates from customary international law. The language of the article provides that it can be exercised only in cases where "the enterprise [not the investor] has incurred loss or damage by reason of, or arising out of, the breach." Article 1117 thus addresses the situation where the alleged violation of Chapter Eleven causes loss or damage to a locally-organized enterprise.

Without Article 1117, the investor would be denied a remedy where a locally-organized enterprise that it owns or controls has suffered an injury, because the enterprise itself does not have standing to bring a claim against the respondent State. The inclusion of Article 1117 in the NAFTA remedies this problem without eliminating the distinction between direct and derivative injuries or altering the general principle that the corporation, as opposed to its individual shareholders, may alone take action on behalf of the corporation.[4]

In U.S. law, "[t]he general rule that corporations are distinct legal entities is well supported by jurisprudence and statute" (*Middleton* v. *Parish of Jefferson*, 707 So. 2d 454 456 (1998); *see also* (1 Fletcher Cyc. Corp. § 25, Chapter 2. The Corporate Entity or Personality (citing D*ole Food Co.* v. *Patrickson*, 538 US 468, 123 S Ct 1655, 155 L Ed 2d 643 (2003); *Cedric Kushner Promotions, Ltd.* v. *King*, 533 US 158, 121 S Ct 2087, 150 L Ed 2d 198 (2001); *American Capital Corp.* v. *F.D.I.C.*, 472 F3d 859 (CA Fed 2006). For an expanded analysis of this case, see 24 Fletcher Corp Law Adviser 12:13 (2006). *Pagan* v. *Calderon*, 448 F3d 16 (CA1 2006); *Southern California Federal Savings & Loan Ass'n* v. *U.S.*, 422 F3d 1319 (CA Fed 2005) (applying California law); *Potthoff* v. *Morin*, 245 F3d 710 (CA8 2001); *Audio Odyssey, LTD* v. *Brenton First National Bank*, 245 F3d 721 (CA8 2001); *LeBoeuf, Lamb, Greene & MacRae, L.L.P.* v.

---

[4]      *International Thunderbird Gaming Corp and the United Mexican States*. Submission of the United States of America. Arbitration under Chapter 11 of the North American Free Trade Agreement and UNCITRAL Arbitration Rules ¶¶ 4-9 available at http://www.state.gov/documents/organization/32819.pdf

*Worsham*, 185 F3d 61 (CA2 1999) (applying New York law); *Itofca, Inc.* v. *Hellhake*, 8 F3d 1202 (CA7 1993) (applying Illinois law); *Federal Deposit Ins. Corp.* v. *O'Melveny & Meyers*, 969 F2d 744 (CA9 1992); *United States* v. *VanDiviner*, 822 F2d 960 (CA10 1987); *Beck* v. *Consolidated Rail Corp.*, 394 F Supp 2d 632 (SD NY 2005) (applying New York law); *South Alabama Pigs, LLC* v. *Farmer Feeders*, Inc., 305 F Supp 2d 1252 (MD Ala 2004) (applying Alabama law); *Nobles* v. *Rural Community Insurance Services*, 303 F Supp 2d 1279 (MD Ala 2004) (applying Alabama law); *CBS, Inc.* v. *Henkin*, 803 F Supp 1426 (ND Ind 1992) (applying Indiana law); Boyle v. Jacor Communications, Inc., 799 F Supp 811 (SD Ohio 1992) (applying New York law); *Stamp* v. *Inamed*, 777 F Supp 623 (ND Ill 1991) (applying Illinois law), citing this treatise; *U.S.* v. *14.36 Acres of Land in McMullen County*, Texas, 252 F Supp 2d 361 (SD Tex 2002); *Porter* v. *Beloit Corp.*, 667 F Supp 367 (SD Miss 1987) (applying Mississippi law); *Alexander* v. *Internal Revenue Service*, 628 F Supp 433 (D Del 1985))). "The legal fiction of a separate corporate entity was designed to serve convenience and justice" (1 Fletcher Cyc. Corp. § 25, Chapter 2. The Corporate Entity or Personality (citing *LeBoeuf, Lamb, Greene & MacRae, L.L.P.* v. *Worsham*, 185 F3d 61 (CA2 1999) (applying New York law); *Puma Industrial Consulting, Inc.* v. *Daal Associates, Inc.*, 808 F2d 982 (CA2 1987)).

It is well established that a shareholder does not have an individual cause of action against third parties for wrongs or injuries to the corporation in which he or she holds stock, even if he or she suffers harm from the damage to the corporation, such as a reduction in the value of his or her stock.[5] BG's derivative claims affect the very basic property rights of the companies in which BG has shares and its stakeholders that, in turn, also affects explicit U.S. public policy standards.

