# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
REPUBLIC OF ARGENTINA,                )
                                                    )
                          Plaintiff,             )
                                                    )
            v.                                     )            Civil Action No. 08-485 (RBW)
                                                    )
BG GROUP PLC,                             )
                                                    )
                          Defendant.          )
_____)

## MEMORANDUM OPINION

Currently before the Court is a cross-motion filed by respondent BG Group PLC ("BG Group") to confirm an arbitral award (the "Award") rendered in its favor and against petitioner Republic of Argentina ("Argentina") under the Federal Arbitration Act, 9 U.S.C. § 207 (2000) (the "FAA"), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, available at 1970 WL 104417 (the "New York Convention" or the "Convention"), which was ratified by Congress and codified at 9 U.S.C. §§ 201-08 (2000).  Cross-Motion for Recognition and Enforcement of Arbitral Award (the "Resp't's Cross-Mot.") at 1.  Argentina previously moved to vacate the Award under the FAA and the New York Convention, but the Court denied that relief in a memorandum opinion and order issued on June 7, 2010.  Republic of Argentina v. BG Group, 715 F. Supp. 2d 108, 126 (D.D.C. 2010) (Walton, J.).  The Court held a hearing on September 28, 2010, as to the merits of the motion currently before the Court, at which time the Court issued an oral ruling granting the cross-motion and informed the parties that it would memorialize its rationale and ruling

1

thereafter.  Hearing Transcript ("Tr.") 48:17-21, Sept. 28, 2010.  This memorandum opinion represents the Court's adherence to that promise.

## I.  Background

Many of the facts germane to the issues confronting the Court in this case have already been set forth in the June 7, 2010 memorandum opinion, but in the interest of providing the factual background necessary to understanding the Court's legal analysis below, those facts will be revisited here.[1]  On December 11, 1990, Argentina and the United Kingdom entered into the Agreement for the Promotion and Protection of Investments, Arg.-U.K., Dec. 11, 1990, 1765 U.N.T.S. 33 ("Investment Treaty"), the purpose of which was to promote foreign investment between these two nations.  Resp't's Cross-Mot. at 1; Pet'r's Pet. ¶ 13.  Similar to other bilateral investment treaties entered into around the same period, the Investment Treaty was designed to ensure foreign investors that they would be treated fairly and equitably, to provide them with "full protection and security," and to restrict the host country "from expropriating the assets of such investors without just compensation."  Resp't's Cross-Mot. at 1.  To address any disputes arising from these investments, Argentina and the United Kingdom agreed to a two-tiered system

---

[1]  The Court considered the following documents in reaching its decision: (1) Argentina's Petition to Vacate or Modify Arbitration Award (the "Pet'r's Pet."); (2) the Memorandum of Points and Authorities of BG Group PLC in Opposition to Motion to Vacate and in Support of Cross Motion for Recognition and Enforcement and for a Pre-Judgment Bond (the "Resp't's Cross-Mot."); (3) Argentina's Memorandum of Points and Authorities in Reply to Respondent's Opposition to the Motion to Vacate or Modify Arbitration Award and in Opposition to Respondent's Cross-Motions for Confirmation of the Award and For a Pre-Judgment Bond (the "Pet'r's Reply"); (4) BG Group's Memorandum of Points and Authorities in Reply to Petitioner's Opposition to Respondent's Cross-Motion for Recognition and Enforcement and for a Pre-Judgment Bond (the "Resp't's Reply"); (5) BG Group's Supplemental Memorandum of Law in Support of Respondent's Motion for Pre-Judgment Bond (the "Resp't's Supp. Mem."); (6) Argentina's Supplemental Memorandum of Points with Regard to Posting a Bond (the "Pet'r's Supp. Mem."); (7) Argentina's Second Supplemental Memorandum of Points with Regard to Posting of Bond (the "Pet'r's 2d Supp. Mem."); (8) BG Group's Supplemental Memorandum of Law on the Applicability of the New York Convention (the "Resp't's 2d Supp. Mem."); (9) Argentina's Supplemental Memorandum Refusing Respondent's Request for a Pre-Judgment Bond (the "Pet'r's 3d Supp. Mem."); (10) BG Group's Supplemental Memorandum in Support of Respondent's Motion for a Pre-Judgment Bond (the "Resp't's 3d Supp. Mem."); (11) Argentina's June 30, 2010 Supplemental Memorandum (the "Pet'r's 4th Supp. Mem."); (12) BG Group's Reply Supplemental Memorandum of Points and Authorities of Petitioner (the "Resp't's 4th Supp. Mem."); and (13) the Reply Supplemental Memorandum of Points and Authorities of Petitioner.

of dispute resolution in which the dispute could be submitted to a "competent tribunal" of the country "in whose territory the investment was made," after which the matter could be referred to arbitration under certain conditions, or the dispute could be submitted directly to international arbitration.[2]  Investment Treaty, art. 8(2).

Also as part of its economic reforms, Argentina enacted several measures in an effort "to reduce inflation and the public deficit," including "privatization of certain state[-]owned companies in many sectors[,] including the gas transportation and distribution industry."  Pet'r's Pet. ¶ 15.  As part of these efforts, Argentina divided its gas transportation and distribution industry, Gas del Estado, Sociedad del Estado, into two transportation companies and eight distribution companies.  Id. ¶ 18.  BG Group, a United Kingdom company, invested in one of the eight gas distribution companies, MetroGAS, through a consortium of investors known as Gas Argentino, S.A.  Id. ¶ 20.  Eventually, BG Group acquired a 54.67% interest in Gas Argentino, S.A., which in turn owned 70% of MetroGAS.  Id. ¶¶ 20-21.

---

[2] Article 8(2) of the Investment Treaty provides for recourse to arbitration under the following circumstances:

> (a)  if one of the Parties so requests . . .:
>
> > (i) where, after a period of eighteen months has elapsed from the moment when the dispute was submitted to [a] competent tribunal of the [country] in whose territory the investment was made;
> >
> > (ii) where the final decision of the aforementioned tribunal has been made but the Parties are still in dispute;
>
> (b)  where the [Parties] have so agreed.

Furthermore, the Investment Treaty provides that "where the dispute is referred to international arbitration," the parties "may agree to refer the dispute either to: (a) the International Centre for the Settlement of Investment Disputes [(the "ICSID")] . . . or (b) an international arbitrator or ad hoc arbitration tribunal . . . under the Arbitration Rules of the United Nations Commission on International Trade Law [(the "UNCITRAL Rules")].  Award at 6 (citing Article 8(3)(a)-(b) of the Treaty).  Here, "[b]ecause the [p]arties failed to agree on submission of the dispute to [the ICSID], [BG Group] submitted the arbitration under [the UNCITRAL Rules]."  Id. at 7.