---

[5]     Richard A. Mann, Barry S. Roberts, Smith and Roberson's Business Law 666 (2003).

Moreover, BG's misleading assertions on Argentina's position are wrong. First, public policy grounds for non-recognition of an award do refer to those laws that are well defined and dominant (*Karen Maritime Ltd.* v. *Omar Int'l. Inc.*, 322 F.Supp.2d 224 (2004)); indeed, reference is made not only to federal U.S. law but also to the laws of the several states (*See Telenor Mobile Communications AS* v. *Storm LL.C.*, 524 F.Supp.2d 332 357 (considering New York law; *see also Black* v. *Cutter Laboratories*, 43 Cal.2d 788 799; *Interinsurance Exchange of Auto. Club of Southern Cal.* v. *Bailes*, 219 Cal.App.2d 830 836). Second, the U.S. Supreme Court has stated that it has never held that the federal policy favoring arbitration "overrides the principle that a court may submit to arbitration 'only disputes…that the parties have agreed to submit ([T]he FAA's proarbitration policy does not operate without regard to the wishes of the contract parties" (Granite Rock Co. v. Int'l. Brotherhood of Teamsters et al, 561 U.S. ___ 12 (2010) (citations omitted).

Additionally, BG argues that even if this Court were to be "empowered to undertake a merits review of the Tribunal's Award, and…found that the Tribunal did commit an error of law in permitting BG to maintain a 'derivative claim,' this still would not be grounds to refuse to recognize the Award under the New York Convention [since a] mere error of law by the Tribunal…does not give rise to a violation of [U.S. public policy]" (Memorandum in Opposition, at 8). Argentina agrees that, for an award to be in manifest disregard of the law, there must be "more than error or misunderstanding with respect to the law" (Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir.1986)).  However, the Award does not contain mere errors of law but essential and crucial errors, which not only are grounds for vacating the Award but also,

and independently, grounds for non-recognition under US law.


**C.      The decision on damages makes Argentina compensate BG for the consequences of the deterioration of the macroeconomic conditions before Argentina adopted the measures at issue. This constitutes an excess of the Tribunal's powers and a violation of the U.S. public policy**

BG does not respond to Argentina's assertion that the Tribunal found Argentine liable and condemned it to pay BG for the consequences of the 2001 macroeconomic crisis. BG tries to convince the Court that Argentina has a problem with the "method" the Tribunal applied to calculate damages, but this is not so. Argentina's position is that the award makes Argentina pay compensation not only for the measures it took to address the crisis, but also for the consequences of the crisis itself – which has been described as one of the more severe crisis in the world's economic history- which occurred *before* the measures were taken.

At most, BG only referred to certain details in an effort to minimize the relevance of the manifest error  committed by the Tribunal and argued in the abstract that (i) Argentina has not shown the existence of a rule reflecting that the general standard of compensation takes into account the fair market value immediately before the measures are adopted;  (ii) even if there were such general standard, there are exceptions to it;  and (iii) even if there were such a general standard and the present case did not fit into one of the exceptions, Argentina has not shown that the violation of that general standard amounts to a violation of U.S. public policy.

This is not a case of mere error, as BG argues; this is a case in which the Tribunal fully disregarded a well-accepted standard of compensation not only at the international

level but also at the U.S. level.

First, in accordance with the World Bank Guidelines, compensation is deemed adequate "if it is based on the fair market value of the taken asset as such value is determined immediately before the time at which the taking occurred or the decision to take the asset became publicly known".[6] Moreover, this requirement is consistent with the principles established by the Financial Accounting Standards Board (hereinafter, "FASB") —a body appointed by the Securities and Exchange Commission (SEC) with powers to issue accounting regulations in US—[7] to establish the value of assets published in financial statements:

> Definition of Fair Value: Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.8
> The discount rate used in the discount rate adjustment technique is derived from observed rates of return for comparable assets or liabilities that are traded in the market. Accordingly, the contractual, promised, or most likely cash flows are discounted at a rate that corresponds to an observed market rate associated with such conditional cash flows (market rate of return).[9]

This very same rule is derived from the reference in the Argentina-U.K BIT to the rule of compensation in case of expropriation (Article 5(1) of the Argentina-U.K. BIT).

---

[6]    Guidelines on the Treatment of Foreign Direct Investment, § IV.3, en 2 World Bank, Legal Framework for the Treatment of Foreign Investment 33, 41-42 (1992) (emphasis added).
[7]    See   About   FASB,   available   at http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495
[8]    FASB, Statement of Financial Accounting Standards No. 157, Fair Value Measurements, September   2006.   ¶   5,   available   at: http://www.fasb.org/cs/BlobServer?blobcol=urldata&blobtable=MungoBlobs&blobkey=id&blobwhere=1175818754924&blobheader=application%2Fpdf (Emphasis added).
[9]    FASB, Statement of Financial Accounting Standards No. 157, Fair Value Measurements, September   2006,   Appendix   B,   ¶   B7,   available   at: http://www.fasb.org/cs/BlobServer?blobcol=urldata&blobtable=MungoBlobs&blobkey=id&blobwhere=1175818754924&blobheader=application%2Fpdf (Emphasis added).