In 2001, after a period of exceptional economic growth, Argentina began to suffer an economic crisis. Pet'r's Pet. at 6-7. In its efforts to respond to this predicament, Argentina enacted an emergency law that took effect on January 6, 2002, which consisted of several measures that, according to BG Group, negatively impacted its investment in MetroGAS. Id.; Respt't's Cross-Mot. at 2. As a result, BG Group initiated international arbitration proceedings on April 25, 2003, under Article 8 of the Investment Treaty,[3] Respt't's Cross-Mot. at 2; Pet'r's Pet. ¶ 6, arguing that Argentina's promulgation of these emergency measures violated Article 5 of the Investment Treaty "by expropriating BG[ Group's] . . . shareholding in GASA and MetroGas and, alternatively, . . . [its] rights under or related to the MetroGAS License," Award ¶ 85(a), as well as Article 2(2) of Investment Treaty "by failing to provide BG[ Group] fair and equitable treatment and protection and security, . . . by taking unreasonable and discriminatory measures, [and] by failing to observe obligations entered into with regard to BG[ Group's] Investments," id. ¶ 85(b).

An arbitral panel commenced proceedings in New York and Washington, D.C. beginning in July of 2006. Pet'r's Pet. ¶ 4. On December 24, 2007, the arbitral panel issued a decision in which it rejected BG Group's contention that Argentina breached Section 5 of the Investment Treaty, Award ¶ 269, concluding that there had been no expropriation of BG Group's investment in MetroGAS because "the impact of Argentina's measures [was] not . . . permanent on the value of BG[ Group's] shareholding in MetroGAS," and that "MetroGAS'[s] business never halted, continues to operate, and has an asset base which is recovering," id. ¶ 270. The panel concluded, however, that Argentina breached Article 2(2) of the Investment Treaty by "fundamentally

---

[3] Over 25 foreign investors initiated arbitration against Argentina claiming violation of bilateral investment treaties as a result of the emergency law's impact. Respt't's Opp'n at 2.

modif[ying] the investment [r]egulatory [f]ramework," <u>id.</u> ¶ 310, and "unilaterally withdr[a]w[ing] commitments which induced BG [Group] to make its investment in Argentina," <u>id.</u> ¶ 343.

With regards to assessing the amount of damages owed by Argentina for its breach of Article 2(2), the arbitral panel applied the standard for reparations set forth in <u>Case Concerning the Factory at Charzow</u> (Ger. v. Pol.), 1928 P.C.I.J. (ser. A) No. 17, <u>see</u> Award ¶ 429, which held that a party injured by a "breach of engagement" was entitled to "reparation [that], as far as possible, [would] wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if the act had not been committed," <u>id.</u> ¶ 425. Applied to this case, the arbitral panel concluded that BG Group was entitled to damages equivalent to the fair market value of its "investment in MetroGAS immediately before and after promulgation of the [emergency measures]," <u>id.</u> ¶ 438; <u>see also</u> <u>id.</u> ¶ 443 (calculating damages based on the difference between the fair market value of BG Group's investment prior to enactment of the emergency measures and the value of the investment while the measures were in place). On this point, BG Group presented an expert witness, John Wood-Collins, who concluded that the value of BG Group's investment prior to the enactment of the emergency measures was $239,400,000, while the value of the investment after the measures were implemented was $1,300,000. <u>Id.</u> ¶ 438. Mr. Wood-Collins's position, therefore, was that BG Group was entitled to $238,100,000 in damages. <u>Id.</u>

The arbitral panel rejected Mr. Wood-Collin's figures, concluding that his findings led "to a result [that] is uncertain and speculative." <u>Id.</u> ¶ 439. The panel then calculated the damages in this case by relying on two transactions involving the sale of shares in MetroGAS and Gas Argentino, S.A. <u>Id.</u> ¶ 443. First, the panel reviewed a transaction that took place after

the promulgation of the emergency measures, in which BG Group relinquished part of its interest in MetroGAS (through Gas Argentino, S.A.) in exchange for a debt write-off, and concluded that the value of BG Group's investment at that time was $91,825.244.15.  Id. ¶ 440.  Second, the panel analyzed a transaction in which the sale of a minority stake in Gas Argentino, S.A., reflected a value of $277,110,730 for BG Group's shares in MetroGAS.  Id. ¶¶ 441-42. Considering the difference between these two values, the arbitral panel concluded that the damage to BG Group's investment as a result of Argentina's breach of Article 2(2) was $185,285,485.85.  Id. ¶ 443.  The arbitral panel also concluded that BG Group was entitled to interest, id. ¶ 467(5), costs for the arbitration, id. ¶ 467(6), and attorneys' fees, id. ¶ 467(7).

On March 21, 2008, Argentina filed in this Court its petition to vacate or modify the Award under 9 U.S.C. §§ 10-11 and Article V(1)(e) of the New York Convention, see Pet'r's Pet. ¶¶ 3-5 (relying on the FAA and New York Convention to vacate or modify the Award), to which BG Group responded with its own motion to have the Award confirmed pursuant to 9 U.S.C. § 9 and Article IV of the Convention, Resp't's Cross-Mot. at 36.  On June 7, 2010, this Court issued a memorandum opinion and order denying Argentina's petition to vacate the Award.  Republic of Argentina, 715 F. Supp. 2d at 126-27.  Specifically, the Court rejected Argentina's arguments that "the arbitral panel exceeded its authority under the Investment Treaty," that "the arbitral panel acted 'in manifest disregard of the law,'" that "there was 'evident partiality or corruption' on the part of one of the arbitrators on the panel," that "the Award was procured through corruption, fraud, or undue means," and that "the Award is disproportionate, unfair, and irrational."  Id. at 121.  As to BG Group's cross-motion to confirm the Award, the Court noted that Argentina did not set forth its reasons as to why confirmation should be denied; rather, Argentina expressly reserved weighing in on the matter pending further briefing on the

issue "'considering the serious violations of public policy' allegedly committed by the arbitral panel." Id. at 126 (quoting Pet'r's Reply at 22). Despite the fact "that Argentina could have (and should have) set forth . . . the basis for [denying confirmation] on public policy grounds," the Court granted Argentina leave to file a supplemental memorandum on the issue of whether the Court should deny confirmation of the Award under Article V(2)(b) of the New York Convention.[4] Id.