Also, this has been applied by the U.S. Supreme Court:

> A taking is a discrete event, a governmental acquisition of private property for which the state is required to provide just compensation. Like other transfers of property, it occurs at a particular time, that time being the moment when the relevant property interest is alienated from its owner. Precise specification of the moment a taking occurred and of the nature of the property interest taken is necessary in order to determine an appropriately compensatory remedy (*Anthony Palazzolo* v. *Rhode Island et al.*, 533 U.S. 606 639 (2001)[10].

There is a good reason for using the date immediately before the measures were taken as the measure of damages. To do otherwise can completely distort the damages calculation because between the chosen date and the date immediately before the measures were taken the value of the asset can undergo material changes unrelated to the impugned measures. This is precisely what happened in this case, where the Tribunal valued BG's shareholding as of 1998, at the peak of Argentina's economy, even though the measures were taken almost four years later, when the crisis was at its peak and the values of all assets had suffered dramatic reductions after 1998.

Second, the present case is not an exception to this rule. As described by BG, an exception is found when: a higher value is required to avoid injustice (Memorandum in Opposition, n. 4). This is somehow surprisingly considering that it was BG who requested its valuation experts in the arbitral proceeding to determine the impact of the measures "immediately before"[11] they were adopted and on the fair value "not more and

---

[10]     Moreover, U.S. courts have held that "[w]hile the initiation of condemnation proceedings…may have reduced the selling price of the land, impairment of the market value of property incident to otherwise legitimate governmental action ordinarily does not result in a taking" (*Kirby Forest Indus.* v. *United States*, 467 U. S. 1 (1984)).

[11]     Expert Valuation Report of Mr. Word Collins, Annex A, Letter of Instruction: "the loss in value should be measured "immediately before" the principal Measure of which BG complaints: Law 25,561 of 6 January 2002" (Annexed as Exhibit "A").

no less".[12] Therefore, it was BG which set the date for determining the value of the property immediately before the measures at stake, *i.e.* January 2002.

In addition, the exception referred to by BG in its Supplemental Memorandum (footnote 4) as regards the Restatement (First) of Restitution (1937) does not apply to the present case since that exception relates to a situation in which the value of the property fluctuates *after* —and not before— the measure was taken..

Finally, the Award violates U.S. public policy. The compensation method used by the Tribunal violates the Fifth Amendment to the United States Constitution ("nor shall private property be taken for public use, without just compensation"). The U.S. Supreme Court held that "just compensation" shall be calculated upon the "market value of the property at the time of the taking contemporaneously paid in money" (*United States* v. *50 Acres of Land*, 469 U. S. 24 (1984)). In fact, in the Acres of Land case, the  Supreme Court denied compensation for an amount higher than the market value immediately before the measures since it "found no basis for departing from the market value standard" (*Id.*).

In sum, the Award violates not only international standards but also U.S. public policy. Consequently, the Award cannot be recognized and enforced.

## CONCLUSION

For the foregoing reasons and the one described in Argentina's Supplemental Memorandum, Argentina respectfully requests that the Court rejects BG's Cross-Motion for Recognition and Enforcement of Arbitral Award pursuant the terms of the New York Convention.

---

[12]         *Id.*, "the loss in value should be the loss caused to BG´s investment in MetroGAS by the Measures (and not by other extraneous factors), no more and no less."

Dated:  July 30, 2010
         New York, New York

Gleason & Koatz, LLP

By: _/s/ *John P. Gleason*_
      John P. Gleason

122 East 42nd Street, Suite 519
New York, New York
(212) 986-1544
Attorney for Petitioner

# EXHIBIT A



## **Annex A    Letter of Instruction**



FRESHFIELDS BRUCKHAUS DERINGER
Avocats à la Cour

John Wood-Collins
Charles River Associates
1 Undershaft
London EC3A 8EE
United Kingdom

PARIS
2 rue Paul Cézanne
75008 Paris
T+ 33 1 44 56 44 56
Direct T+ 33 1 44 56 29 54 83
F+ 33 1 44 56 44 00/01/02/03
Direct F+
Palais J 007
E nigel.blackaby@freshfields.com
W freshfields.com
DOC ID PA478734
OUR REF NAB/SMN
YOUR REF
CLIENT MATTER NO. 100653-0010

2 January 2006

Dear Mr. Wood-Collins

### UNCITRAL Arbitration: BG Group plc. v. The Republic of Argentina

This is to confirm our instructions to you, as initially relayed to you in our meeting of
8 December 2004 and as supplemented in subsequent communications.