Argentina then filed its supplemental memorandum in support of denying confirmation of the Award on June 30, 2010, relying on Article V(1)(c) of the New York Convention, which states that the Court may deny recognition of an arbitral award "when the award deals with a difference . . . not falling within the terms of the submission to arbitration," in addition to Article V(2)(b). Specifically, Argentina asserts that (1) "[t]he [a]rbitral [t]ribunal exceeded its powers in permitting BG [Group] to arbitrate its claims in blatant disregard of the [p]arties' agreement to arbitrate," Pet'r's 3d Supp. Mem. at 12; (2) the arbitral panel's decision to allow BG Group to bring a claim for "alleged damages suffered . . . by . . . MetroGAS [] in which BG [Group] held . . . shares," id. at 13, "is contrary to the public policy of the United States," id. at 16; and (3) the arbitral panel's reliance on a 1998 transaction in determining the fair market value of MetroGAS

---

[4] In its prior opinion, the Court imprecisely framed the present issue as "whether vacatur is appropriate under Article V(b)(2) of the New York Convention," Republic of Argentina, 715 F. Supp. 2d at 126, rather than whether the Court should confirm the Award. A proceeding to vacate or modify an arbitral award is distinguishable from one to confirm an award; in point of fact, the purpose of a proceeding to vacate an arbitral award, which can only be held in "the country in which, or under the [arbitration] law of which, [an] award is made," is to render the award unenforceable in any other nation that is a party to the New York Convention, see TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 935-36 (D.C. Cir. 2007) (quoting New York Convention, art. V(1)(e)) (concluding that a "principal precept of the New York Convention" is that "an arbitration award does not exist to be enforced in other Contracting States if it has been lawfully 'set aside' by a competent authority in [the country in] which the award was made"), while a proceeding to confirm an award, which can be held in any other signatory state to the New York Convention, concerns whether an arbitral award—even one that has not been 'set aside' by a competent authority—should nonetheless be enforced in that particular state, see Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 364 F.3d 274, 287 (5th Cir. 2004) (observing that the issue confronting countries "where recognition and enforcement are sought" is "whether that state should enforce the arbitral award").

in 2001, see id. at 18, is an excessive use of its powers and, moreover, contravenes settled United States public policy because the calculation of actual damages must take into account the injury "suffered as of the time of the wrongful act or the taking []of property[]," id. at 22.  Additionally, Argentina argued at the September 28, 2010 hearing that the arbitral panel's decision to arbitrate BG Group's claims also violated the public policy of the United States.  See Tr. 8:20-21:15, Sept. 28, 2010.

Not surprisingly, BG Group urges the Court to reject all of these arguments.  BG Group asserts that Argentina's attack on the Award as having been made in excess of the arbitral panel's authority "have already been dismissed by the Court," Resp't's 4th Supp. Mem. at 3.  As for Argentina's public policy arguments, BG Group contends that Argentina's position is unmeritorious because it has failed to identify any fundamental public policy that implicates "this country's 'most basic notions of morality and justice.'"  Id. at 7.

## II.  Standard of Review

Pursuant to 9 U.S.C. § 207, the Court is required to "confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention."  Those specified grounds can be found under Article V of the Convention.  Specifically, Article V(1) authorizes the Court to deny confirmation of the arbitral award under the following circumstances:

> (a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

> (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

  (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

  (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

  (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

Furthermore, Article V(2) of the Convention provides the Court with two additional grounds for denying recognition of an arbitral award:

  (a) The subject matter of the difference is not capable of settlement by arbitration under [United States] law . . . ; or

  (b) The recognition or enforcement of the award would be contrary to the public policy of [the United States].

As one federal circuit court has observed, "[t]here is now considerable case[]law holding that . . . the grounds for relief enumerated in Article V of the Convention are the <u>only</u> grounds available for [denying recognition or enforcement] of a [foreign] arbitral award." <u>Yusef Ahmed Alghanim & Sons v. Toys "R" Us, Inc.</u>, 126 F.3d 15, 20 (2d Cir. 1997) (emphasis added) (citing <u>M & C Corp. v. Erwin Behr GmbH & Co., KG</u>, 87 F.3d 844, 851 (6th Cir. 1996); <u>Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Industrial Y Comercial</u>, 745 F. Supp. 172, 181-82 (S.D.N.Y. 1990); <u>Brandeis Intsel Ltd. v. Calabrian Chems Corp.</u>, 656 F. Supp. 160, 167 (S.D.N.Y. 1987); and Albert Jan van den Berg, <u>The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation</u> 265 (1981)); <u>see also</u> <u>TermoRio</u>, 487 F.3d at 935 (D.C. Cir. 2007) (quoting <u>Yusuf</u>, 126 F.3d at 23) (concluding that where an enforcement action

is brought in a jurisdiction outside of where the arbitral award was rendered, "the state may refuse to enforce the award <u>only</u> on the grounds explicitly set forth in Article V of the Convention").   Given that the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature.  <u>See, e.g.</u>, <u>Zeiler v. Deitsch</u>, 500 F.3d 157, 169 (2d Cir. 2007) ("Confirmation under the Convention is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm.").   "[T]he showing required to avoid summary confirmation is high," <u>Ottley v. Schwartzberg</u>, 819 F.2d 373, 376 (2d Cir. 1987), and the burden of establishing the requisite factual predicate to deny confirmation of an arbitral award rests with the party resisting confirmation, <u>Imperial Ethiopian Gov't v. Baruch-Foster Corp.</u>, 535 F.2d 334, 336 (5th Cir. 1976); <u>see also</u> New York Convention, art. V ("Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes [proof] to the competent authority where the recognition and enforcement is sought . . . .").

The Court also must remain mindful of the principle that "judicial review of arbitral awards is extremely limited," and that this Court "do[es] not sit to hear claims of factual or legal error by an arbitrator" in the same manner that an appeals court would review the decision of a lower court.  <u>Teamsters Local Union No. 61 v. United Parcel Serv., Inc.</u>, 272 F.3d 600, 604 (D.C. Cir. 2001) (quoting <u>Kanuth v. Prescott, Ball & Turben, Inc.</u>, 949 F.2d 1175, 1178 (D.C. Cir. 1991)).   In fact, careful scrutiny of an arbitrator's decision would frustrate the FAA's "emphatic federal policy in favor of arbitral dispute resolution," <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 631 (1985) (internal citation omitted)—a policy

that "applies with special force in the field of international commerce," id.—by "undermining the goals of arbitration, namely, settling disputes efficiently and avoiding lengthy and expensive litigation," LaPrade v. Kidder, Peabody & Co., 94 F. Supp. 2d 2, 4-5 (D.D.C. 2000) (Sullivan, J.), aff'd 246 F.3d 702 (D.C. Cir. 2001).  Instead, "a court must confirm an arbitration award where some colorable support for the award can be gleaned from the record."  Id.

### III.  Legal Analysis

As the Court noted in its prior memorandum opinion, "[t]he remaining question in this matter . . . is whether the Court should grant BG Group's cross-motion to confirm the Award." Republic of Argentina, 715 F. Supp. 2d at 126.  Argentina argues that the Award should not be confirmed by the Court because (1) the arbitral panel "completely disregard[ed] the terms of the parties' agreement to submit to arbitration," Pet'r's 3d Supp. Mem. at 6; (2) the arbitral panel improperly allowed BG Group to present a "derivative" claim in contravention of United States and international law, see id. at 13-14; and (3) the arbitral panel improperly held Argentina "liable to pay compensation for the consequences of an economic crisis," id. at 17.  As to the first and third issues, Argentina argues that the arbitral panel exceeded its powers in reaching the conclusions that it did, see id. at 12, 22, and that as to all three issues, Argentina contends that recognition of the Award, given these alleged errors, would be contrary to the well-settled public policy of the United States, see id. at 16, 18; Tr. 8:20-21:15, Sept. 28, 2010.