#### Introduction

As you know, our client, BG Group plc, (*BG*) owns a 45.1 % shareholding in MetroGAS
SA, an Argentine gas distribution company serving the greater Buenos Aires area. Part of
BG's shareholding (6.8%) is held directly and the remainder (38.3%) is held through its
54.7% shareholding in Gas Argentino SA (*GASA*), which has a 70% shareholding in
MetroGAS. MetroGAS is one of eight gas distribution companies in Argentina, operating
under a licence (the *Licence*) granted by the Republic of Argentina (*Argentina*), which runs
until 2027, extendable at MetroGAS's option, subject to certain conditions, for a further
10 years.

BG made its initial investment in MetroGAS in 1992, and its subsequent investments in
MetroGAS in 1994, 1995 and 1998, under the terms and conditions set out in the legal and
regulatory regime governing the privatisation of the gas industry and in the Licence (the
*Regulatory Framework*). However, as from 2000, Argentina has taken certain measures
with regard to the gas industry (the *Measures*), which have caused a significant loss in value
to BG's investment in MetroGAS.

As a result of these Measures, on 25 April 2003, BG instituted arbitral proceedings against
Argentina under the auspices of the United Nations Committee on International Trade (the



2|3

*UNCITRAL Arbitration*), pursuant to the Agreement between the UK and Argentina for the Promotion and Protection of Investments (the *Treaty*), claiming that the Measures are in breach of the Treaty, for which it is entitled to compensation.

On behalf of BG, we have instructed you to prepare an independent expert valuation of the loss in value of BG's investment in MetroGAS caused by the Measures for the purposes of the UNCITRAL Arbitration.  BG has been directed to submit its independent expert valuation report to the UNCITRAL Tribunal no later than 6 February 2006.

#### Background materials

For factual background, we attach as Exhibit I to this letter a note explaining the principal economic terms and conditions of the Regulatory Framework under which BG made its investment, and the principal Measures taken by Argentina, including Law 25,561 of 6 January 2002, which BG claims have breached the Treaty and caused a loss to its investment in MetroGAS.  We have also provided you with a copy of the Notice of Arbitration, dated 25 April 2003, the Statement of Claim, dated 7 February 2005, copies of relevant legal, regulatory and financial documents (including the documents which support the contents of Exhibit I) and other relevant economic data from BG and from MetroGAS. We ask that you attach to your report a list of all documents on which you rely.

#### Valuation guidelines

Pursuant to the Treaty and international law, your valuation of the loss caused to BG's investment in MetroGAS should reflect the following three fundamental principles.

(a)    the loss in value should reflect the difference in the "genuine value", that is, the fair market value, of BG's investment in MetroGAS at a certain point in time in two different scenarios (i) without the Measures; and (ii) with the Measures;

(b)    the loss in value should be measured "immediately before" the principal Measure of which BG complains: Law 25,561 of 6 January 2002. If, however, you determine that in order to calculate the *actual* loss in value caused to BG's investment in MetroGAS you should reflect events that have occurred since 6 January 2002, you are asked to adjust your analysis accordingly; and



3|3

(c)     the loss in value should be the loss *caused* to BG's investment in MetroGAS by the
        Measures (and not by other extraneous factors), no more and no less.

In your valuation, you should select the most appropriate method by which to value BG's
investment in MetroGAS in order to reflect these fundamental principles: this method should
be your base case. If, however, you determine that it is appropriate to consider other
methods of valuation in order to provide an objective comparison to your method of
valuation, you are asked to include an analysis of these other methods in your report.

You should also adjust the loss in value of BG's investment in MetroGAS to take into
account any part of that loss which might be borne by the creditors of GASA.

In addition to your valuation of the loss in the fair market value of BG's investment in
MetroGAS caused by the Measures, you are instructed to analyse the historical loss caused
to BG's investment in MetroGAS by the Measures from January 2002 to January 2006. In
order to do this, you are asked to analyse what free cashflow would have been available to
BG without the Measures, and to deduct from that any sum actually paid by MetroGAS to
BG in light of the Measures.

We also instruct you to advise us on an appropriate methodology for the calculation of
interest payable in respect of BG's loss, both pre- and post-award.

As the UNCITRAL Arbitration proceeds, we will provide you with copies of relevant legal
pleadings and documentation. We will also ask you to comment on Argentina's response to
your valuation, as well as any valuation presented by Argentina, and to be available to
provide testimony in the final hearing.

Yours sincerely

Nigel Blackaby/Sylvia Noury