As an initial matter, the Court has serious doubts about whether Article V(1)(c) of the New York Convention authorizes this Court to deny confirmation of the Award on the ground that the arbitral panel exceeded its powers.  Unlike Section 10(a)(4) of the FAA, which states that an award may be vacated "where the arbitrators exceeded their powers," Article V(1)(c) is not so broad; rather, Article V(1)(c) authorizes the Court to deny confirmation of an award if

"[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration."  See also Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier, 508 F.2d 969, 976 (2d Cir. 1974) (recognizing that Article V(1)(c) "tracks in more detailed form [Section] 10(d) of the Federal Arbitration Act . . . which authorizes vacating an award 'where the arbitrators exceeded their powers'" (emphasis added));[5] Mgmt. & Technical Consultants S.A. v. Parsons-Jurden Int'l Corp., 820 F.2d 1531, 1534 (9th Cir. 1987) ("[I]t is generally recognized that the [New York] Convention tracks the Federal Arbitration Act." (internal citation omitted)).  Put differently, a situation where an arbitrator "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration," New York Convention, art. V(1)(c), is just one "detailed" example of a broader category of acts that can be considered an excessive use of power by an arbitrator under Section 10(a)(4) of the FAA.  But arguably, it is only that specific scenario, not other actions that would be encompassed under Section 10(a)(4), that is covered under the New York Convention.  Indeed, where an arbitral award is issued by an arbitrator who exceeds his powers by acting in "manifest disregard of the law," see Comedy Club, Inc. v. Improv West Assocs., 553 F.3d 1277, 1281 (9th Cir. 2009) ("[A]n arbitrator's manifest disregard of the law remains a valid ground for vacatur of an arbitration award under [Section] 10(a)(4) of the [FAA]."),[6] at least one other court has found

---

[5] Section 10(d) of the FAA was re-designated as Section 10(a)(4) in 1990.  See, e.g., S. Rep. No. 101-543, at 24 (1990).

[6] In Hall Street Associates LLC v Mattel, Inc., 552 U.S. 576 (2008), the Supreme Court called into question the continuing viability of the "manifest disregard of the law" standard as a non-statutory basis for vacatur of an arbitral award.  See id. at 584 (concluding that Sections 10(a) and 11 of the FAA "provide the . . . exclusive grounds for expedited vacatur and modification" of an arbitral award); Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp., ___ U.S. ___, ___, 130 S. Ct. 1758, 1768 n.3 (2010) (declining to decide whether the "manifest disregard of the law" standard survived Hall Street Associates).  While the Ninth Circuit has continued to recognize the "manifest disregard of the law" standard after Hall Street Associates, see Comedy Club, 553 F.3d at 1281, the District of Columbia Circuit has
(continued . . .)

that such an award cannot be denied confirmation under Article V of the Convention,[7] see M & C Corp., 87 F.3d at 851 (concluding that "Article V of the [New York] Convention lists the exclusive grounds justifying refusal to recognize an arbitral award," and that "[t]hose grounds . . . do not include . . . manifest disregard of the law").  Thus, the plain language of Article V(1)(c) does not appear to have the far reach that Argentina desires.

Nonetheless, the Court need not conclusively decide whether Article V(1)(c) allows the Court to deny recognition of an arbitral award in every instance where an arbitration panel (or an individual arbitrator) exceeds its powers, because even assuming that Article V(1)(c) can be interpreted so broadly, the Court already concluded in its earlier memorandum opinion in this case that the arbitral panel did not exceed its powers during the course of the arbitration that is the subject of this case.  See Republic of Argentina, 715 F. Supp. 2d at 121.  While the Court previously examined the arbitral panel's exercise of power in the context of whether the Award should be vacated under Section 10(a)(4) of the FAA, see, e.g., id. at 121 ("Argentina asserts that the Court must vacate the Award under Section 10(a)(4) because, inter alia, the arbitral panel improperly 'permit[ed] BG [Group] to arbitrate its claims' before seeking recourse in the Argentine courts[,] . . . and . . . that the arbitral panel wrongfully rejected 'the discounted cash flow method' in calculating the amount of the Award" (internal citations omitted)), the fact that Argentina now relies on Article V(1)(c) of the New York Convention makes no difference.  The upshot of the Court's earlier opinion is that the arbitral panel did not exceed its powers, and that

_____

(. . . continued)

yet to address this issue, see Regnery Pub., Inc. v. Miniter, No. 09-7039, 2010 WL 1169843, at *1 (D.C. Cir. Mar. 17, 2010) (assuming, without deciding, that the "manifest disregard of the law" standard survived Hall Street Associates).

[7] In fact, this appears to be the exact argument that Argentina is pursuing here—not that the arbitrator resolved a dispute falling outside the scope of the arbitration, but that the panel deliberately ignored the terms of the Investment Treaty and applicable principles of international law.

conclusion has the same legal effect whether Argentina relies on Section 10(a) of the FAA, or Article V(1)(c) of the New York Convention.  And, because Argentina fails to provide any reason why the Court should revisit its prior ruling, Argentina's attempt to deny confirmation of the Award under Article V(1)(c) must be rejected.  See Lemmons v. Georgetown Univ. Hosp., 241 F.R.D. 15, 22 (D.D.C. 2007) (Walton, J.) (quoting Judicial Watch v. Dep't of Army, 466 F. Supp. 2d 112, 123 (D.D.C. 2006) (Urbina, J.)) ("[W]here litigants have once battled for the Court's decision, they should neither be required, nor without good reason permitted, to battle for it again.").

Turning to the issue of whether recognition of the Award would be contrary to the public policy of the United States, the Court finds it helpful to review some foundational and relevant legal principles in this regard.  "The public policy defense" under the New York Convention "is to be construed narrowly [and] applied only where enforcement would violate the forum state's most basic notions of morality and justice." TermoRio, 487 F.3d at 938 (quoting Karaha Bodas Co., 364 F.3d at 305-06).  More specifically, the Court's authority to deny recognition of an arbitral award under the New York Convention "is limited to situations where the contract as interpreted [by the arbitrators] would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."  Banco de Seguros Del Estado v. Mutual Marine Office, Inc., 344 F.3d 255, 264 (2d Cir. 2003) (emphasis added and alteration in original) (quoting United Paperworks Int'l Union v. Misco, Inc., 484 U.S. 29, 43 (1987)).  This does not mean, however, that an arbitral award may be denied confirmation simply because it violates some statute in existence in the United States.  As one court noted:

> All laws, be they procedural or substantive, are founded on strong policy considerations.  Yet not all laws represent this country's "most basic notions of

morality and justice."   Were it otherwise, the Convention's public policy exception would eviscerate the very goal of the Convention as a whole—to encourage the recognition and enforcement of commercial arbitration agreements.

A. Halcoussis Shipping Ltd. v. Golden Eagle Liberia Ltd., Civil Action No. 88-4500 (MJL), 1989 WL 115941, at *2 (S.D.N.Y. Sept. 27, 1989).   Given the public policy defense's narrow application, the burden of establishing that an arbitral award is contrary to public policy "is high, and infrequently met," Ackermann v. Levine, 788 F.2d 830, 841 (2d Cir. 1986); and "[o]nly in clear[]cases" should the party seeking to deny confirmation of an arbitral award prevail, Tahan v. Hodgson, 662 F.2d 862, 866 n.17 (D.C. Cir. 1981); see also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan, 190 F. Supp. 2d 936, 955 (S.D. Tex. 2001) ("Application of the public policy exception will succeed in only the narrowest of circumstances . . . .").   With these principles serving as the Court's touchstone, the Court turns to each of the contentions raised by Argentina in both its supplemental memorandum and at the September 28, 2010 hearing.

A. The Arbitrability of the Dispute

Argentina argues that the Court should deny confirmation of the arbitral award under Article V(b)(2) because it did not consent to arbitrate this dispute.   From Argentina's perspective, the Court must first "second guess" the arbitral panel's conclusion that this dispute was arbitrable, see Tr. 4:11-15, Sept. 28, 2010 ("THE COURT: But why should I question the [a]rbitration [p]anel's decision as to its authority to issue the arbitration award?   You're not suggesting I should second[-]guess that, are you?   MR. BOTTINI: Yes, Your Honor, we are saying that."), and instead adopt its interpretation that Argentina's consent to arbitrate this dispute rested on the condition that "the dispute had to be submitted for [eighteen] months to . . . an Argentine judge," id. at 5:5-7, id. at 7:15-18.   Then, Argentina urges the Court to find that because this condition was not met, it therefore did not consent to arbitrate this dispute, and thus

enforcement of the Award would contravene the principle that "arbitration of a particular dispute" is to occur only when "the parties agreed to arbitrate that dispute." Granite Rock Co. v. Int'l Brotherhood of Teamsters, ___ U.S. ___, ___, 130 S. Ct. 2847, 2856 (2010); see also Stolt-Nielsen, ___ U.S. at ___, 130 S. Ct. at 1773 (recognizing "the basic precept that arbitration 'is a matter of consent, not coercion'" (quoting Volt Information Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989)).

Argentina's analytical approach is flawed, however.  As the authorities cited above command, the Court is without authority to deviate from the arbitral panel's interpretation of the Investment Treaty in determining whether enforcement of the Award would contravene the public policy of the United States.  Rather, the Court must accept as correct the arbitral panel's construction of the Investment Treaty in determining whether the agreement violates public policy.  See Banco de Seguros Del Estado, 344 F.3d at 264 (quoting United Paperworks Int'l Union, 484 U.S. at 43) (holding that the question to be resolved on a challenge under Article V(2)(b) is whether "the contract as interpreted would violate some explicit public policy" (emphasis added)); cf. Nat'l R.R. Passenger Corp. v. Consol. Rail Corp., 892 F.2d 1066, 1070 (D.C. Cir. 1990) (quoting W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of America, 461 U.S. 757, 766 (1983)) (concluding in the context of the FAA that it is the duty of the courts to resolve "question[s] of public policy [that are] implicated under the contract as interpreted" (emphasis added)).  Besides, in a case such as this one, in which Argentina "acknowledge[s] that the [a]rbitral [panel] has the principal power to rule upon its jurisdiction,"[8] Tr. 4:2-3, Sept. 28, 2010, any extensive judicial review of

---

[8] To be sure, the issue of whether the parties in a dispute "have agreed to submit a particular dispute to arbitration" is one that is "typically an issue for judicial determination."  Granite Rock, ___ U.S. at ___, 130 S. Ct. at 2855 (internal quotation marks omitted).  Only where the record reflects a "clear and unmistakable" intention by the

(continued . . .)

the panel's interpretation of the Investment Treaty would be contrary to the Supreme Court's ruling in First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995).   There, the Supreme Court observed that where

> the parties agree[d] to submit the arbitrability question . . . to arbitration . . . . then the court's standard for reviewing the arbitrator's decision about that matter should not differ from the standard courts apply when they review any other matter that [the] parties have agreed to arbitrate . . . . That is to say, the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances[, e.g., Section 10 of the Federal Arbitration Act].

Id. at 943 (citing 9 U.S.C. § 10).   In other words, where the parties have conferred upon the arbitrator the authority to determine whether the dispute is arbitrable, then judicial review of that decision "is extremely limited," and this Court is without authority "to hear claims of factual or legal error by an arbitrator." Teamsters Local Union No. 61, 272 F.3d at 604 (quoting Kanuth, 949 F.2d at 1178).   Thus, it is the arbitral panel's interpretation of the Investment Treaty, and not Argentina's (or this Court's), that controls the Court's analysis.

Accepting, as it must, the arbitral panel's construction of the Investment Treaty, it is evident to the Court that Argentina was not compelled to arbitrate this dispute without its consent, and thus there was no violation of the principle set forth in Granite Rock.[9]   Here, the arbitral panel concluded that Article 8(2)(a)(i) of the Investment Treaty, as agreed to by both the United Kingdom and Argentina, allowed BG Group to submit its claim to arbitration without

---

(. . . continued)
parties to arbitrate arbitrability would that issue fall outside the reach of the courts.  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  Given Argentina's concession that the arbitral panel had the authority to rule on its own jurisdiction, however, the Court need not decide whether "clear and unmistakable evidence" exists in this case.

[9] Consequently, the Court finds it unnecessary to decide whether the issuance of an arbitral award, despite a finding by an arbitral panel (or individual arbitrator) that one or both of the parties did not consent to the arbitration, is one that contravenes this country's "most basic notions of morality and justice."  TermoRio, 487 F.3d at 928 (quoting Karaha Bodas Co., 364 F.3d at 305-06).

first seeking recourse before the Argentine courts.  See Award ¶ 157 ("The Tribunal . . . finds admissible the claims brought by BG [Group] in this arbitration . . . .").  Although the arbitral panel acknowledged that Article 8(2)(a)(i) requires claimants, as a general matter, to "litigate in the [Argentine] courts for [eighteen] months before they can bring their claims to arbitration," id. ¶ 146, it found that "[a]s a matter of treaty interpretation, . . . Article 8(2)(a)(i) cannot be construed as an absolute impediment to arbitration," id. ¶ 147.   This, the arbitral panel concluded, is because it must apply both the terms of the "treaty itself, [as well as] the applicable principles of international law," id. ¶ 90, and if Article 8(2)(a)(i) were read to require BG Group to seek relief before the Argentine courts even where Argentina passed measures that were essentially meant "to bar recourse to the courts," id. ¶ 148, that "interpretation would lead to the kind of absurd and unreasonable result proscribed by Article 32 of the Vienna Convention," id. ¶ 147 (emphasis added).[10]  Thus, the arbitral panel concluded that Article 8(2)(a)(i), when viewed in light of Article 32's directive to interpret treaty provisions to avoid an "absurd and unreasonable result," did not require recourse to the Argentine Courts for eighteen months as Argentina had made attempts "to unilaterally elude arbitration."  Id.  Based on that interpretation, therefore, it cannot be said that Argentina's participation in the arbitration was without its consent; to the contrary, the arbitral panel concluded that Article 8(2)(a)(i), as agreed to by Argentina, allows for direct recourse to arbitration.  Accordingly, enforcement of the Award does

---

[10] As the Court noted in Republic of Argentina, 715 F. Supp. 2d at 122:

> Article 32 of the Vienna Convention on the Law of Treaties, to which Argentina is a signatory, provides that "[r]ecourse may be had to supplementary means of interpretation" when standard means of treaty interpretation would "leave[ ] the meaning [of the provision] ambiguous or obscure[,] or ... lead[ ] to a result which is manifestly absurd or unreasonable." The arbitral panel was authorized, if not compelled, to resort to sources of international law in construing Article 8(2)(a)(i) of the Investment Treaty. See Investment Treaty, art. 8(4) (requiring "[t]he arbitral tribunal [to] decide the dispute in accordance with the provisions of [the Investment Treaty] and the applicable principles of international law").

not offend the notion that "[a]rbitration is strictly a matter of consent," <u>Granite Rock</u>, ___ U.S. at

___, 130 S. Ct. 2847, 2857, and thus the Court rejects Argentina's efforts to prevent confirmation

of the Award on this basis.

   B.   <u>BG Group's "Derivative" Claims</u>

   Next, Argentina argues that the arbitral panel's decision to allow BG Group to directly

proceed against Argentina on a "derivative claim[] . . . is contrary to the public policy of the

United States of America." Pet'r's Supp. Mem. at 16. Specifically, Argentina asserts that it was

MetroGAS that directly suffered harm as a result of the various measures enacted in 2002, <u>id.</u> at

13, and that any damages suffered by BG Group were limited to the decrease in the value of its

shares in Gas Argentino, S.A. and MetroGAS, <u>id.</u> at 12. Argentina further contends that it is

well-established in both international and United States jurisprudence that "a shareholder does

not have an individual cause of action against third parties for wrongs or injuries to the

corporation in which he or she holds stock," <u>id.</u> at 14, and that the adjudication of this claim by

the arbitral panel, therefore, violates this principle, <u>id.</u> at 16.

   The Court agrees with Argentina that, as a general matter, a shareholder cannot "maintain

a direct action when the alleged injury is inflicted on the corporation and the only injury to the

shareholder is the indirect harm which consists of the diminution in the value of his or her

shares." <u>Lapidus v. Hecht</u>, 232 F.3d 679, 683 (9th Cir. 2000); <u>see also</u> <u>Labovitz v. Washington

Times Corp.</u>, 172 F.3d 897, 902 (D.C. Cir. 1999) (recognizing the "general principle[] of

corporate law" that a shareholder "cannot recover on account of injury done to the corporation"

(internal quotation marks omitted)). But what Argentina fails to recognize is that there are

numerous exceptions to this rule, including where "a special contractual duty exists." <u>Nocula v.

UGS Corp.</u>, 520 F.3d 719, 726 (7th Cir. 2008); <u>see also</u> <u>Oliver v. Sealaska Corp.</u>, 192 F.3d 1220,

1226 (9th Cir. 1999) (recognizing that a direct action can be maintained by a shareholder where, inter alia, "there is a special duty, such as a contractual duty").  Moreover, such a duty can be owed to a third-party beneficiary to a contract, so long as "the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly."[11]  Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001).

These principles, when applied to the facts of this case, refute Argentina's argument that BG Group could not bring a direct action against it under the Investment Treaty.  There is no question that Argentina, as a "contracting party," directly owed BG Group, an "investor," the duty under the Investment Treaty to refrain from enacting "unreasonable or discriminatory measures" that would "impair . . . the management, maintenance, use, enjoyment, or disposal of investments in its territory."[12]  Investment Treaty, art. 2(2).  BG Group is, therefore, a third-party beneficiary under the Investment Treaty,[13] and the arbitral panel's decision to entertain BG

---

[11] The principles detailed in these cases are applicable in the present case because the Investment Treaty is at its very essence a contractual agreement between Argentina and the United Kingdom.  See, e.g., Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 253 (1984) ("A treaty is in the nature of a contract between nations").

[12] In fact, Argentina owed BG Group a litany of other duties under the Investment Treaty.  See Investment Treaty, art. 2(1) ("Each Contracting Party shall encourage and create favourable conditions for investors of the other Contracting Party to invest capital in its territory, and . . . shall admit such capital."); id., art. 3(1) ("Neither Contracting Party shall in its territory subject investments or returns of investors of the other Contracting Party to treatment less favourable than which it accords to investments or returns of its own investors or to investments or returns of investors of any third State."); id., art. 3(2) ("Neither Contracting Party shall in its territory subject investors of the other Contracting Party, as regards their management, maintenance, use, enjoyment[,] or disposal of their investments, to treatment less favourable than that which it accords to its own investors or to investors of any third State."); id., art. 4 ("Investors of one Contracting Party whose investments in the territory of the other Contracting Party suffer losses owing to . . . a state of national emergency . . . shall be accorded by the latter Contracting Party treatment . . . no less favourable than that which the latter Contracting Party accords to its own investors or to investors of any third State."); id., art. 5(1) ("Investments of investors of either Contracting Party shall not be nationalised, expropriated[,] or subjected to measures having [the same] effect . . . in the territory of the other Contracting Party except for a public purpose related to the internal needs of that Contracting Party on a non-discriminatory basis," and in such cases the investor "shall have a right . . . to prompt review[] by a judicial or other independent authority of that Contracting Party."); id., art. 6(1) ("Each Contracting Party shall in respect of investments guarantee to investors of the other Contracting Party the unrestricted transfer of their investments and returns to the country where they reside.").

[13] Although BG Group was not explicitly identified in the Investment Treaty as a beneficiary of the agreement, that is of no moment here.  See, e.g., Synovus Bank of Tampa Bay v. Valley Nat'l Bank, 487 F. Supp. 2d 360, 368

(continued . . .)

Group's direct action against Argentina for enacting "unreasonable [and] discriminatory measures" that "impair[ed]" BG Group's investment, Investment Treaty, art. 2(2); Award ¶ 413, is <u>consistent</u> with, rather than contrary to, well-settled principles of American jurisprudence.[14] As a consequence, the Court rejects Argentina's "derivative claim" argument.

   C.   <u>The Arbitral Panel's Damages Assessment</u>

   Finally, Argentina asserts that the arbitral panel's assessment of damages in this case is contrary to the public policy of the United States.  Pet'r's 3d Supp. Mem. at 17.   It is important to note here that, as far as the Court can tell, Argentina does not dispute the general rule applied by the arbitral panel in assessing the award of damages in this case, to wit, the difference in the value of BG Group's "investment in MetroGAS immediately before and after promulgation of the [emergency measures]," Award ¶ 438; <u>see also id.</u> ¶ 443 (calculating damages based on the difference between the value of BG Group's investment prior to enactment of the emergency measures and the value of the investment after Argentina's measures were in place).   What Argentina does take issue with is what it believes to be the arbitral panel's failure to assess the fair market value of BG Group's shares in MetroGAS as of the date when the emergency measures went into effect, Pet'r's 3d Supp. Mem. at 22, which was January 6, 2002, Pet'r's Pet. at 6-7; Respt't's Cross-Mot. at 2.  Specifically, Argentina argues that the arbitral panel should have appraised the value of BG Group's investment on "the day before the [emergency] measures" were taken, Tr. 17:7, Sept. 28, 2010, when the Argentine economy had already

_____

(. . . continued)
(S.D.N.Y. 2007) ("While the third-party beneficiary does not have to establish that it is explicitly mentioned in the contract, New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract.").

[14] Because the Court concludes that enforcement of the Award would not violate any general principle of corporate law recognized by the courts of this country, it need not resolve the question of whether enforcement of an arbitral award that would contravene this principle would be contrary to this country's "most basic notions of morality and justice." <u>TermoRio</u>, 487 F.3d at 928 (quoting <u>Karaha Bodas Co.</u>, 364 F.3d at 305-06).

collapsed, Pet'r's 3d Supp. Mem. at 18, instead of assessing "the value of BG[ Group's] stake in MetroGAS in 1998 . . . . when the Argentine economy was at its peak," id. at 18, by relying on the July 12, 1998 transaction involving the sale of Gas Argentino, S.A. shares, Award ¶ 441. Argentina asserts that the arbitral panel's valuation of BG Group's investment resulted in Argentina being "held responsible . . . for the effects of the economic crisis it suffered between 1998 and 2001," and thus the arbitral panel's ruling conflicts with both the principle that "[a]ctual pecuniary loss sustained as a direct result of the wrong is the measure to be applied in fixing damages," Pet'r's 3d Supp. at 22 (citing Ainger v. Michigan General Corp., 476 F. Supp. 1209, 1233 (S.D.N.Y. 1979)),[15] as well as the Fifth Amendment's guarantee of entitlement to only "just compensation" for the taking of property, see Tr. 15:21-25, Sept, 28, 2010 (asserting that "the guiding principle of just compensation and the [T]akings [C]lause of the Fifth Amendment is that the owner of the condemned property must be made whole[,] but is entitled to no more").

These arguments are without merit.  For starters, Argentina distorts the arbitral panel's reliance on the 1998 transaction.  At the onset of its analysis regarding Mr. Wood-Collins's damages assessment, the arbitral panel observed that he

a) assessed the loss in the fair market value of BG[ Group's] investment in MetroGAS as [of] January 2002; [and]

b) adjusted the result of (a) above to account for the part of the loss which might be borne by the creditors of [Gas Argentino, S.A.] and calculated BG[ Group's] "historical loss" for the period of January 2002 to December 2005.

---

[15] Argentina also cites American Fire & Casualty Co. v. Finn, 341 U.S. 6 (1951), as standing for the proposition that "[a]ctual pecuniary loss sustained as a direct result of the wrong is the measure to be applied in fixing damages." Pet'r's 3d Supp. at 22.  The case, however, has little, if anything, to do with the appropriate standard to be applied in calculating damages.  Rather, the issue confronting the Supreme Court in Finn was to determine what is "the proper federal rule to be followed on a motion by a defendant to vacate a United States District Court judgment, obtained by a plaintiff after removal from a state court by [a] defendant, and to remand the suit to state court." Finn, 341 U.S. at 7.

Award ¶ 430.   At no point in its analysis, however, did the arbitral panel take issue with Mr. Wood-Collins's conclusion that January 1, 2002, should be the starting point for measuring the loss in BG Group's investment.  Award ¶ 438.   Rather, the only concern expressed by the arbitral panel regarding Mr. Wood-Collin's assessment of the fair market value of BG Group's investment was that his figures were "uncertain and speculative."   Id. ¶ 439.   The panel concluded that the more "objective indication of the value of BG[ Group's] investment," id. ¶ 440, were actual transactions that reflected MetroGAS's fair market value, id. ¶ 443 (noting that the arbitral panel's calculation of damages was "based on actual transactions") (emphasis added)); specifically, the cancellation of debt totaling $38,200,000 "in exchange for an 18.8% interest in MetroGAS that took place after the enactment of Argentina's emergency measures, see id. (concluding that the "Ashmore/Marathon transaction . . . . provides an objective indication of the value of BG[ Group's] investment after the Emergency Law"), and the sale of a 25% interest in Gas Argentino, S.A. for $75,000,000, id. ¶ 442 (concluding that a 1998 transaction involving an interest in MetroGAS "is also a better proxy of the value of BG[ Group's] investment before promulgation of the Emergency Law").  It is not the case, therefore, that the arbitral panel found that July 12, 1998, was the appropriate date from which to measure the damages suffered by BG Group; instead, the panel agreed (albeit implicitly) with Mr. Wood-Collins that January 1, 2002, was the starting point for calculating the damages in this case, but in reaching this conclusion, it found that the value of MetroGAS's shares, as reflected by the July 12, 1998 transaction, was a "better proxy of the value of BG[ Group's] investment before promulgation of the [e]mergnecy [l]aw."  Award ¶ 442.

As a practical matter, this analytical distinction makes little difference because under the arbitral panel's calculus, its exclusive reliance on the July 12, 1998 transaction has the result of

equating the value of BG Group's investment in MetroGAS in 1998 with the value of that investment on January 1, 2002.  As a legal matter, however, this distinction is significant.  Had the arbitral panel concluded that July 12, 1998, was the correct starting point to measure the damages suffered by BG Group, even though the act that caused the injury—the promulgation of the emergency law—occurred on January 1, 2002, then Argentina would have a colorable argument that it is being held accountable for something more than just "the actual pecuniary loss sustained as a direct result of the wrong."  Ainger, 476 F. Supp. at 1233.  But, because the arbitral panel measured the fair market value of BG Group's investment in MetroGAS as of January 1, 2002, Argentina's challenge must not be directed at the date at which the panel measured the damages, but rather at the fact that the arbitral panel relied on the 1998 transaction to appraise the fair market value of BG Group's investment in MetroGAS in 2001.  Given that the employment of the "fair market value" standard "as a measuring device in the workaday world of business" does not include resorting to "the equivalent of a precise scientific formula," McDonald v. Comm'r, 764 F.2d 322, 330 (5th Cir. 1985); see also BMW of North America v. United States, 39 F. Supp. 2d 445, 447 (D.N.J. 1998) (observing that "the determination of 'fair market value' is not an exact science, and that reasonable persons . . . could reach different conclusions with respect to . . . 'fair market value'"); In re Air Vermont, Inc., 41 B.R. 486, 491 (Bankr. D. Vt. 1984) ("It is generally known that determination of the fair market value . . . by appraisal is not an exact science."), this value assessment "is necessarily one of fact to be determined by the evidence," Crawford v. Helvering, 70 F.2d 744, 745 (D.C. Cir. 1934) (per curiam).   And, in considering whether enforcement of the Award is contrary to public policy, the Court is without authority to conduct "an exercise in factfinding," United Paperworkers Int'l Union, 484 U.S. at 44, as "[t]he parties did not bargain for the facts to be found by a court, but by

an arbitrator chosen by them," id. at 45.  The Court, therefore, cannot second-guess the arbitral

panel's reliance on the 1998 transaction in determining the fair market value of BG Group's

investment in MetroGAS on January 1, 2002, and because the panel appraised the value of the

investment as of the date that Argentina enacted the emergency measures that ultimately caused

monetary harm to BG Group, the Court cannot conclude that enforcement of the Award would

contravene any principle in Ainger.[16]

Neither does the Award contravene the principle of "just compensation" as set forth in

the Fifth Amendment.  The Takings Clause of the Fifth Amendment "prohibits the government

from taking private property for public use without just compensation."  Palazzolo v. Rhode

Island, 533 U.S. 606, 617 (2001) (emphasis added).  For the Court to find that enforcement of the

Award would offend the policy of the "just compensation" mandate of the Fifth Amendment, the

Court would have to conclude (1) that there was a government taking; (2) that the taking was of

private property for public use; and (3) that the taking occurred without providing "just

compensation."  U.S. Const., amend. V.  It had been Argentina's position during the arbitration

proceeding, however, that no government expropriation occurred in this case.  See Award ¶ 252

("Argentina denied that any expropriation under Article 5 of the [Investment Treaty] has

occurred.").  Indeed, the arbitral panel sided with Argentina on this point, reasoning that "the

impact of Argentina's measures has not been permanent on the value of BG[ Group's]

shareholding in MetroGAS," as the "business never halted, continues to operate, and has an asset

base which is recovering."  Award ¶ 270.  Thus, enforcement of the Award cannot be said to be

---

[16] Finding no inconsistency between the arbitral panel's ruling and the principles set forth in Ainger, the Court need
not resolve the question of whether an arbitral award that imposes damages in excess of actual pecuniary loss would
be contrary to this country's "most basic notions of morality and justice."  TermoRio, 487 F.3d at 928 (quoting
Karaha Bodas Co., 364 F.3d at 305-06).

contrary to the Takings Clause when, as Argentina successfully demonstrated in the arbitration, there had been no improper government expropriation of BG Group's investment.[17]

To the extent Argentina is asserting that the arbitral panel's issuance of the Award itself violates the Takings Clause and contravenes the public policy of the United States, that position is also without merit.  Of course, the arbitral panel is not an arm of any government, and thus any decision rendered by it could not constitute a "government taking."  But even assuming that the arbitral panel, as a quasi-judicial body, see, e.g., Portland Gen. Elec. Co. v. U.S. Bank Trust Nat'l Assoc., 218 F.3d 1085, 1090 (9th Cir. 2000) (observing that an "arbitrator plays a quasi-judicial role" in conducting an arbitration), could be viewed as a governmental entity, the Supreme Court noted in Stop the Beach Renourishment, Inc. v. Florida Dep't of Environmental Protection, ___ U.S. ___, ___, 130 S. Ct. 2592, 2604 (2010), that no clear standard exists for what constitutes a "judicial taking, or indeed whether such a thing as a judicial taking even exists."  It cannot be said, therefore, that the arbitral panel's issuance of the Award was an act that "violate[d] some explicit public policy that is well defined and dominant."  Banco de Seguros Del Estado, 344 F.3d at 264 (quoting United Paperworkers Int'l Union, 484 U.S. at 43) (emphasis added).  Accordingly, if Argentina's position is that the issuance of the Award itself offends the Takings Clause and precludes confirmation of the Award, that argument also fails.

## IV.  Conclusion

"A judgment is unenforceable as against public policy to the extent that it is 'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'" Ackermann, 788 F.2d at 841 (quoting Tahan, 662 F.2d at 864).  Argentina's attempts to convince

---

[17] The Court takes no position on whether enforcement of an arbitral award that fails to comport with the Takings Clause would contravene this country's "most basic notions of morality and justice."  TermoRio, 487 F.3d at 928 (quoting Karaha Bodas Co., 364 F.3d at 305-06).

the Court to deny confirmation of the Award fall exceedingly short of this standard.  Indeed, Argentina failed to establish that the arbitral panel's interpretations of the Investment Treaty contravened <u>any</u> well-settled law or case precedent, let alone that its rulings were contrary to a principle so inextricably woven into the fabric of American jurisprudence to warrant this Court's intervention.  Having failed to meet "the showing required to avoid summary confirmation," <u>Ottley</u>, 819 F.2d at 376, the Court concludes that the Award must be confirmed, and that BG Group is entitled to damages of $185,285,485.85, along with interest, costs for the arbitration, and attorneys' fees.[18]

  **SO ORDERED** on this 21st day of January, 2011.[19]

REGGIE B. WALTON
United States District Judge

---

[18] According to BG Group's calculation, the total award including interest and attorneys' fees as of July 2010, was $233,344,409.91.  Resp't's 4th Supp. Mem., Ex. 1 (July 21, 2010 Declaration of Elliot Friedman) Ex. A. Presumably, BG Group will seek an award of interest that will include the time period between July 2010, and the date of the final order confirming the Award.  The parties, therefore, shall appear before the Court for a hearing at 2:00 p.m. on February 3, 2011, for the purpose of determining the appropriate amount of interest payments owed by Argentina to BG Group as of the date of the hearing.  An order to this effect will be issued contemporaneously with the issuance of this memorandum opinion.

[19] A final order will be issued at the conclusion of the February 3, 2011 hearing (1) granting BG Group's cross-motion to confirm the Award; (2) entering final judgment in favor of BG Group and against the Republic of Argentina in the amount of $185,285,485.85, plus an amount of interest to be determined at the February 3, 2011 hearing.